Nos. 17-15983 & 17-16142

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

CHARLES RIDGEWAY, *et al.*,

*Plaintiffs, Appellees, and Cross-Appellants*,

v.

WAL-MART STORES, INC.,

*Defendant, Appellant, and Cross-Appellee*.

On Appeal from the United States District Court
for the Northern District of California (Hon. Susan Illston)
No. 08-05221-SI

# APPELLANT'S PRINCIPAL BRIEF


RACHEL S. BRASS
JOSEPH A. GORMAN
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

JAMES H. HANSON
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, PC
10 West Market Street, Suite 1500
Indianapolis, IN 46204

THEODORE J. BOUTROUS, JR.
LAUREN M. BLAS
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520
tboutrous@gibsondunn.com

*Attorneys for Defendant, Appellant, Cross-Appellee Wal-Mart Stores, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies that Defendant-Appellant and Cross-Appellee Wal-Mart Stores, Inc. has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Dated: December 8, 2017

s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION..........................................................2

ISSUES PRESENTED................................................................................2

STATEMENT OF THE CASE...................................................................3

SUMMARY OF ARGUMENT ..................................................................18

STANDARD OF REVIEW .......................................................................20

ARGUMENT ..............................................................................................21

I. The Case Should Have Been Dismissed For Want Of An Article III Case Or Controversy ..........................................22

II. The Liability Judgment For Layovers, Rest Breaks, And Inspections Should Be Reversed ..........................................27

A. Plaintiffs Should Not Have Been Awarded Damages For Layovers ..........................................................27

1. Layovers Are Not Compensable As A Matter of Law ..........................................................28

2. The Court's Jury Instruction Incorporated An Erroneous Interpretation Of Wal-Mart's Layover Policy ..........................................................35

B. Plaintiffs Should Not Have Been Awarded Damages For Rest Breaks And Inspections ..........................................40

1. There Was No Violation Of The Minimum Wage Law ..........................................................40

2. The District Court Erred In Finding Wal-Mart's Pay Plans Unlawful, And So Instructing The Jury On Rest Breaks And Inspections ..................................44

III. The Court Erred In Excusing Compliance With Rule 23's Class Certification Prerequisites ....................................................... 46

A. The District Court Improperly Excused Plaintiffs From The Burden Of Proving A Class-Based Claim With Classwide Evidence ....................................................... 46

B. The Court Did Not Hold Plaintiffs To Their Burden Of Providing A Damages Model Tracking The Harms Actually Suffered By The Class ............................................... 56

CONCLUSION ........................................................................................ 58

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adair v. City of Kirkland*,
185 F.3d 1055 (9th Cir. 1999) .......................................................................42

*Aguilar v. Ass'n for Retarded Citizens*,
234 Cal. App. 3d 21 (1991) ...........................................................................33

*Am. Trucking Ass'ns v. City of Los Angeles*,
660 F.3d 384 (9th Cir. 2011) .........................................................................34

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946).....................................................................13, 21, 46, 54, 55

*Augustus v. ABM Sec. Servs., Inc.*,
2 Cal. 5th 257, 270 (2016) .............................................................................33

*Bono Enter., Inc. v. Bradshaw*,
32 Cal. App. 4th 968 (1995) ...................................................................32, 36, 37

*Brewer v. City of Napa*,
210 F.3d 1093 (9th Cir. 2000) .......................................................................21

*Brigham v. Eugene Water & Elec. Bd.*,
357 F.3d 931 (9th Cir. 2004) .....................................................................28, 29

*Brinker Rest. Corp. v. Superior Court*,
53 Cal. 4th 1004 (2012) ..............................................................................5, 6

*Brinker Rest. Corp. v. Superior Court*,
165 Cal. App. 4th 25 (2008) ...........................................................................4

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...............................................................................21, 52, 53

*Burnell v. Swift Transp. Co. of Ariz. LLC*,
2016 WL 2621616 (C.D. Cal. May 4, 2016)....................................................42

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016).................................................................................23, 25

*Cardenas v. McLane Foodservices, Inc.*,
796 F. Supp. 2d 1246 (C.D. Cal. 2011) ....................................................... 43

*Chao v. A-One Med. Srvs., Inc.*,
346 F.3d 908 (9th Cir. 2003) ....................................................... 21

*Cole v. CRST, Inc.*,
2012 WL 4479237 (C.D. Cal. Sept. 27, 2012) ....................................................... 42

*Coles v. Eagle*,
704 F.3d 624 (9th Cir. 2012) ....................................................... 46

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ....................................................... 52, 57

*Csaszi v. Sharp Healthcare*,
2003 WL 352422 (Cal. Ct. App. Feb. 18, 2003) ....................................................... 36

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ....................................................... 50

*Dilts v. Penske Logistics, LLC*,
769 F.3d 637 (9th Cir. 2014) ....................................................... 21, 34, 35

*Douglas v. Talk Am., Inc.*,
266 F.R.D. 464 (C.D. Cal. 2010) ....................................................... 26

*Douglas v. Xerox Bus. Servs., LLC*,
875 F.3d 884 (9th Cir. 2017) ....................................................... 20, 41, 42

*Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*,
498 F.3d 920 (9th Cir. 2007) ....................................................... 24

*In re Facebook Privacy Litig.*,
2015 WL 3640518 (N.D. Cal. June 11, 2015) ....................................................... 26

*Falcon v. Philips Elec. N. Am. Corp.*,
304 F. App'x 896 (2d Cir. 2008) ....................................................... 26

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ....................................................... 34

*Flores v. EP2, Inc.*,
2011 WL 13213898 (C.D. Cal. May 20, 2011)....................26

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....................22, 52

*Gibson v. Cty. of Riverside*,
181 F. Supp. 2d 1057 (C.D. Cal. 2002)....................51

*Glidden v. Chromalloy Am. Corp.*,
808 F.2d 621 (7th Cir. 1986)....................25

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
254 F.3d 825 (9th Cir. 2001)....................52

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981)....................27

*Harnish v. Widener Univ. Sch. of Law*,
833 F.3d 298 (3d Cir. 2016)....................48

*Harolds Stores, Inc. v. Dillard Dep't Stores*,
82 F.3d 1533 (10th Cir. 1996)....................51

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989)....................39

*Hatch v. Reliance Ins. Co.*,
758 F.2d 409 (9th Cir. 1985)....................26

*Hawkins v. Comparet-Cassani*,
251 F.3d 1230 (9th Cir. 2001)....................22

*L. Tarango Trucking v. Cty. of Contra Costa*,
181 F. Supp. 2d 1017 (N.D. Cal. 2001)....................48

*Lakeside-Scott v. Multnomah Cty.*,
556 F.3d 797 (9th Cir. 2009)....................21

*Lewis v. Casey*,
518 U.S. 343 (1996)....................48

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ....................................................................52

*Lyons v. Williams*,
91 F.3d 1308 (9th Cir. 1996) ....................................................................49

*McLaughlin v. Ho Fat Seto*,
850 F.2d 586 (9th Cir. 1988) ....................................................................54

*Medrano v. D'Arrigo Bros. Co. of Cal.*,
336 F. Supp. 2d 1053 (N.D. Cal. 2004)..........................................................41

*Mendiola v. CPS Sec. Soln's, Inc.*,
60 Cal. 4th 833 (2015) ............................................................................33

*Morillion v. Royal Packing Co.*,
22 Cal. 4th 575 (2000) ...................................................................32, 37, 38

*Nance v. May Trucking Co.*,
2014 WL 199136 (D. Or. Jan. 15, 2014)...........................................28, 29, 31

*Nance v. May Trucking Co.*,
685 F. App'x 602 (9th Cir. 2017) ...........................................19, 28, 29, 31

*O'Shea v. Littleton*,
414 U.S. 488 (1974)..................................................................................25

*Pavao v. Pagay*,
307 F.3d 915 (9th Cir. 2002) ....................................................................49

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) ..................................................................21

*Perez v. Sun Pac. Farming Coop., Inc.*,
2015 WL 3604165 (E.D. Cal. June 8, 2015) ...................................................45

*Pittsburgh Press Club v. United States*,
579 F.2d 751 (3d Cir. 1978) .....................................................................51

*Preiser v. Newkirk*,
422 U.S. 395 (1975)..................................................................................24

*Quezada v. Con-Way Freight, Inc.*,
2012 WL 2847609 (N.D. Cal. July 11, 2012) ............................................43, 44

*Reed v. Bowen*,
849 F.2d 1307 (10th Cir. 1988) ...................................................................25, 26

*Reinhardt v. Gemini Motor Transp.*,
869 F. Supp. 2d 1158 (E.D. Cal. 2012) .............................................................42

*Sable Commc'ns of Cal., Inc. v. FCC*,
827 F.2d 640 (9th Cir. 1987) ..........................................................................21

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)...........................................................................................57

*Smith v. Bayer Corp.*,
131 S. Ct. 2368 (2011).......................................................................................24

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016).......................................................................24, 55, 57

*Standard Fire Ins. Co. v. Knowles*,
133 S. Ct. 1345 (2013).......................................................................................24

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)........................................................ 25, 47, 48, 49, 50, 54

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982)...........................................................................................23

*Vaquero v. Stoneledge Furniture, LLC*,
9 Cal. App. 5th 98 (2017) .................................................................................45

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...................................................................24, 56, 57

*Warth v. Seldin*,
422 U.S. 490 (1975)...........................................................................................25

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000)...........................................................................................53

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) .....21

**Constitutional Provisions**

U.S. Const., art. III, § 2 .....23

**Statutes**

28 U.S.C. § 1291 .....2

28 U.S.C. § 1332 .....2

28 U.S.C. § 2072 .....24

49 U.S.C. § 14501 .....34

Cal. Lab. Code § 200 .....40

Cal. Lab. Code § 226.2 .....43, 56

Cal. Lab. Code § 1194 .....41

Cal. Vehicle Code § 23222 .....38

**Regulations**

29 C.F.R. § 785.41 .....29

49 C.F.R. § 392.5 .....38

49 C.F.R. § 392.60 .....38

49 C.F.R. § 393.76 .....6, 7, 9

49 C.F.R. § 395.1 .....30, 35

49 C.F.R. § 395.2 .....19, 30, 42

49 C.F.R. § 395.3 .....6, 29, 42

49 C.F.R. § 395.8 .....29, 30, 33, 56

8 Cal. Code Regs. § 11090....................................................................32

13 Cal. Code Regs. § 1201....................................................................19, 30, 33

13 Cal. Code Regs. § 1212.5....................................................................6, 29

13 Cal. Code Regs. § 1212....................................................................30, 33

13 Cal. Code Regs. § 1213....................................................................29

**Rules**

Fed. R. Evid. 702 ....................................................................51

**Other Authorities**

Federal Motor Carrier Safety Administration, Hours of Service of Drivers, 68 Fed. Reg. 22470 (Apr. 28, 2003)....................................................................35

## INTRODUCTION

This is a minimum wage case brought on behalf of a class of Wal-Mart-employed truck drivers who are among the highest paid in the industry—earning an average of $300 per day, up to $120,000 annually, and an effective hourly rate of $21. Nevertheless, due to a series of erroneous rulings before and at class certification, summary judgment, and trial, the class received a $54.6 million verdict that defies basic precepts of federal jurisdiction and common sense, and contravenes state and federal law. Plaintiffs recovered this sum when, four years after the lawsuit was filed as a failed meal and rest break case, no plaintiff remained to litigate it. The award includes lost wages for time spent resting and sleeping when state and federal law prohibit working, and wages for rest breaks that the drivers elected not to take.

The district court failed to remedy this absurd result at every turn. Rather than dismiss the lawsuit when no willing plaintiff remained and the controversy disappeared—as Article III requires—the court ordered Wal-Mart to produce employee lists so that Plaintiffs' lawyers could find new clients. Rather than halt the illogic of separately paying drivers for each task, no matter how *de minimis*, or paying drivers for time they are prohibited from working under federal law, the district court affirmatively instructed the jury that such time should be paid. And rather than decline to certify a class with highly dissimilar experiences, the court shifted the burden to Wal-Mart to *disprove* damages. Each of these errors warrants reversal.

## STATEMENT OF JURISDICTION

The district court originally had jurisdiction under 28 U.S.C. § 1332(d) because the putative class exceeded 100 members, including members with citizenship diverse from Wal-Mart, and the amount in controversy exceeded $5 million excluding interest, but lost jurisdiction once no actionable case or controversy remained. This Court has jurisdiction over this timely appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I. Whether the court lacked jurisdiction for want of an Article III case or controversy after the original four named plaintiffs abandoned it.

II. Whether the liability judgment should be reversed because the district court erred in concluding that—

A. Federally mandated 10-hour layover breaks are compensable; and

B. Wal-Mart did not compensate for rest breaks and inspections, even though drivers were paid the minimum wage or more for every hour worked.

III. Whether the court erred in certifying the class despite the lack of reliable, representative, common proof, and instead shifting the burden to Wal-Mart to disprove Plaintiffs' injury and damages.

## STATEMENT OF THE CASE

### A. Wal-Mart's Drivers And Activity-Based Pay System

Wal-Mart's fleet of long-haul truck drivers operates out of three California "distribution centers," which are used as hubs to distribute freight from Wal-Mart's vendors to stores throughout the western states. ER1287, ER1352-1353. Each driver's workday is different from the last, depending on his route, destinations, and driving conditions, as well as the driver's own preferences relating to breaks and hours of work. *See*, *e.g.*, ER1230, ER1235, ER1245.

For their work, Wal-Mart pays its drivers over $300 in average daily pay (ER438, ER472-473, ER616, ER639, ER656, ER677) and between $80,000 to $120,000 annually (ER404, ER422, ER473, ER651, ER624). That compensation "is among the highest in the trucking industry." ER74.

Drivers earn these industry-leading wages through Wal-Mart's comprehensive "activity-based pay" system that includes: (i) mileage pay, covering all miles driven (ER969, ER1430); (ii) "activity" pay, covering tasks that comprise that activity, such as an "Arrive" (covering the process involved in arriving at the facility), or a "Hook and Depart" (covering the steps taken to hook a new trailer to the truck and depart the location) (ER969); and (iii) hourly pay (at a rate of $14/hour) for time such as waiting for assignment at a distribution center, waiting at a weigh scale, or

attending meetings (ER973-977). Drivers also receive an automatic $42 inconvenience fee when they take a federally mandated 10-hour break (called a "layover") away from home. ER558; ER582-583. No conditions or restrictions are placed on the drivers' activities or location during that 10-hour period. ER977. This compensation system resulted in average earnings of over $21/hour, far exceeding the effective minimum wage during the class period (ER1045), and causing drivers to receive at least the minimum wage during each hour worked. ER907. For these and other reasons, Wal-Mart has far lower turnover than others in the trucking industry (ER74, ER407-408, ER626-627), and driving for Wal-Mart is one of the industry's most sought-after jobs (ER572, ER596, ER698-99).

### B. Four Wal-Mart Drivers File A Meal And Rest Break Lawsuit

Given Wal-Mart's lucrative and comprehensive driver-pay structure, it is unsurprising that this lawsuit originally had little to do with California's minimum-wage provisions. Four current and former Wal-Mart drivers filed a lawsuit on October 10, 2008, primarily alleging violations of California's meal and rest break laws, then an unresolved area of California law. ECF No. 1. Less than two weeks later, the California Supreme Court granted review of *Brinker Restaurant Corp. v. Superior Court*, 165 Cal. App. 4th 25 (2008), *petition for review granted*, 85 Cal. Rptr. 3d 688, to clarify the law in that area. At the parties' request, the trial court stayed this case pending the *Brinker* decision (ER1451), and lifted the stay in 2012

when the Supreme Court clarified that an employer need only make meal and rest breaks "available," but not "ensure" they are taken. *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012).

### C. The Original Plaintiffs Abandon This Lawsuit

After the stay was lifted, but years before any class was certified, Plaintiffs' counsel found themselves without even one plaintiff. ER1449. Two of the original plaintiffs had died, a third had "lost interest," and counsel no longer wanted the fourth to serve as a named plaintiff due to "'concerns' about [his] ability … to continue to adequately represent the class." *Id.*

Plaintiffs' counsel sought an order requiring Wal-Mart to produce its drivers' contact information for the express purpose of "determining the identity of new plaintiffs and Class representatives." ER1449. Wal-Mart objected that the requested relief was unprecedented and that, absent any case or controversy, the court lacked jurisdiction to order it. ER1438-1447. Citing no authority, and referencing only the "unique circumstances" of the three-year stipulated stay and the "significant passage of time" since the suit was filed, the court granted the motion and ordered Wal-Mart to provide the contact information. ER243. Wal-Mart complied. *See* ER73.

### D. The New Plaintiffs Recast The Lawsuit As A Minimum Wage Case

The newly solicited named plaintiffs filed an amended complaint—without any of the original named plaintiffs—recasting this matter as a minimum wage case

with a number of derivative and penalty claims. ER1400-1428. Their theory was *not* that Wal-Mart failed to pay drivers the minimum wage in any given pay period, day, or hour, but that Wal-Mart's activity-based compensation system did not pay drivers the minimum wage for (1) 10-hour layovers, (2) 10-minute rest breaks, and (3) performing a series of tasks inherent to truck driving, including truck inspections. *Id*.

1. Layovers are mandated by federal and California regulations which require all drivers to accurately record ten hours off-duty before driving or working anew. 49 C.F.R. § 395.3(a)(2); 13 Cal. Code Regs. § 1212.5(a). As noted, Wal-Mart pays a $42 inconvenience fee or "layover pay" because drivers typically take these layovers away from home. ER580-581. Many trucks (including Wal-Mart's) contain an industry-standard "sleeper berth," which serves as an accessible, inexpensive place to rest during the layover for long-haul truck drivers often far from home. ER956; 49 C.F.R. § 393.76(a)(1), (a)(2) (describing sleeper berth dimensions). Although these laws prohibit drivers from working at any point during the mandatory 10-hour break, Plaintiffs claimed this time was compensable, and sought the difference between the $42 and the minimum wage across all ten hours. ER1339, ER1423.

2. Plaintiffs also alleged that while Wal-Mart authorized drivers to take 10-minute rest breaks at any time, those breaks were not separately *paid* on a minute-by-minute basis under Wal-Mart's activity-based pay system. ER1336, ER1416.

3. Plaintiffs further alleged that Wal-Mart failed to pay for a series of twelve tasks inherent to truck driving, such as fueling, weighing, and inspecting the truck, completing paperwork, washing, meeting with a driver coordinator to discuss routes and deliveries, and waiting for freight. ER1335-1338, ER1406. Conceding that three tasks were properly compensated, Plaintiffs argued nine tasks to the jury, which ultimately awarded damages only for the twice-daily safety checks, called "pre- and post-trip inspections." ER915-916.

### E. The District Court Certifies A Class

Plaintiffs sought class certification on their minimum wage claims, contending they would "prove [c]lass-wide damages through common proof" by showing that Wal-Mart's driver pay manuals governed all drivers' work and that the challenged tasks were "highly repetitive, performed by [d]rivers on a daily basis[,] and subject to uniform regulation, policies and procedures." ER1382-1384. Plaintiffs represented to the court that the evidence they hoped to gather would show only "minor variation" in the amount of time "[d]rivers take to complete the tasks" and declared that "quantifying the time spent by [d]rivers performing the tasks presents an ideal opportunity to employ representative testimony." ER1384. Plaintiffs further asserted that because Wal-Mart kept "extensive daily activity and payroll data," "a damage analysis will be a straightforward process," but they did not explain how they would actually try their claims. *Id.*

Wal-Mart responded that because long-haul truck driving varied by day and by driver, Plaintiffs could not try or prove their claims on a classwide basis. ER1359-1373. Each day, each driver's route involved different tasks: A route through the Sierra Nevada Mountains "in the ice and snow" might involve installing "huge tire chains" (ER689), washing the slush off of the truck, and in some instances waiting while "stuck in a snowstorm," for which the drivers were paid "unscheduled time" (ER671), whereas a route in and around Los Angeles might involve "heavy traffic" and "congestion" for which drivers were compensated using a "regional pay code" (ER674-675). And of course, the length of all of those tasks would vary considerably based on weather, time of day, traffic, driver preferences, and other factors. ER898-903, ER1352-1358.

But the court shunted those concerns aside and certified a class to litigate the following "common" questions: "whether Wal-Mart's piece-rate plan violates California's minimum wage laws by failing to pay drivers minimum wage for all hours worked; whether Wal-Mart's drivers are entitled to payment of at least minimum wage for all hours worked; and whether Wal-Mart requires drivers to perform services during [DOT]-mandated layovers, for which drivers are paid less than California's minimum wage." ER198-199.

### F. Plaintiffs' Motions For Partial Summary Judgment

Following class certification, Plaintiffs moved for partial summary judgment

on their minimum wage claims, arguing the court could find liability because Wal-Mart's pay manuals lacked activity pay codes for certain tasks performed by drivers. ER1330. That argument relied heavily on one page of Wal-Mart's 165-page 2008 pay manual, which states:

> ***No Pay Is Earned When:***
>
> - Driver is required to drop a trailer for fueling or maintenance and then reconnect
> - Moving trailers at any location to get to an assigned trailer
> - Clearing a dock to drop a trailer
> - Meeting with the Accident Review Committee to have accident reviewed
> - Renewing a Driver's license or taking D.O.T. physical/Re-Certification
> - Volunteering for non-driving civic activities or programs
> - At a weigh scale
> - Slow (or stop-and-go) traffic due to road construction, heavy traffic flow, etc
> - Undergoing D.O.T. inspection
> - Time spent waiting on a work assignment at Driver's home domicile.

ER978. Notably, though, this page is silent on most of the disputed tasks (including rest breaks, inspections, and layovers), and was not in effect for most of the class period. *Id*. In opposing summary judgment, Wal-Mart argued and submitted testimony that Plaintiffs had misinterpreted the manuals, and also submitted testimony

and other evidence showing that, in practice, activity-based pay covered the contested tasks. ER1309-1313. Wal-Mart also argued that because both issues presented, at minimum, disputed questions of material fact, summary judgment was improper. ER1304-1305. Rather than submit these questions to the jury, the court wholly disregarded the evidence demonstrating that these tasks were paid in practice and instead accepted Plaintiffs' interpretation of the 2008 pay manual, finding that "certain required tasks are specifically designated as unpaid activities" in the manual and that "activities that are not separately compensated (and are explicitly listed and recognized as unpaid activities) may not properly be built in or subsumed into the activity pay component of Wal-Mart's pay policies." ER186.

Plaintiffs also argued at summary judgment that layovers were compensable because "Wal-Mart pays its class members only $42.00 for [the] layover on the condition that class members spend the layover in the tractor cab" and "[w]hile on layover, class members are required to perform certain tasks for Wal-Mart such as immediately reporting any accident that occurs." ER1339. Wal-Mart responded that drivers were not working and could take their layover wherever they liked (placing them outside Wal-Mart's control); received a $42 inconvenience fee if they took the layover in the sleeper berth or in a hotel (often a practical necessity for long-haul truck drivers far from home); and even received the $42 if they took the layover at *home* so long as they first obtained permission to receive the layover pay for doing

so. ER1320-1323. Nevertheless, the court granted Plaintiffs' motion, relying heavily on the following provision of Wal-Mart's pay manual:

> ***LO – Layover Time:***
> A *layover* is earned when taking a mandatory DOT break and is not paid in conjunction with any other type of pay. The intent is to pay Drivers for layovers taken in the tractor cab.
>
> - Any exceptions must be approved prior to the Layover by the GTM, including:
>   - Drivers taking a layover at his/her residence
>   - Drivers taking a layover not required by hours of service rules

ER977; *see also* ER1471. The court concluded that although drivers were free to leave the truck at their leisure, Wal-Mart, through its pay manual, "specified and controlled" the "physical location of the layover" by restricting paid layovers "to the tractor cab" and "specifically exclud[ing]" the driver's residence (ER189)—two questions of fact that were hotly disputed. ER1320-1323. This new layover theory differed from the question that was certified, namely "whether Wal-Mart requires drivers to perform services" during layovers. ER199.

Following classwide discovery, Plaintiffs filed a second motion for partial summary judgment on their derivative Unfair Competition Law ("UCL") claim, which the court granted, thereby adding (as a practical matter) one year to the statute of limitations on Plaintiffs' minimum wage claims. ER170.

### G. Wal-Mart's Motion To Decertify The Class

In its class certification order, the court had invited Wal-Mart to seek decertification "if it later becomes clear that there are major variations in the time class-members spent completing tasks like paperwork or fueling." ER205. Classwide discovery revealed such variations: By the time of the decertification motion, 55 drivers had been deposed about their work for Wal-Mart, and the only consistent feature of that testimony was, as various drivers put it, that "every dispatch" and "every day" "was different." ER1230; ER1235, ER1245, ER1240. Given the variation in duration and frequency of the allegedly unpaid time, Wal-Mart argued that Plaintiffs would be unable to deliver on their promise to provide a reliable "straightforward" data-driven classwide liability and damages model. ER1262, ER1384.

Plaintiffs opposed, relying on their expert, Dr. G. Michael Phillips, and his model purporting to "estimate how much time [drivers] spent performing various activities and then, under various assumptions, estimate the dollar equivalent values for such time." ER1210. The components of the model were as follows: First, individual drivers were subpoenaed for depositions. Forty ultimately responded, appeared, and completed 39-question written surveys estimating the amount of time they "usually" spent on various tasks, and the frequency with which they performed those tasks. ER1211. Then, the drivers met privately with class counsel and discussed the survey answers. ER1135, ER1154. The answers were then "clarified

and/or modified" through questioning by Wal-Mart and Plaintiffs' counsel. ER1154-1155, ER1211. None of the named plaintiffs were surveyed or deposed as part of the "model." *See* ER896.

Dr. Phillips created a "Monte Carlo" statistical simulation based on his interpretation of some (but not all) of the deposition testimony prompted by the written surveys (and sometimes elicited by Plaintiffs' counsel) to create an "average median response" for each task. ER1155, ER1211. That testimony was supplemented with certain corporate records to generate a range of estimated times and frequencies for each challenged task, including layovers, inspections, and rest breaks. ER1155.

Despite these problems, and with trial less than two months away, the court denied Wal-Mart's decertification motion, finding that notwithstanding the variation across drivers, Plaintiffs "presented a plan for proving damages" and that Wal-Mart could "disprove the damages model" at trial. ER163. The court also noted, citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), that "Plaintiffs … should not be punished by Wal-Mart's lack of records regarding time spent on activities such as pre- and post-trip inspections, time spent fueling, paperwork, etc." ER161. Still, the court "agree[d] with Wal-Mart" that, notwithstanding Dr. Phillips's report, "[P]laintiffs need[ed] to present a plan for manageably trying this case. The plan currently before the Court … appear[ed] to mirror the plan presented at the class certification stage." ER159.

### H. Wal-Mart's Other Pre-Trial Motions

Wal-Mart moved for summary judgment, arguing that Plaintiffs' interpretation of the California minimum wage law was preempted by the Federal Aviation Administration Authorization Act ("FAAAA") and its implementing regulations. ER1273-1298. Wal-Mart also argued that summary judgment was appropriate on the named plaintiffs' individual claims, because none had provided any evidence of his own, individualized damages. Instead, they relied on Dr. Phillips's averages and estimates, which materially deviated from their own experiences. *Id.*

Plaintiffs cross-moved for summary judgment, arguing that the FAAAA did not preempt their claims because their effect on Wal-Mart's prices, routes, and services was tangential at best. ER1202-1208. They also argued that the named plaintiffs were not required to prove their damages individually and could rely on their expert-generated estimates. ER1205. The court denied Wal-Mart's motion and granted Plaintiffs' cross-motion. ER163.

Wal-Mart also moved to exclude Dr. Phillips's opinions on the grounds that his "survey" was entirely unscientific, his methodology was unreliable, and his opinions had no bearing on the critical question whether class members in fact performed work during time that was unpaid. ER1145.

Wal-Mart's rebuttal expert, Dr. Jonathan Walker, identified numerous flaws in Dr. Phillips's survey methodology and report, including his failures to: (1) use a

double-blind methodology (and instead relying on questioning by Plaintiffs' counsel); (2) address double-counting of allegedly unpaid tasks; (3) determine whether tasks were performed during unpaid time; (4) select survey participants randomly; (5) use neutral or independent data coding for participant responses (and instead picking the most favorable); and (6) address various cognitive biases that may have distorted drivers' responses. Most important, Dr. Walker faulted Dr. Phillips for designing a "survey" with questions that were so vague and confusing that more than 75% of drivers could not answer them or described their own answers as unreliable. ER1152, ER1177. Dr. Walker concluded: "Dr. Phillips does not provide any reliable evidence that any particular class member was underpaid by any amount at all on any particular paycheck" and had "no statistical basis to rule out that class damages are 1/2, 1/10 or even 1/100 of what he estimates. On an individual basis, his analysis does not establish that any particular class members suffered any damages at all." ER1222-1223.

The court dismissed these serious defects, describing them as "go[ing] to … weight rather than … admissibility." ER125. Although Wal-Mart had challenged the survey as failing every basic scientific requirement, the court dodged those issues as well by dubbing the survey a "questionnaire" and by declaring (incorrectly) the case was "not [one] in which an expert report [was] derived *entirely* from survey responses" (ER126), and as such, need not meet the methodological demands of a

proper survey. The court brushed aside Wal-Mart's concerns that the damages model compensated uninjured class members, stating that "the 'fit test' does not require an expert to provide all of the components of a party's case." *Id.*

### I. The Jury Trial

Trial commenced on October 27, 2016 between Wal-Mart and "[a]ll persons employed in California by [Wal-Mart] in the position of Private Fleet Driver at any time from October 10, 2004 to October 15, 2015." ER133, ER94, ER107. Testifying drivers covered a range of topics, including how much they enjoyed driving with Wal-Mart (ER596, ER613, ER474-475, ER424-425, ER437), Wal-Mart's fair treatment of them (ER609, ER614, ER567, ER443, ER415), and the significant control they had over their schedule and earnings (ER445-446, ER478, ER602, ER624). They also testified about their widely varying practices with respect to the challenged tasks: Some drivers, for example, took rest breaks at specific, but varying, intervals (ER587, ER611), while others seldom took them or did not take them at all (ER664, ER606, ER551, ER554-555, ER564, ER501-502, ER449-450, ER458). Some drivers took layovers in hotels rather than the sleeper berth, and still received the $42 inconvenience fee (ER489, ER642-643, ER652-653, ER433, ER462, ER466), some laid over at home (ER694, ER544, ER496-497), and others slept in the truck but also watched movies, visited family, exercised, ate, or went golfing (ER681, ER600, ER487-488, ER431-432), or chose among many other unrestricted

activities.

### J. Jury Instructions

Following a charge conference with the parties after the close of evidence, the court read the final instructions to the jury. ER82-106. The instructions on layovers, rest breaks, and tasks emphasized the court's partial summary judgment ruling against Wal-Mart, stating (despite Wal-Mart's repeated objections, *see* ER1505-ER1506, ER1489, ER359-ER360, ER870), that "the Court has previously found" that Wal-Mart's policies violated the minimum wage laws. ER97-99. The court also instructed the jury—over Wal-Mart's objections that the court was misreading *Anderson v. Mt. Clemens Pottery Co.*—that Plaintiffs could prove the amount of damages using a "just and reasonable inference" rather than actual proof, which then shifted the burden to Wal-Mart to disprove Plaintiffs' evidence. ER101, ER998, ER904.

### K. The Verdict

The jury rejected Plaintiffs' minimum wage claims for seven tasks: truck washing, weighing, fueling, and weight adjustments; meeting with the driver coordinator; undergoing DOT roadside inspections; and waiting at a store or vendor. ER915-916. The jury awarded $44,699,766 for layovers, $3,961,975 for rest breaks, $2,971,220 for pre-trip inspections, and $2,971,220 for post-trip inspections—Dr. Phillips's calculations to the penny. ER916.

### L. Post-Trial Motions

After trial, Plaintiffs sought an additional $87 million, including $25.7 million in civil penalties under California Labor Code section 1197.1; $5.86 million in restitution under the UCL; and $54.6 million in liquidated damages under California Labor Code section 1194.2. ER1560. The court awarded restitution, citing its second partial summary judgment ruling (ER67-72), but declined to award liquidated damages because the trial evidence showed that "Wal-Mart implemented its pay policy in good faith" and had "reasonable grounds for believing their piece-rate compensation scheme complied with California minimum wage law" (ER73-76). The court also rejected Plaintiffs' penalties request, holding that section 1197.1 is enforceable only "through a representative action under" the Private Attorneys General Act, which Plaintiffs had not pursued. ER76-81. A $60.8 million judgment was entered for Plaintiffs. ER63-64.

Wal-Mart renewed its earlier request for judgment as a matter of law and filed a motion for a new trial (ER886), which, aside from claims that Plaintiffs had abandoned, was denied. ER60.

## SUMMARY OF ARGUMENT

I. The district court should have dismissed this case in 2012 when the original plaintiffs ceased to be willing or able to continue litigating. At that time, there was no Article III case or controversy and thus, no jurisdiction. No federal

authority permitted the court to continue the case, much less order Wal-Mart to help counsel find new plaintiffs. ER242. Reversal is warranted on this basis alone.

II. The liability judgment and resulting damages award should be reversed because the district court erred in concluding, at summary judgment, that Wal-Mart did not pay drivers for layovers, rest breaks, and inspections, and so instructing the jury.

A. Layover time is not compensable as a matter of law. After the trial in this case, this Court held that sleeper-berth time is not compensable because federal and Oregon regulations state that drivers are not working during that time. *Nance v. May Trucking Co.*, 685 F. App'x 602 (9th Cir. 2017) (unpublished). Similarly, federal and California regulations prohibit drivers from working, or even being "in readiness to work," during a layover. 49 C.F.R. § 395.2; 13 Cal. Code Regs. § 1201(u). These authorities compel the common-sense and decades-long, industry-accepted conclusion that layovers are not compensable. To hold otherwise would create a direct conflict between California and federal law, in violation of the FAAAA.

Even if layover time were compensable under California law where an employer "controls" the driver, the court erred at summary judgment by finding as a matter of law, based only on Wal-Mart's pay manual explaining when drivers would be paid the $42 layover pay, that Wal-Mart exercised "control." That erroneous

order led to an erroneous instruction that the jury *must* find that layovers are "compensable work" if Wal-Mart applied its pay manual in practice.

B. Wal-Mart is not required to "separately" or "directly" compensate drivers for every task inherent to truck driving. ER186, ER97. The most that is required is a pay system that in fact pays for all time worked and does not borrow from a paid hour to cover an unpaid hour. *See*, *e.g.*, *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 890 (9th Cir. 2017). And under any standard—whether pay is averaged across a day or workweek, considered by the hour, or dependent upon a task being "directly related" to other paid tasks—there was no minimum wage violation here, and the court erred in instructing the jury otherwise.

III. The court erred in allowing Plaintiffs to prove liability and damages using their expert's inaccurate and unreliable estimates, which had no grounding in any class member's experience and conflicted with the experiences of the named plaintiffs. But rather than entering judgment for Wal-Mart because there was no admissible evidence to sustain the verdict (*see Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)), the court, based on a fundamental misreading of *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), improperly shifted the burden to Wal-Mart to *disprove* Plaintiffs' estimates (ER161).

## STANDARD OF REVIEW

I. The existence of an Article III case or controversy is reviewed de novo.

*Sable Commc'ns of Cal., Inc. v. FCC*, 827 F.2d 640, 642 (9th Cir. 1987).

II. An order denying a motion for a judgment as a matter of law or granting partial summary judgment is reviewed de novo. *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802 (9th Cir. 2009); *Chao v. A-One Med. Srvs., Inc.*, 346 F.3d 908, 914 (9th Cir. 2003).

A district court's construction of the FAAAA and its preemptive reach is reviewed de novo. *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 640 (9th Cir. 2014).

The formulation of jury instructions is reviewed for abuse of discretion. (*Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000)), unless challenged as a misstatement of law, in which case, review is de novo (*Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014)).

III. A district court's decision to certify a class is reviewed for abuse of discretion. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). "A court abuses its discretion if its certification order is premised on legal error." *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001).

The decision whether to exclude expert testimony is reviewed for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

## ARGUMENT

This case has been marred throughout by a failure to hold Plaintiffs to the fundamental prerequisites of federal litigation, including their burdens of proof.

That failure started with a decision to disregard Article III's case or controversy requirement, grew with the misapprehension and misapplication of the regulatory regime governing long-haul truck driving and the requirements of California's minimum wage laws, and culminated in an unsupported and unlawful judgment. Only a reversal of the judgment in its entirety or, at minimum, a dramatic reduction of the damages award, can cure those errors.

## I. The Case Should Have Been Dismissed For Want Of An Article III Case Or Controversy

After the original four plaintiffs either passed away, decided to abandon the suit, or were deemed inadequate representatives, leaving no live claim against Wal-Mart, the court, at Plaintiffs' counsel's request, ordered Wal-Mart to produce employee data "for the purpose of identifying new plaintiffs and potential class representatives." ER242. That was legal error: the court lacked jurisdiction to sustain the lawsuit without any case or controversy between the parties, and no power—equitable or otherwise—permitted it to override Article III's unequivocal requirements. U.S. Const., art. III, § 2.

Article III's "Case" or "Controversy" requirement grants federal courts authority to adjudicate only "the legal rights of litigants in actual controversies." *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) (internal quotation marks omitted). Thus, "to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable

interest, or 'personal stake' in the outcome of the action." *Id*. Where "an intervening circumstance deprives the plaintiff of a personal stake … at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (internal quotation marks omitted).

The court departed from these fundamental principles by not only permitting the case to proceed without an actual controversy, but *ordering* Wal-Mart to produce information to Plaintiffs' counsel so that they could "search for new named plaintiffs." ER242. The court (citing nothing) reasoned that the "significant passage of time" called for unusual measures, and that while the deceased plaintiffs' claims had been "extinguished," the claims of the other two plaintiffs "continue[d] to exist" even if they did not intend to pursue them. ER243. That is not how Article III works.

Plaintiffs who voluntarily or involuntarily abandon claims do not have a live case or controversy with the defendant. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016); *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (courts may only resolve cases that "affect the rights of litigants in the case before them"); *see also Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 924 (9th Cir. 2007) (where a named plaintiff makes a "voluntary dismissal of [his] claims before the putative class [is] certified," "there is no

longer a 'case or controversy' to be decided within the meaning of Article III of the Constitution").

Nothing about the fact that this case was brought as a putative class action changes that, because the absent persons are not parties "to the class-action litigation *before the class is certified*." *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1349 (2013) (citations and internal quotations omitted); *see also Smith v. Bayer Corp.* 131 S. Ct. 2368, 2380 (2011). Moreover, the Supreme Court has repeatedly held that under the Rules Enabling Act, Rule 23 cannot be used to "abridge, enlarge, or modify any substantive right." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (citing 28 U.S.C. § 2072(b)). Thus, if the named plaintiffs no longer have any dispute with the defendants—because they have passed away, grown weary of the case, no longer wish to represent the class because their claims are not cognizable, or are no longer adequate representatives—then their claims no longer "exist" (ER243), and "the case may come to a halt even if a properly certified class action would survive the mootness of the representative's claims." *Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 626 (7th Cir. 1986); *Warth v. Seldin*, 422 U.S. 490, 503 (1975) (unless plaintiffs can "demonstrate the requisite case or controversy between themselves personally and respondents, 'none may seek relief on behalf of himself or any other member of the class'") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)); *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts,

C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class or not."); *cf. Campbell-Ewald*, 136 S. Ct. at 672 (holding that a case is not moot where, unlike here, "a would-be class representative with a live claim of her own" seeks to demonstrate that "certification is warranted").

For all of these reasons, where, as here, the live controversy between the parties ends, courts routinely refuse to order defendants to provide information to enable plaintiffs to continue litigating their claims. In *Reed v. Bowen*, 849 F.2d 1307 (10th Cir. 1988), for example, the Tenth Circuit affirmed the denial of a class certification motion where the named plaintiffs had been deemed inadequate and none "had suffered any injury." *Id*. at 1311. *Reed* rejected the argument that counsel for the plaintiffs was "entitled to discover putative class members … to identify potential intervenors before the district court [could] dismiss the suit" (*id*. at 1313), explaining that "[n]o court has held, in a factual context similar to this case, that counsel has a *right* to use the power of the courts, through the Rules of Civil Procedure, to find a client who could be intervened as a plaintiff in a suit which has no party plaintiff," or which lacks a "viable party plaintiff." *Id*. at 1313–14 & n.7. This Court reached a similar conclusion in *Hatch v. Reliance Insurance Co.*, 758 F.2d 409, 416 (9th Cir. 1985), where it affirmed the district court's denial of an attempt to obtain from the defendant a list of surnames of similarly situated putative class members to support efforts to certify the class. *See also Falcon v. Philips Elec. N. Am. Corp.*, 304 F. App'x

896, 898 (2d Cir. 2008) (unpublished) (affirming denial of a motion to reopen discovery to "identify a substitute class representative" when the existing class representative was deemed inadequate and lacked a live controversy with the defendant).[1]

These precedents establish that the proper course under the circumstances would have been to dismiss the complaint without prejudice. None support the course taken here: ordering Wal-Mart to help Plaintiffs' counsel find a client to continue Plaintiffs' counsel's headless case. To the extent the court relied on the "significant passage of time" as the basis for its extraordinary ruling (ER243), that justification, too, withers under scrutiny. As the foregoing cases illustrate (and setting aside those cases involving pre-certification communications for the purposes of gathering information about class claims, *see*, *e.g*., *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101–02 (1981)), courts routinely deny requests like Plaintiffs' even after years of litigation. Moreover, given that the original driver-plaintiffs expressly stipulated to stay the case pending *Brinker* (ER1454), the fact that they lost interest, after

---

[1] District courts within this Circuit are in accord. *See*, *e.g*., *Flores v. EP2, Inc*., 2011 WL 13213898, at *1 (C.D. Cal. May 20, 2011) (noting there is no authority to "use the court's discovery to find a replacement representative when all named representatives have been dismissed and the case is still precertification"); *Douglas v. Talk Am., Inc*., 266 F.R.D. 464, 467 (C.D. Cal. 2010) (refusing to allow use of "the discovery process to go 'fishing' through defendant's list of customers to find a new class representative"); *In re Facebook Privacy Litig*., 2015 WL 3640518, at *3 (N.D. Cal. June 11, 2015) ("a plaintiff may not seek information from a defendant to find a proper representative to keep the case alive").

*Brinker* was decided and nixed the principle theory of their case, is no reason to keep the lawsuit going.

The case and controversy ended in 2012 when the named plaintiffs became unwilling or unable to continue litigating it. It was legal error and an abuse of the class action procedure to treat it otherwise. Reversal is warranted on this basis alone.

## II. The Liability Judgment For Layovers, Rest Breaks, And Inspections Should Be Reversed

The district court also erred in concluding that (i) federally mandated 10-hour layover breaks are compensable, and (ii) Wal-Mart did not compensate drivers for rest breaks and inspections, even though drivers were paid the minimum wage or more for every hour worked. The verdict should be reversed on this basis as well. At minimum, a new trial should be granted due to the instructional errors that arose from these erroneous conclusions.

### A. Plaintiffs Should Not Have Been Awarded Damages For Layovers

$44.7 of the $54.6 million in damages awarded at trial was for time spent sleeping, resting, or partaking in activities of the driver's choosing during 10-hour layovers required by federal and California law. That verdict is not only contrary to decades-long, industrywide practice (ER630, ER548; *see also* ER1302), but also the result of a series of erroneous rulings, beginning at summary judgment and ending with a confusing and inaccurate jury instruction. It should be reversed.

### 1. Layovers Are Not Compensable As A Matter of Law

To determine whether federally regulated time is "compensable," this Court looks to guidance from analogous regulatory schemes. *See*, *e.g.*, *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 936 (9th Cir. 2004).

i. In a strikingly similar case (decided after this trial), this Court affirmed a decision holding that time spent in a truck's sleeper berth is not compensable under Oregon law or the Fair Labor Standards Act ("FLSA"). *See Nance*, 685 F. App'x at 605, *affirming in part Nance v. May Trucking Co.*, 2014 WL 199136 (D. Or. Jan. 15, 2014). *Nance* concerned driver-trainees who were required to ride in a truck with an experienced driver for a period of time. 2014 WL 199136, at *1. Some of that time was spent in the sleeper berth while the more experienced driver drove. *Id.* The trainees contended they should have been paid for sleeper-berth time because the defendant-company "'control[led]' [them] while the truck [was] moving." *Id*. at *6. In rejecting this argument and granting summary judgment to the defendant, the district court looked to federal and Oregon regulations stating that an employee is not working "*when he is permitted to sleep in adequate facilities furnished by the employer*," such as a sleeper berth. *Id*. at *7 (citing 29 C.F.R. § 785.41). Relying on these regulations, the trial court held that "[a]s a matter of law … time spent in the sleeper berth, simply because the truck is moving, is not compensable." *Id*. This Court affirmed, concluding that "the district court properly relied on the persuasive

authority of federal and state regulations saying drivers are not entitled to compensation for time they are permitted to sleep in the berths of moving trucks." *Nance*, 685 F. App'x at 605 (citing *Brigham*, 357 F.3d at 940 & n.17).

As in *Nance*, federal and California regulations clearly show that layover time is *not* compensable. Under those regulations, time on the road falls into one of four "statuses": (i) off duty; (ii) sleeper berth; (iii) driving; and (iv) on-duty. 49 C.F.R. § 395.8(b); *cf.* 13 Cal. Code Regs. § 1213(c). Importantly, drivers are required to accurately record their duty status and can be penalized for not doing so. 49 C.F.R. §§ 395.8(a)(2), (e)(1), (f)(7).

Under both federal and California regulations, drivers are prohibited from entering the "driving" status "without first taking 10 consecutive hours off duty." 49 C.F.R. § 395.3(a)(1); *cf.* 13 Cal. Code Regs. § 1212.5(a). If the driver is operating a vehicle with a sleeper berth, then that 10-hour "layover" may consist *only* of time "off duty," "sleeper-berth time," or certain combinations of the two. 49 C.F.R. § 395.1(g)(1)(i); 13 Cal. Code Regs. § 1212(g)(1)(A). The 10-hour layover period cannot be interrupted, and any time spent "on duty" cannot count as layover time; if at any point the layover is interrupted, the 10-hour period recommences. 49 C.F.R. § 395.1(g)(1)(i); 13 Cal. Code Regs. § 1212(g)(1)(A). Here, though many drivers slept in the sleeper berth during their layover (ER559-560), and others slept in hotels or at home (ER466, ER489). In addition to sleeping, drivers went to the movies

(ER681), to restaurants (ER452-453), went for long walks (*id.*), visited family (ER442), or even went sightseeing (ER432), during layovers—all of which was recorded as "off-duty" time.

In contrast, the "on duty" status refers to time when drivers are "in readiness to work," and expressly excludes "[t]ime spent resting in a sleeper berth." 49 C.F.R. § 395.2; 13 Cal. Code Regs. § 1201(u). Thus, during a layover, drivers are necessarily *not* working (because they cannot be "driving" and cannot be "on duty"), and are necessarily *not* on call (because they cannot be in "readiness to work"). And the regulations obligate the drivers themselves to accurately log their own status. 49 C.F.R. §§ 395.8(a)(2), (e)(1), (f)(7).

As a result, just as the regulations in *Nance* led to a finding that sleeper-berth time was not compensable, the factual and commonsense conclusion here is that mandatory, uninterruptable leisure time spent at the driver's discretion during a federally mandated layover is not compensable as a matter of law. To hold otherwise would mean that, despite being relieved of all duties and free to pursue activities of their own choosing (and in fact doing so), drivers would be required to log their layover time as "on duty," and could therefore not satisfy the regulatory requirement that they take 10 hours *off* duty before driving. The verdict, therefore, is incompatible with the federal regulatory scheme.

ii. Because this Court did not decide *Nance* until after the trial here, the district court did not address it until its order on post-trial motions. The court attempted to distinguish *Nance* factually on the ground that Wal-Mart drivers were required to ask permission to take a layover away from the sleeper berth. ER57-58 ("Wal-Mart's policy designating places to take layovers—in the tractor unless a driver obtained permission to go elsewhere—constituted control."). As explained below (*see* pp. 36–37, *infra*), that is demonstrably false, and the jury instruction incorrectly so stating warrants a new trial on its own. But even if permission were required, that does not distinguish *Nance* because those drivers could not physically leave the truck *at all* while it was actually moving, and the time was still not compensable. *Nance*, 685 F. App'x at 605 ("drivers are not entitled to compensation for time they are permitted to sleep in the berths of moving trucks"); *Nance*, 2014 WL 199136, at *8. A driver cannot be under *more* control when he is permitted to freely leave his truck—or even to leave with permission—than when he physically cannot leave it because the wheels are spinning, and any other ruling would create an intra-circuit conflict.

The district court here also attempted to distinguish *Nance* legally, holding that while Oregon and federal law define compensable work as "to suffer or permit to work," California law "requires an additional inquiry: whether the employer ex-

ercised control." ER58. While the court was correct that under California law, compensable work includes time an "employee is suffered or permitted to work," as well as "time during which an employee is subject to the control of an employer" (8 Cal. Code Regs. § 11090), that does not change the outcome here because Wal-Mart does not "control" drivers during layovers as a matter of law.

California law offers no precise definition of "control," but courts have held that "the mere fact that the employer requires the employees' activity" is not determinative of whether that activity is compensable. *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 587 (2000). What matters is the *degree* to which an employer "directs, commands or restrains an employee." *Id*. at 583 (quoting *Bono Enter., Inc. v. Bradshaw*, 32 Cal. App. 4th 968, 975 (1995), *disapproved of on other grounds by Tidewater Marine W., Inc. v. Bradshaw*, 14 Cal. 4th 557, 574 (1996)). "[P]ractical limitations on an employee's movement" that are inherent in a break from work—such as a time limit or geographic restriction—are "not sufficient to establish employer control." *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 270 (2016). Thus, California courts have typically found "control" in situations where, unlike here, employees are "on call." *See*, *e.g.*, *Aguilar v. Ass'n for Retarded Citizens*, 234 Cal. App. 3d 21, 24 (1991); *Mendiola v. CPS Sec. Soln's, Inc.*, 60 Cal. 4th 833, 841 (2015).

When those standards are applied, it is clear that Wal-Mart does not control drivers during layovers. The regulations themselves state that a driver cannot work (13 Cal. Code Regs. § 1212(g)(1)(A)), is not on call (*id.*, § 1201(u)), and cannot be interrupted (*id.*, § 1212(g)(1)(A)) during the layover. Rather, drivers must be "free to pursue activities of [their] own choosing." ER906. Wal-Mart cannot override these regulations. Not surprisingly, there was no evidence that any driver recorded layover time as "on duty" and was not paid for it. 49 C.F.R. § 395.8(a)(2).

Finally, to the extent the district court distinguished *Nance* on the grounds that the Oregon and federal regulation were "similar," that is simply wrong. California, like Oregon, has adopted regulations applicable to intrastate transport that are materially identical to the relevant federal regulations' provisions. *See* pp. 29–30, *supra*.

It simply cannot be the case that drivers prohibited from working under state and federal law are considered to be working under state wage-and-hour law and therefore must be paid during their layover. Because the district court erred in concluding that layovers can constitute "hours worked," the layover portion of the verdict should be vacated.

iii. In any event, a finding that layovers are compensable under California law would be preempted by the FAAAA. That statute's broad preemption provision declares that state laws "related to a price, route, or service of any motor carrier" are expressly preempted. 49 U.S.C. § 14501(c)(1); *Am. Trucking Ass'ns v. City of Los*

*Angeles*, 660 F.3d 384, 395–96 (9th Cir. 2011), *rev'd on other grounds*, 569 U.S. 641 (2013) (discussing FAAAA's deregulatory purpose); *see also Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (regulations "have no less pre-emptive effect than federal statutes"). A California rule requiring transportation companies operating in California to pay minimum wage for layovers taken in the state, thereby causing them to have to track the location of layovers and altering their routes, would plainly impact "price[s], route[s], or service[s]." 49 U.S.C. § 14501(c)(1).[2]

And *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014), which held that California's meal and rest break laws are not preempted by the FAAAA because they are not sufficiently "related to" prices, routes, or services, is not to the contrary, because there is an actual conflict between state and federal law here. The Hours of Service regulations prohibit drivers from working during their layovers (49 C.F.R. § 395.1(g)(1)(i)), because Congress determined that this would allow freight to be safely transported from ports to cities nationwide (*e.g.*, FMCSA, Hours of Service of Drivers, 68 Fed. Reg. 22470 (Apr. 28, 2003) (rule "generates the most favorable combination of reduced fatigue-related incidents, increased driver alertness, and other safety benefits")). But if the verdict here stands, and drivers are compensated

[2] Wal-Mart identified an expert witness to so testify. ECF No. 330-22.

for layovers, employers may respond by imposing greater restrictions on drivers' leisure time (for example, by prohibiting them from leaving the truck, or restricting where they may stop), thereby diminishing the quality of the drivers' rest and undermining Congress's safety-related objectives. That puts this case squarely within the exception recognized by *Dilts* for situations in which Congress "in fact contemplated the[] preemption" of this issue. 769 F.3d at 643. Because the verdict would contravene Congress's FAAAA deregulatory objectives, it should be vacated.

#### 2. The Court's Jury Instruction Incorporated An Erroneous Interpretation Of Wal-Mart's Layover Policy

Even if layovers could be deemed compensable, the district court improperly decided that question at summary judgment, resulting in an erroneous jury instruction, and warranting a new trial.

i. In 2015, the district court improperly granted partial summary judgment to Plaintiffs on the theory that Wal-Mart's written pay plans, standing alone, "controlled" Plaintiffs even though the issue of control was in dispute (*see* pp. 10–11, *supra*), reserving for the jury only the question whether Wal-Mart applied those pay plans in practice (ER186-189).

The court erred in concluding that Wal-Mart's pay manual subjected drivers to Wal-Mart's control. The fact that Wal-Mart automatically pays drivers a $42 inconvenience fee for layovers away from home does not somehow create control.

*Csaszi v. Sharp Healthcare*, 2003 WL 352422, at *10 (Cal. Ct. App. Feb. 18, 2003) (time "not controlled [by Sharp]" in which employees were "free to move around [and] engage in personal activities" not compensable merely because employer paid $2.50 per hour for that time) (internal quotations omitted).

The statement in the pay manual that drivers must seek "permission" before obtaining layover pay for a layover taken at home does not establish control, either. The court cited two cases on this point. In *Bono Enterprises v. Bradshaw*, the court found control where employees were "direct[ed], command[ed], or restrain[ed]" from leaving the worksite during lunch. 32 Cal. App. 4th at 975. Critically, in a distinction overlooked below, the court emphasized an "extremely significant" and dispositive fact: had the company merely required employees to make "prior arrangements to reenter the plant" before leaving, those employees would not "remain subject to the employer's control." *Id*. at 978 n.4. Thus, while a flat prohibition on an employee's activity may lead to control, requirements making it more burdensome for the employee to act, standing alone, will not.

That same distinction between prohibitions and added burdens undermines the court's reliance on *Morillion v. Royal Packing Co*. There, the court found control because the employer *required* its agricultural workers to (i) assemble at designated departure points to be picked up by the employer's bus, (ii) ride the bus to the fields,

(iii) wait for the bus at the end of the day, and (iv) ride the bus back to the departure points. 22 Cal. 4th at 579–80.

In stark contrast to *Bono* and *Morillion*, Wal-Mart's pay plans do not prohibit drivers from leaving the truck during layovers. The evidence at trial established that drivers are not required to use the sleeper berth, and they may leave the truck for hours or the entire night—it is completely up to them. ER694, ER544, ER496-497. And whether applying the court's misreading of the pay manual (to create a requirement to seek prior approval to go home) or the correct reading (to create a requirement to seek prior approval to obtain the $42 for a layover taken at home), under the logic of *Bono* and *Morillion*, neither establishes control on its own. It was error not to grant judgment as a matter of law to Wal-Mart on this issue.

ii. After trial, in response to Wal-Mart's post-trial motions, the court offered an entirely new theory of "control," holding that "[t]he jury's conclusion that Wal-Mart exercised control is supported by substantial evidence," citing a hodgepodge of testimony from drivers unrelated to the court's summary judgment order, including that drivers were not permitted to drink alcohol, possess firearms, or invite their spouse or pet into the sleeper berth during their layover. ER59-60. But, California law is clear that the question of control is one of degree (*Morillion*, 22 Cal. 4th at 583, 586), and these rules of workplace etiquette or legal and safety compliance have little relation to those cases in which California courts have found control.

*See* 49 C.F.R. § 392.5(a)(1) (prohibition on consuming alcohol before driving); *id*., § 392.60(a) (unauthorized persons not to be transported absent permission); Cal. Vehicle Code § 23222(a) (open container law). Common sense confirms why: a rule prohibiting a substitute teacher from keeping firearms or alcohol in his car while parked in the school lot would not turn that teacher's commute home (or lunch break in the car) into "control." A rule prohibiting a court reporter from bringing her dog into the courthouse would not turn her weekend trip to the courthouse to fetch her wallet that she left behind into "control"—even if Spot stays home.

iii. In any event, the jury was not given an opportunity to decide the question of control. Although the court's erroneous summary judgment order purported to leave open the narrow question whether Wal-Mart in fact applied its pay plan in practice, the jury instruction made that impossible and was therefore tantamount to a directed verdict. The instruction contained three parts and told the jury that: (1) the court has *already* found that Wal-Mart's "driver pay manuals subjected drivers to Wal-Mart's control during layover period"; (2) "[u]nder California law," if there is control, then a driver must be paid, and (3) the only way Wal-Mart could escape liability under this instruction was if Wal-Mart did *not* "appl[y] the policy as it is stated in the driver pay manuals." ER98. This instruction put Wal-Mart in the untenable position of having to prove that it disregarded its own policies rather than

defend its policy as not controlling anyone. Had the court allowed each side to present testimony at trial regarding the meaning of the language in the pay plan, and the actual layover practices, it would have properly given the question of control to the jury. ECF No. 561 at 8.

The court's emphasis on what it "ha[d] found" severely tilted the scales by suggesting to the jury that the court had already decided Wal-Mart violated the law. Plaintiffs' counsel seized on this language in closing, telling the jury, with respect to the question whether drivers were subject to Wal-Mart's control:

> *You don't get to decide that*. The judge has told you in the jury instruction the Court has found that the pay policy, as written, subjected Wal-Mart drivers to control during layover periods, and therefore, the only question remaining is … whether Wal-Mart applied the policy as stated in the Driver Pay manuals.

ER330 (emphasis added). These errors rendered the jury instruction fatally deficient and warrant a new trial. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 208 (9th Cir. 1989).

* * *

The layover portion of the verdict should be reversed because (i) layovers are not compensable work as a matter of law, and (ii) the court erred in entering partial summary judgment and in instructing the jury on layovers.

### B. Plaintiffs Should Not Have Been Awarded Damages For Rest Breaks And Inspections

The district court committed a parallel legal error in not granting judgment to Wal-Mart on Plaintiffs' minimum wage claims based on rest breaks and inspections. When analyzed under the correct legal standard, there was no basis to conclude drivers were not paid at least minimum wage for all hours worked, and it was improper to find Wal-Mart's pay plan unlawful and to instruct the jury on that basis.

#### 1. There Was No Violation Of The Minimum Wage Law

The verdict cannot stand because Plaintiffs were, in fact, paid the minimum wage, and accordingly suffered no compensable injury traceable to Wal-Mart. The California Labor Code does not require employers to pay by the hour. Cal. Lab. Code § 200(a) (permitting payment "by the standard of time, task, piece, commission basis, or other method of calculation"). Nevertheless, the district court essentially directed the jury to find for Plaintiffs if the time spent on any single task was not *separately* compensated. That is the wrong standard. Where, as here, the driver's hourly, daily, monthly, and yearly earnings were at, if not well in excess of, the minimum wage; each allegedly unpaid task was performed during an hour in which the driver was compensated at or above the minimum wage; and the task was directly related to others for which the driver was directly earning compensation, there can be no minimum wage violation.

Section 4(B) of California Wage Order 9-2001, which applies to the transportation industry, requires employers to pay "not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." An employer violates the Labor Code if it pays "less than the legal minimum wage." Cal. Lab. Code § 1194. The relevant question is thus whether an employee's wages have fallen below the minimum wage in any given hour, though courts disagree as to *how* that analysis should be undertaken.

One approach asks whether the employee is being paid "no less than the sum" they would have been paid during a pay period if the employer had paid the minimum wage for all hours worked. *See*, *e.g.*, *Xerox*, 875 F.3d at 890 (approving across-workweek averaging for non-hourly compensation plans under the FLSA rather than analyzing whether minimum wage was received for each hour worked); *Medrano v. D'Arrigo Bros. Co. of Cal.*, 336 F. Supp. 2d 1053, 1057–58 (N.D. Cal. 2004) (rejecting the "separate hour" standard under California law). There is no dispute that the drivers in this case made an average of at least $300 per day, and at least between $85,000 and $90,000 (up to $120,000), per year. *See* p. 3, *supra*. Under federal DOT regulations, drivers can spend no more than 14 hours "on duty" each day, and must complete their pre- and post-trip inspections, and take their rest breaks, while on duty. 49 C.F.R. §§ 395.2, 395.3. Thus, assuming average hourly earnings of

$300 per day across no more than 14 hours, drivers earned a minimum effective rate of over $21 per hour for all hours worked, far higher than the applicable minimum wage. *Cf. Adair v. City of Kirkland*, 185 F.3d 1055, 1062 n.6 (9th Cir. 1999) ("the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked"); *Xerox*, 875 F.3d at 890 (distinguishing between "tak[ing] money already due and apply[ing] it against unpaid hours" and "compensate[ing] employees for all hours worked by using a workweek average to arrive at the appropriate wage"). Wal-Mart did not use an averaging method as part of its pay plan, but there is no question its actual pay satisfies this standard.

A second approach is to ask whether "a particular driver's pay was reduced below the minimum wage for each hour worked" (*Burnell v. Swift Transp. Co. of Ariz. LLC*, 2016 WL 2621616, at *6 (C.D. Cal. May 4, 2016)) "by analyzing the compensation paid" for each such hour (*Reinhardt v. Gemini Motor Transp.*, 869 F. Supp. 2d 1158, 1168 (E.D. Cal. 2012); *see also Cole v. CRST, Inc.*, 2012 WL 4479237, at *7 (C.D. Cal. Sept. 27, 2012) (asking whether an "employee generated enough compensation … to exceed the minimum wage for that hour")). It is also undisputed that Wal-Mart satisfies that standard: drivers made the minimum wage in each hour worked. ER906-907.

A final standard, which was codified by the California Legislature and took effect on January 1, 2016, asks whether a given task is "directly related" to another

directly compensated task. *See* Cal. Lab. Code § 226.2. If so, an employer need not pay separately for the time spent on that task. While the district court declined to apply that standard here, despite repeated requests (ER1093, ER1024, ER991-992), had it done so, Plaintiffs could not prove a minimum wage violation. That is because performing a safety inspection, just like taking a rest break, is directly related to the directly compensated acts of hooking, departing, arriving (paid as "activities"), and safely driving the truck (paid by mileage). ER1015, ER1024.

In place of these standards, the district court asked the jury to decide whether Wal-Mart had "compensate[d] directly" for each task. ER97. This framing rested on a misreading of the case law, particularly *Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246 (C.D. Cal. 2011) and *Quezada v. Con-Way Freight, Inc.*, 2012 WL 2847609 (N.D. Cal. July 11, 2012). Those cases did not involve the question of direct compensation; they involved tasks *designated* as unpaid and not compensated *at all* within the defendants' pay structure. *See Cardenas*, 796 F. Supp. 2d at 1252 (defendant argued it "need not compensate [employees] for time not included in the piece rate formula if the average wage would exceed minimum wage"); *Quezada*, 2012 WL 2847609, at *6 (defendant conceded that the amount of time employees spent on "inspections, waiting, and paperwork *bear[s] no relationship* to how long they drive in a given shift") (emphasis added). That is not the case for either rest breaks or inspections because Wal-Mart did not designate these tasks as

unpaid, but included them within other pay structures. Under any of the correct legal standards, judgment notwithstanding the verdict should have been granted on Plaintiffs' minimum wage claims for rest breaks and inspections.

#### 2. The District Court Erred In Finding Wal-Mart's Pay Plans Unlawful, And So Instructing The Jury On Rest Breaks And Inspections

Even if the relevant question were whether Plaintiffs received separate or direct compensation for each inspection or rest break, the trial court erred in analyzing that, too. The court granted partial summary judgment to Plaintiffs on inspections and rest breaks, reasoning that these tasks were "explicitly listed and recognized as unpaid activities" and as such, could "not properly be built in or subsumed into the activity pay component of Wal-Mart's pay policies." ER186. But nowhere in Wal-Mart's pay manuals are inspections or rest breaks characterized as "unpaid" or not separately paid. The fact that no specific pay code exists for "inspections" as exists for industry-insider terms such as "Hook" or "Arrive," does not mean that the time spent inspecting is not paid—it is simply part of another activity code.[3]

The court compounded this error when it instructed the jury that Wal-Mart's manuals "do not separately specify pay for rest breaks," and concluded, in its order denying Wal-Mart's post-trial motions, that the instruction was "not misleading"

[3] The court's ruling on Plaintiffs' UCL claim was based on this same error and should be vacated for similar reasons. ER165.

because the manuals are supposedly "silent as to pay." ER61. But this is not the law: if drivers are paid at least the minimum wage for the hour in which a rest break is taken, the law has been satisfied. *See* pp. 40–43, *supra*. While rest break time may not be specifically designated as unpaid (*see*, *e.g.*, *Vaquero v. Stoneledge Furniture, LLC*, 9 Cal. App. 5th 98, 110 (2017) (employers must separately compensate rest periods if their "compensation plan does not already include a minimum hourly wage for such time"); *see also Perez v. Sun Pac. Farming Coop., Inc.*, 2015 WL 3604165, at *6 (E.D. Cal. June 8, 2015) (quoting Minutes of a Meeting of the Indus. Welfare Comm'n, No. 527, at 8 (Mar. 7, 1947) ("it is the intent of the Commission that the rest period section *will not be construed* to mean that any additional time rate payment is due any worker whose wages are computed on an individual production basis") (emphasis added)), there is no requirement that a factfinder parse every minute of the hour in which a rest break is taken to determine if the time is paid, provided the minimum wage is paid within that hour.

With respect to inspections, the court prejudiced Wal-Mart—as it did with respect to layovers (*see* p. 39, *supra*)—by referring to its prior orders and thereby suggesting that the court had already found that Wal-Mart violated the law. The court could not reasonably have expected a jury so instructed to do anything but find against the company on this claim. *See Coles v. Eagle*, 704 F.3d 624, 630–31 (9th Cir. 2012). This error, too, calls for reversal and a new trial.

## III. The Court Erred In Excusing Compliance With Rule 23's Class Certification Prerequisites

Plaintiffs never met their burden of providing representative, classwide proof in this case. The district court's decision to disregard that failure of proof—in its decertification order, admission of Dr. Phillips's testimony, and Rule 50(b) order—depended on a fundamentally flawed understanding of the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), which should be reversed as legally erroneous.

### A. The District Court Improperly Excused Plaintiffs From The Burden Of Proving A Class-Based Claim With Classwide Evidence

1. Classwide proof often consists of representative evidence, and the Supreme Court has articulated a simple rule regarding the use of such evidence: If the evidence "could have sustained a reasonable jury finding … in each employee's individual action," then it is "a permissible means of establishing the employees' hours worked in a class action." *Tyson Foods*, 136 S. Ct. at 1046–47. If not, such evidence cannot be relied upon in a class action. *See id.* at 1048 (distinguishing the rejection of representative evidence in *Dukes* because the employees were "not similarly situated," and as such, "none … could have prevailed in an individual suit" by relying on the class evidence).

The evidence Plaintiffs provided did not meet this standard. The issue is not merely one of methodology (however improper), or whether the averages

Dr. Phillips generated were accurate (they were not), it is that the statistical picture Dr. Phillips painted failed to reflect the actual experiences of the class members.

Dr. Phillips functionally conceded this point. Although the nine named plaintiffs testified about the length and frequency of their layovers, rest breaks, and inspections, none offered any standalone damages calculations based on those experiences or attempted to use those experiences to show they were representative of injuries suffered by class members. *Tyson Foods*, 136 S. Ct. at 1048 (representative evidence cannot be "based on implausible assumptions"). Wal-Mart sought summary judgment on this basis (ER1273), but the court erroneously held that named plaintiffs could rely on statistical averages derived from third parties rather than their own experiences. *Compare* ER1293-1297 (explaining named plaintiffs' burden of providing damages) *with* ER161. That is exactly backwards: representative evidence may be used because it reflects the experience of a subset of class members, and there has been a showing that their experiences are similar to the class. That does not imply that aggregate estimates regarding the class may be reverse-extrapolated to the subset. *See*, *e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("[N]amed plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"); *L. Tarango Trucking v. Cty. of Contra Costa*, 181 F. Supp. 2d 1017, 1027–28 (N.D. Cal. 2001) ("*Lewis*

stands for the proposition that the Court can issue a remedy in a class action only for violations of the law that have caused an injury in fact to one of the named plaintiffs.").

The district court excused this, however, because a minor subset of drivers happened to give the same answers that Dr. Phillips's model did. ER121. But while that happenstance intersection might support Dr. Phillips's accuracy with respect to an individual class member's claim, it does not permit extrapolation across the class because there is no reason to believe that the experiences of those drivers are in fact "similar" to those of the class and therefore "probative as to the experiences of all." *Tyson Foods*, 136 S. Ct. at 1048–49; *see also Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 313 n.10 (3d Cir. 2016) (relevant question when considering statistical model was whether it was "a good fit" for the defendant and showed the defendant not to be an "outlier"). To the contrary, Dr. Phillips admitted the evidence on which he relied showed "a lot more variation from individual to individual"—variation so significant he could not determine actual injury or the resulting damages for any single driver—even the named plaintiffs. ER530-532.

Dr. Phillips's admission cannot be reconciled with *Tyson Foods*. 136 S. Ct. at 1046–47. Having conceded that he has no opinions regarding whether any driver

performed work for which they were not compensated, there are no individual experiences from which to extrapolate and conclude that the class as a whole performed work for which it was not compensated. *Id.*

That defect becomes particularly glaring when examined through the lens of the named plaintiffs. Even though the named plaintiffs were tasked with "establishing each element of [their] claim" (*Pavao v. Pagay*, 307 F.3d 915, 919 (9th Cir. 2002); *Lyons v. Williams*, 91 F.3d 1308, 1311 (9th Cir. 1996)), their testimony did not establish *any* elements; indeed, the district court expressly found the jury had "accepted the damages calculations set forth by plaintiffs' expert witness, Dr. G. Michael Phillips" (ER49). Allowing the named plaintiffs—on their own and on behalf of the class—to prove up their claims using the highly variable experiences of a non-random sample of forty drivers who never testified at trial, rather than their own testimony about their own experiences or even an expert's analysis based on their own experiences, is not an acceptable way to "sustain[] a reasonable jury finding … in each employee's individual action." *Tyson Foods*, 136 S. Ct. at 1046–47. And that is particularly true where, as here, the named plaintiffs' experiences contradicted the assumptions on which Dr. Phillips's damages estimates for them rested. *Compare e.g.*, ER515 (Phillips assumed two 10-minute rest breaks per day) *with* Harold (ER551) (took them only "if it was necessary"); Opitz (ER554-555, ER564) ("never really took [them]"); *and* Day (ER501-502) (did not

like to take them); *compare also*, *e.g.*, ER509-510; ER512 (Phillips assumed drivers inspected their truck twice daily for 15 minutes apiece) *with* Merhoff (ER590) (seven minute pre-trip) *and* Famoso (ER481) (10–15 minute pre-trip); *compare also* ER901 (Phillips assuming drivers under control for ten hours) *with* pp. 16–17, *supra* (discussing driver activities during layovers).

2. Plaintiffs' supposedly "representative" evidence suffered from another irremediable flaw: it was unreliable and unhelpful to answering the key question in the case—namely, did Wal-Mart fail to pay drivers for all time worked, and if so, how much time was unpaid. When expert testimony is being used as representative evidence, it cannot be trusted if it is "statistically inadequate," or "based on implausible assumptions." *Tyson Foods*, 136 S. Ct. at 1048. Dr. Phillips's damages model suffers from both deficiencies, and the district court erred in deciding it could be permitted under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

First, the model was statistically unreliable because Dr. Phillips's estimates for the frequency and amount of time drivers spent on various tasks were based predominantly on a survey with irredeemable and "substantial deficiencies in [its] design or execution." *Gibson v. Cty. of Riverside*, 181 F. Supp. 2d 1057, 1067, 1069 (C.D. Cal. 2002) (citing *Harolds Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996)) (court should exclude survey where the sample "is clearly

not representative of the universe it is intended to reflect") (internal citations omitted); *Pittsburgh Press Club v. United States*, 579 F.2d 751, 759 (3d Cir. 1978) (excluding survey where all respondents were "interested in the litigation, were told the precise nature of the litigation and the purpose of the survey").

The district court overlooked that shortcoming because it trusted Plaintiffs' assertion that the "survey" was not in fact a "survey" in the scientific sense (ER126), and that any such deficiencies had been fixed by Dr. Phillips's incorporation of "a wide range of data" for some of the inputs (*id.*). That was wrong: while some of his *frequency* estimates may have been based on other data, his *duration* estimates were based almost entirely on the flawed surveys. ER1178-1201, ER1129-1131, ER1105-1106. And because drivers had widely varying practices with respect to each task, their estimates for duration were all over the map. Where, as here, half of the necessary calculation for damages was based on little more than speculation, the calculation should have been excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or

otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001) (analysis must be "sufficiently fact based to be reliable").

Second, Dr. Phillips's opinions also should have been excluded—from the trial entirely, or as support for the verdict—because he could not say whether the rest breaks and inspections were performed during paid or unpaid time, and whether all of the layover time he estimated for drivers was in fact spent in the truck. ER1152-1153. The court recognized this problem, but punted, saying: "[t]hat Dr. Phillips himself does not purport to answer [the question whether tasks were performed during unpaid time] does not serve as a basis for striking his report." ER127. That, too, was error, as a "model purporting to serve as evidence of damages … must measure only those damages attributable to [plaintiffs'] theory [of harm]." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see also Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("plaintiffs must be able to show that their damages stemmed from the defendant's action that created the legal liability"). Dr. Phillips admitted he had no opinion regarding whether any individual performed work during an hour in which he did not receive the minimum wage. ER1106. Nor did any other witness provide evidence to support that conclusion. There is thus no evidence to support the verdict.

In short, regardless whether Dr. Phillips's testimony should have been excluded before trial began, it surely was error to use it to sustain the jury's verdict after it became clear that there was *no* classwide evidence showing that rest breaks, inspections, and layovers were taken or performed, without exception, during unpaid time. Dr. Phillips's testimony should have been excluded, and judgment as a matter of law granted to Wal-Mart based on the lack of representative evidence and common proof. *Brooke Group*, 509 U.S. at 242–43 (affirming exclusion of inadmissible expert testimony post trial and entry of judgment); *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000) (affirming entry of judgment after "excision of testimony erroneously admitted" at trial).

3. Despite the fact that Dr. Phillips's damages model was in no way representative, conflicted with class member testimony, and was deeply flawed methodologically, the court nevertheless allowed the model to be shown to the jury and let it stand as the sole classwide proof supporting the verdict. It did so, in large part, by reading *Anderson v. Mt. Clemens Pottery Co.* to create an evidentiary presumption that effectively allowed Plaintiffs to set forth their damages using rough approximations. Nothing in *Mt. Clemens*, or the cases interpreting it since, supports that result.

In *Mt. Clemens*, the plaintiff-employees argued they were not properly paid for time that they were required to be on the employer's premises. The court con-

cluded this time was properly considered work, but that the employer failed to comply with its statutory duty under the FLSA to track it. 328 U.S. at 687–88. Because the employer had deprived the employees of necessary records, the Court ruled that an individual employee could—assuming he could show he "in fact performed work for which he was improperly compensated"—prove his damages "*as a matter of just and reasonable inference*" and leave it to the employer to rebut the inference. *Id.* (emphasis added). *Mt. Clemens*, properly read, therefore permits employees to prove damages through their *own* foundationally firm estimate but *only if* the employer "violate[s] [it]s *statutory* duty to keep proper records." *Tyson Foods*, 136 S. Ct. at 1047 (emphasis added); *Mt. Clemens*, 328 U.S. at 687 (citing the statutory duty under section 11(c) of the FLSA to "keep proper records of wages, hours and other conditions and practices of employment"); *see also McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) (applying *Mt. Clemens* presumption where employer failed to retain accurate *statutorily-required* records). Nothing in *Mt. Clemens* excuses plaintiffs from having to establish that they in fact worked without being compensated, and to prove the extent of their damages, in favor of an estimate made by a witness with no factual basis to say that they did. *See Spokeo*, 136 S. Ct. at 1547, 1548. Such a rule would effectively entitle plaintiffs to a lesser burden of proof merely because their preferred form of evidence is unavailable. That cannot be the law.

But that is the rule the district court created in this case. While acknowledging that "*Mt. Clemens* involved the statutory duty to keep records," it nevertheless concluded that *Mt. Clemens*'s "policy rationales" were "informative" and decided that "Plaintiffs … should not be punished by Wal-Mart's lack of records regarding time spent on activities such as pre- and post-trip inspections, time spent fueling, paperwork, etc." ER161. It therefore ruled that *Mt. Clemens*'s "just and reasonable inference" standard could be applied *even though* there was no statutory duty to keep records, and *even though*—at the time the court allowed the testimony—Plaintiffs had not in fact proved that they performed work "that was not properly compensated." ER160, ER108-109; *Mt. Clemens*, 328 U.S. at 686–87.

There is no reason to read *Mt. Clemens* as creating this broader presumption without any wrongdoing by the defendant. *Mt. Clemens* did not impose a freestanding obligation on employers to keep records for every conceivable claim employees might bring. Instead, its presumption sprung from the inverse notion that an employer should not *escape* liability by failing to keep records it was obligated to keep. That unfairness is not an issue here, because unlike the defendants in *Mt. Clemens* and *Tyson Foods*, Wal-Mart was under no statutory obligation to *separately* track time a driver spent on inspections or rest breaks—indeed, not until 2016 (after the close of the class period for this case), did the Legislature create an obligation to separately track and pay rest breaks. *See* Cal. Lab. Code § 226.2; ECF No. 546-5

(explaining rationale for section 226.2). As to layovers, the law requires only that Wal-Mart direct drivers to track their duty status, which it did. *See* 49 C.F.R. § 395.8(a), (b); ER633-637. The idea that Plaintiffs would be "punished" (ER161), by being held to their burden of proving "the amount of wages owed" through actual evidence as their claim required, rather than unrepresentative estimates, finds no support in any precedent. *See* ER1010, ER1032; Judicial Council of Cal. Civil Jury Instruction 2701.

The district court erred in using *Mt. Clemens* to paper over the fatal deficiencies in Plaintiffs' proof and to improperly shift the burden to Wal-Mart to *disprove* Plaintiffs' estimates rather than requiring them to abide by the proper standard of proof. That legal error mandates reversal.

### B. The Court Did Not Hold Plaintiffs To Their Burden Of Providing A Damages Model Tracking The Harms Actually Suffered By The Class

The district court's erroneous *Mt. Clemens* analysis also relieved Plaintiffs of their burden of proving that class members "suffered the same injury" (*Dukes*, 564 U.S. at 349–50) and that their damages were "capable of measurement on a class-wide basis" in a manner "consistent with [their] liability case" (*Comcast*, 569 U.S. at 34, 35). For this reason as well, judgment should be entered in Wal-Mart's favor.

The trial court was not empowered to award relief to the class absent "injury in fact" affecting each "plaintiff in a personal and individual way." *Spokeo*, 136

S. Ct. at 1547, 1548. That is because nothing in Rule 23 alters the basic principle that plaintiffs must prove liability and standing for each class member. *See Dukes*, 564 U.S. at 367; *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality op.) ("A class action … leaves the parties' legal rights and duties intact and the rules of decision unchanged."). The court recognized this problem before trial, holding that "class members may not recover for harm they did not suffer." ER156. But, applying *Mt. Clemens*' burden-shifting approach, the court ultimately concluded, contrary to fact, that the damages model solved this problem, and instructed the jury accordingly. ER101.

That was wrong. Plaintiffs' model did not differentiate between the injured and uninjured members of the class. That was a real concern, as examples of uninjured class members abounded: some drivers testified that they never took rest breaks at all, and others opted not to take every rest break. *See* p. 16, *supra*. The same was true for inspections: drivers and managers alike testified that inspections were "part of" a paid activity (such as a Hook or an Arrive), particularly when performed at a distribution center. *See* ER696, ER667-668; ER593. And while many drivers slept in the sleeper berths, they also testified to leaving their truck for a wide range of activities. Because drivers away from their trucks could not have been under Wal-Mart's control, there would be no injury, and therefore, no liability. *See also* ER582-583, ER442, ER452-453, ER681.

The court was not entitled to ignore the Supreme Court's clear guidance on these issues, nor was it permitted to rely on *Mt. Clemens* both to discharge Plaintiffs' obligation to prove injury and damages, and to shift the burden to Wal-Mart despite the absence of any violation of a statutory record-keeping obligation. These legal errors require a new class trial stripped of innovative evidentiary presumptions and in which Plaintiffs are held to their proper burden of proof.

## CONCLUSION

For the foregoing reasons, Wal-Mart respectfully requests that this Court—

- DISMISS the action for want of an actionable case or controversy (Part I);
- REVERSE the judgment of liability and attendant damages for layover time (Part II.A);
- REVERSE the judgment of liability and attendant damages for the remaining minimum wage claims (rest breaks and inspections) (Part II.B);
- DECERTIFY the class, for failure to demonstrate admissible classwide proof of liability or damages (Part III); and
- REVERSE any remaining awards of restitution and attorneys' fees in their entirety.

Dated: December 8, 2017 Respectfully submitted,

s/ Theodore J. Boutrous, Jr.

RACHEL S. BRASS
JOSEPH A. GORMAN
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921

JAMES H. HANSON
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, PC
10 West Market Street, Suite 1500
Indianapolis, IN 46204

THEODORE J. BOUTROUS, JR.
LAUREN M. BLAS
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520
tboutrous@gibsondunn.com

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendant, Appellant, and Cross-Appellee Wal-Mart Stores, Inc. states that it is not aware of any related cases pending before this Court.

Dated: December 8, 2017

s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the foregoing Appellant's Opening Brief is proportionately spaced, has a typeface of 14 points, and contains 13,603 words, excluding the portions excepted by Fed. R. App. P. 32(a)(7)(B)(iii), according to the word count feature of Microsoft Word used to generate this brief.

Dated: December 8, 2017

s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, I filed the foregoing Appellant's Opening Brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.