Nos. 17-15983 & 17-16142

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHARLES RIDGEWAY, *et al.*,

*Plaintiffs, Appellees, and Cross-Appellants;*

v.

WAL-MART STORES, INC.,

*Defendant, Appellant, and Cross-Appellee.*

On appeal from the United States District Court for the Northern District of California (Hon. Susan Illston), Case No. 08-05221-SI.

# APPELLEES' PRINCIPAL AND RESPONSE BRIEF


Lawrence M. Artenian
Laura E. Brown
WAGNER JONES KOPFMAN & ARTENIAN LLP
1111 E. Herndon Ave., Suite 317
Fresno, CA 93720
(559) 449-1800
lartenian@wagnerjones.com

Jacob M. Weisberg
LAW OFFICES OF JACOB M. WEISBERG
844 N. Van Ness Ave.
Fresno, CA 93728
(559) 441-0201
jmw@jweisberglaw.com

Stanley Saltzman
MARLIN & SALTZMAN LLP
29229 Canwood Street, Suite 208
Agoura Hills, CA 91301
(818) 991-8080
ssaltzman@marlinsaltzman.com

Michael Rubin
Matthew Murray
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
mrubin@altber.com

*Attorneys for Plaintiffs/Appellees/Cross-Appellants Charles Ridgeway, et al.*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ………………… 1

JURISDICTIONAL STATEMENT …………………………………………….. 2

RE-STATEMENT OF ISSUES ………………………………………………. 2

STATEMENT OF THE CASE ……………………………………………….. 3

A. The Complaint ……………………………………………………. 3

B. Class Certification ………………………………………………… 4

C. Partial Summary Judgment ……………………………………….. 6

D. Trial ……………………………………………………………….. 9

E. Post-Trial Motions ……………………………………………...11

STANDARD OF REVIEW ………………………………………………….. 13

I. The Trial Court Had Article III Jurisdiction Throughout the Litigation ……………………………………………………………… 15

II. The Jury Had Ample Basis to Find that Wal-Mart Failed to Pay Minimum Wage for Layovers, Rest Breaks, and Pre- and Post-Trip Truck Inspections ………………………………………………………. 22

A. Wal-Mart Exercised Control Over Drivers During Layovers and Did Not Pay for Rest Breaks or Inspections …………………. 22

B. The Jury Had Ample Grounds to Find Wal-Mart Liable for Failing to Pay for Layover Time …………………………………. 23

1. Wal-Mart Waived Any Challenge to the Jury Instructions Regarding the Compensability of Layover Time ………….. 23

2. The Court Properly Let the Jury Decide Whether Wal-Mart In Fact Exercised Control During Layovers ………………. 26

3. The Extent of Control Exercised by Wal-Mart During Layovers Made That Time Compensable …………………. 30

4. Federal Law Does Not Preempt the Trial Court's Application of California Law to Layover Time When Drivers Are Subject to Wal-Mart's Control …………………………………….. 35

C. The Jury Had Ample Grounds to Find Wal-Mart Liable for Failing to Pay for Rest-Break and Pre- and Post-Trip Inspection Time ……………………………………………………………. 38

1. The Trial Court Applied the Correct Legal Standard ……… 38

2. The Trial Court Properly Allowed the Jury to Decide Whether Wal-Mart Paid for Rest Breaks and Inspections …. 43

III. The Jury's Damages Calculations Were Fully Supported ……………….. 45

A. Dr. Phillips' Calculations Relied on Wal-Mart's Records and Were Supported by Substantial Evidence ………………………… 46

B. Wal-Mart's Challenge to Dr. Phillips' Testimony Are Meritless … 50

IV. The District Court's Order Denying Liquidated Damages Must Be Reversed ………………………………………………………………… 56

A. Defendants Must Overcome a Heavy Burden to Avoid Liquidated Damages Under Labor Code §1194.2 ……………….. 59

B. The District Court Erroneously Relied on Post-Trial Hearsay Evidence that Lacked Foundation and Was Not Subject to Cross-Examination ………………………………………………... 60

C. The District Court's Error Was Prejudicial ………………………. 62

CONCLUSION ……………………………………………………………… 68

## TABLE OF AUTHORITIES

Cases

*Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952 (9th Cir. 2013) ………………….. 51

*Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003) …………………………….. 51

*Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008) ……………… 53-54

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ……………… *passim*

*Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314 (2005) ………………... 40, 41, 66

*Augustus v. ABM Sec. Servs., Inc.*, 2 Cal.5th 257 (2016) ………………….. 30, 34

*Aves v. Shah*, 997 F.2d 762 (10th Cir. 1993) …………………………………… 24

*Bell v. Farmers Ins. Exch.*, 115 Cal.App.4th 715 (2004) ……………………… 51

*Bluford v. Safeway Stores, Inc.*, 216 Cal.App.4th 864 (2013) …………. 40, 41, 66

*Bratt v. Cty. of Los Angeles*, 912 F.2d 1066 (9th Cir. 1990) ………………. 15, 64

*Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004 (2012) ……. *passim*

*Brock v. Seto*, 790 F.2d 1446 (9th Cir. 1986) ………………………………... 51

*Brock v. Shirk*, 833 F.2d 1326 (9th Cir. 1987) ……………………………….. 14

*Brock v. Wilamowsky*, 833 F.2d 11 (2d Cir. 1987) ………………………….. 60

*Boyde v. California*, 494 U.S. 370 (1990) ……………………………………… 29

*Campbell-Ewald v. Gomez*, 136 S.Ct. 663 (2016) ……………………………… 19

*Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908 (9th Cir. 2003) ………………. 60

*City of Long Beach v. Standard Oil Co.*, 46 F.3d 929 (9th Cir. 1995) …………. 28

*Cole v. CRST, Inc.*, 2012 WL 4479237, *7 (C.D. Cal. Sept. 27, 2012) ……….. 41

*Coursen v. A.H. Robins Co.*, 764 F.2d 1329 (9th Cir.), *amended at* 773 F.2d 1049 (9th Cir. 1985) ………………………………………………………. 26, 28

*Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014) ……………... 37, 38

*Douglas v. Talk America*, 266 F.R.D. 464 (C.D. Cal. 2010) …………………… 22

*Elkins v. Sup. Ct.*, 41 Cal.4th 1337 (2007) …………………………………….. 62

*Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985 (9th Cir. 2007) ……………. 14

*Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920 (9th Cir. 2007) …………………………………………… 19

*Falcon v. Philips Electronics North America Corp.*, 304 Fed.Appx. 896 (2d Cir. 2008) ………………………………………………………………………... 21

*Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016) ………………….. 65

*Gilchrist v. Jim Slemons Imports, Inc.*, 803 F.2d 1488 (9th Cir. 1996) ……….. 24

*Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621 (7th Cir. 1986) ……………… 19

*Gong v. Hirsch*, 913 F.2d 1269 (7th Cir. 1990) ………………………………… 24

*Gonzalez v. Downtown LA Motors, LP*, 215 Cal.App.4th 36 (2013) …… 40, 41, 66

*Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945) ………………………. 62

*Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008) ……………. 14, 22

*Hatch v. Reliance Ins. Co.*, 758 F.2d 409 (9th Cir. 1985) ………………….. 20-21

*Hernandez v. Mendoza*, 199 Cal.App.3d 721 (1988) ………………………….. 51

*In re Facebook Litigation,* 2015 WL 3640518 (N.D. Cal. 2015) ………………. 21

*In re First All. Mortg. Co.,* 471 F.3d 977 (9th Cir. 2006) ……………………… 46

*Leyva v. Medline Indus., Inc.,* 716 F.3d 510 (9th Cir. 2013) ………………….. 46

*Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896 (3d Cir. 1991) ………… 60, 67

*Masson v. New Yorker Magazine, Inc.,* 85 F.3d 1394 (9th Cir. 1996) ……... 14, 26

*McLaughlin v. Ho Fat Seto,* 850 F.2d 586 (9th Cir. 1988) ………………… 50-51

*Medrano v. D'Arrigo Bros. Co. of Cal.,* 336 F.Supp.2d 1053 (N.D. Cal. 2004) ... 41

*Mendiola v. CPS Security Solutions, Inc.,* 60 Cal.4th 833 (2015) ……… 33, 34, 36

*Morillion v. Royal Packing Co.,* 22 Cal.4th 575 (2000) ……………….. 30, 31, 33

*Mull for Mull v. Motion Picture Indus. Health Plan,* 865 F.3d 1207 (9th Cir. 2017)

*Muniz v. United Parcel Serv., Inc.,* 738 F.3d 214 (9th Cir. 2013) ……………... 61

*Murphy v. Kenneth Cole Productions, Inc.,* 40 Cal.4th 1094 (2007) ………….. 30

*Nance v. May Trucking Co.,* 685 Fed. Appx. 602 (9th Cir. 2017) …………. 36, 37

*Oglesby v. S. Pac. Transp. Co.,* 6 F.3d 603 (9th Cir. 1993) ……………………. 13

*O'Shea v. Littleton,* 414 U.S. 488 (1974) ………………………………………. 19

*Preiser v. Newkirk,* 422 U.S. 395 (1975) ……………………………………….. 19

*Reed v. Bowen,* 849 F.2d 1307 (10th Cir. 1988) ………………………………. 19

*Spokeo v. Robins,* 136 S.Ct. 1540 (2016) ………………………………………. 19

*Tyson Foods, Inc. v. Bouaphakeo,* 136 S.Ct. 1036 (2016) ……………….. *passim*

*United Commercial Ins. Service, Inc. v. Paymaster Corp.*, 962 F.2d 853 (9th Cir. 1992) ………………………………………………………………….. 61-62

*Walton v. United Consumers Club, Inc.*, 786 F.2d 303 (7th Cir. 1986) ……. 62, 68

*Warth v. Seldin*, 422 U.S. 490 (1975) …………………………………………….. 19

*Weeks v. Angelone*, 528 U.S. 225 (2000) ………………………………………. 28

*Vaquero v. Ashley Furn. Indus., Inc.*, 824 F.3d 1150 (9th Cir. 2016) …………. 46

*Vaquero v. Stoneledge Furniture LLC*, 9 Cal.App.5th 98 (2017) ……… 40, 41, 46

Statutes

28 U.S.C. §1291 ………………………………………………………………. 2

28 U.S.C. §1332(d) ……………………………………………………………. 2

29 U.S.C. §206(b) …………………………………………………………... 60

29 U.S.C. §260 ………………………………………………………………. 60

California Business & Professions Code §17200 …………………………. *passim*

California Code of Civil Procedure §377.20 …………………………………… 17

California Code of Civil Procedure §377.30 …………………………………… 17

California Code of Civil Procedure §377.31 …………………………………… 17

California Labor Code §221 ……………………………………………………. 41

California Labor Code §223 …………………………………………………… 41

California Labor Code §226(a) ………………………………………………… 54

California Labor Code §226.2 ………………………………………………. 42

California Labor Code §1194.2 ………………………………………… *passim*

California Labor Code §1197.1 ……………………………………… 11, 57, 58

California Labor Code §1174 ………………………………………………... 54

Regulations

IWC Wage Order No. 9-2001, §2(G) ……………………………………… 4

IWC Wage Order No. 9-2001, §2(H) ………………………………... 23, 36, 42

IWC Wage Order No. 9-2001, §4 ……………………………………….... 42

IWC Wage Order No. 9-2001, §7(A) ……………………………………... 54

IWC Wage Order No. 9-2001, §12 ……………………………………… 5

49 C.F.R. §395.2 ………………………………………………………….. 36

49 C.F.R. §396.11 ……………………………………………………… 5

Rules

Federal Rule of Civil Procedure 15 ……………………………………….. 20

Federal Rule of Civil Procedure 23(a) ……………………………….... *passim*

Federal Rule of Civil Procedure 23(f) ……………………………………… 6

Federal Rule of Civil Procedure 25 ………………………………………. 3, 17

Federal Rule of Civil Procedure 30(b)(6) ………………………………… 7, 8, 45

Federal Rule of Civil Procedure 43 ………………………………………………. 61

Federal Rule of Evidence 801(c) …………………………………………………. 61

Federal Rule of Evidence 802 ……………………………………………………. 61

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

After eight years of litigation culminating in a 16-day jury trial, a Northern District of California jury under the supervision of Hon. Susan Illston found that defendant-appellant Wal-Mart Stores, Inc. violated California wage-and-hour law by failing to pay the state minimum wage for four categories of work performed by Wal-Mart delivery drivers in California (while finding in Wal-Mart's favor regarding seven other categories of work).

The court rejected Wal-Mart's post-trial motions, finding it "manifestly incorrect" to conclude that the jury's verdict was unsupported by substantial evidence or that plaintiffs had failed to establish classwide damages. ER52-60 & nn.3-5, 7 (citing trial record). The court awarded an additional year of restitution under California's Unfair Competition Law ("UCL"), Bus. & Prof. Code §17200 (which has a longer limitations period than the California Labor Code and is tried by the judge), but denied plaintiffs' request for liquidated damages under California Labor Code §1194.2—the basis for plaintiffs' cross-appeal, *infra* 57-68.

Wal-Mart frames this appeal as a series of baseless legal challenges because it cannot possibly obtain reversal under the highly deferential "substantial evidence" standard of review.

First, Wal-Mart asserts that there was a moment in 2012 when this lawsuit had no plaintiff. The pleadings and court findings show otherwise. Next, Wal-Mart

contends that the trial court's jury instructions were inadequate. But Wal-Mart endorsed the critical instruction (which was correct), waiving any challenge. Wal-Mart also insists that the evidence at trial was insufficient to establish classwide liability and damages. Not only did the judge and jury disagree, but the classwide evidence and representative and expert testimony fully satisfied any due process requirement.

For the reasons set forth below and by Judge Illston in her comprehensive post-trial rulings, the jury's findings on liability and damages and the court's UCL rulings in this case should be affirmed. However, this Court should reverse the trial court's denial of liquidated damages because it rested on inadmissible post-trial declarations and application of an erroneous legal standard.

## JURISDICTIONAL STATEMENT

The trial court had subject matter jurisdiction under CAFA, 28 U.S.C. §1332(d), throughout this case. This Court has jurisdiction under 28 U.S.C. §1291.

## RE-STATEMENT OF ISSUES

1. Whether the district court had Article III jurisdiction when plaintiffs filed their Second Amended Complaint.

2. Whether the district court committed reversible error in instructing the jury how to evaluate the legality of Wal-Mart's pay practices concerning its California drivers' layover, rest-break, and pre- and post-trip truck inspection time.

3. Whether the district court's judgment violated Wal-Mart's due process rights insofar as it rested in part on evidence that Wal-Mart contends was insufficient to establish classwide damages.

4. Whether the district court erred in denying liquidated damages to plaintiffs under Labor Code §1194.2, based on post-trial hearsay declarations.

Applicable statutes and wage orders are in the accompanying addendum.

## STATEMENT OF THE CASE

### A. The Complaint

Plaintiffs filed this lawsuit for California wage-and-hour violations in Alameda County Superior Court in October 2008. SER717-19. Wal-Mart timely removed, and the case was stayed from February 2009 through May 2012 pending *Brinker Restaurant v. Superior Court*, 53 Cal.4th 1004 (2012). ER1451-54.

Two of the four original plaintiffs died during that stay. ER242. While plaintiffs could have moved to substitute the deceased plaintiffs' successors under Fed.R.Civ.Pro. 25, plaintiffs and their counsel instead sought and obtained court-ordered discovery into the identities and claims of other potential class members, ER243, recognizing that class representatives (unlike other plaintiffs and class members) must be "adequate" to obtain class certification under Rule 23(a). Then, *while all four original plaintiffs remained in the case*, plaintiffs successfully moved

to be replaced with 14 new plaintiffs whose factual circumstances they believed would avoid any Rule 23(a) adequacy challenge. ER242.

Plaintiffs' Second Amended Complaint focused on 11 categories of work-related activities that plaintiffs alleged were not properly compensated under California law, which requires employers to pay at least the minimum wage for all "hours worked," defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." IWC Wage Order No. 9-2001, §2(G); SER715-16.

Plaintiffs' operative Fourth Amended Complaint was filed on May 10, 2013. ER1400. Plaintiffs sought damages, restitution, and statutory penalties under the Labor Code and UCL, including liquidated damages under Labor Code §1194.2.

**B. Class Certification**

Plaintiffs subsequently moved to certify a class of all Wal-Mart private fleet truck drivers employed in California after October 10, 2004. Plaintiffs supported that motion with extensive documentary evidence, including evidence that all proposed class members were subject to the same written pay policies. ER195-197; *see* Dist. Ct. Dkt. No. 113 (supporting evidence).

Plaintiffs' evidence showed that all class members were paid a combination of hourly, mileage-based, and piece-rate compensation rates based on designated job

codes, which did not separately compensate drivers for all required job duties (including truck-safety inspections that all drivers were required to conduct before and after every trip) or for California-mandated rest breaks.[1]

Plaintiffs also presented evidence that Wal-Mart's pay policies and practices, set forth in its Driver Pay Manuals (and later in the trial testimony), subjected drivers to Wal-Mart's "control" (as defined by California law) during the mandatory 10-hour layover periods that began after plaintiffs had driven the maximum daily number of hours permitted by DOT regulations. During those layovers, Wal-Mart prohibited drivers from returning home or staying at a hotel without express written permission from their managers, and imposed various additional restrictions on the drivers' activities. ER59 n.7. Although Wal-Mart paid each driver $42 per 10-hour layover (except when it gave the driver permission to return home or stay at a hotel), that amount was well below California minimum wage.

---

[1] U.S. Department of Transportation ("DOT") regulations require drivers to perform pre- and post-trip vehicle inspections before and after every shift. 49 C.F.R. §396.11 Additional inspections can be required throughout the day, but this litigation focused on the first and last inspection of each day only, because it was undisputed that every driver performed these inspections, and because the exact days on which each class member drove a truck and performed those two inspections were readily determined from Wal-Mart's records. SER87-91.

California law requires employers to provide paid rest breaks of at least 10 minutes for roughly every four hours worked, IWC Wage Order No. 9-2001, §12, and Wal-Mart's records enabled plaintiffs to determine the exact days on which each class member was eligible to take rest breaks. SER211-12, 214.

The trial court granted plaintiffs' motion for class certification after concluding that Wal-Mart's written policies and the evidence demonstrating Wal-Mart's classwide application of those policies raised common issues of liability that predominated over any individual issues, and that damages could be calculated using classwide electronic payroll data and other evidence sufficient to support reasonable estimates of the average time class members spent on regularly performed tasks (such as the daily pre- and post-trip truck inspections, and rest breaks), as permitted by *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946) (and later, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036 (2016)). ER192-212.

This Court denied Wal-Mart's motion for leave to file an interlocutory appeal under Rule 23(f) on November 14, 2014.

### C. Partial Summary Judgment

After extensive discovery, *see* ER13-14 (fee order summarizing discovery burdens), plaintiffs on March 6, 2015, filed a motion for partial summary judgment on their minimum wage claims. Plaintiffs contended that Wal-Mart: (1) failed to compensate drivers for all required job duties; (2) required drivers to take rest breaks without compensation; and (3) subjected drivers to Wal-Mart's control during 10-hour layovers without paying at least California minimum wage. Plaintiffs supported their motion with Wal-Mart's own documents, including its 2001, 2006,

and 2008 Driver Pay Manuals and deposition testimony from Wal-Mart's two Rule 30(b)(6) deponents. ER179-81.

The Driver Pay Manuals stated that Wal-Mart paid its drivers based on: (1) mileage; (2) performance of certain work activities designated by job code (such as arriving at a destination, and time unhooking trailers from the truck), which were compensated on a piece-rate basis; and (3) performance of certain other tasks such as participation in driver meetings, at an hourly rate. *Id.*

The Manuals stated that the drivers could not return home or stay at a hotel during 10-hour layovers without prior manager approval, and that any driver who did so without permission was subject to termination. *Id.*; ER959 (drivers only receive $42 layover-pay if not "at their home domicile"; "any layover at home requires prior management approval"); SER675-76 ("The following are unacceptable and may lead to immediate termination: … Unauthorized break at home (Private Fleet Operations Manual; Driver D.O.T Breaks)"). The 2008 Manual also stated: "The intent is to pay Drivers for layovers taken in the tractor cab. Any exceptions must be approved prior to the layover by the GTM (general transportation manager), including: Drivers taking a layover at his/her residence." ER959; SER679-80. No compensation would be paid for a layover "if *any portion* of it is taken at home." ER959; SER677 (emphasis in original); SER675.[2]

[2] Although Wal-Mart permitted its drivers to leave their trucks during layovers to

The deposition testimony of Wal-Mart's Rule 30(b)(6) witnesses confirmed that Wal-Mart's Driver Pay Manual provisions were mandatory for all California-based drivers and accurately stated how Wal-Mart determined drivers' compensation. ER180-81; SER692 (Pay Manual provisions "are definitely followed by the company"); SER682 ("Any method or type of pay that deviates from this pay manual is not authorized."). Wal-Mart's corporate designees also testified that the drivers earned mileage pay only when the wheels of their trucks were turning, SER695-96, and that the hourly wage for "waiting" time (at a vendor or store, for company business) was earned only after the driver had spent 45 unpaid waiting minutes (or two unpaid hours prior to 2006). SER706-07.

The trial court granted plaintiffs' motion, concluding based on the uncontroverted facts that "the pay policies detailed in the Manuals violate California wage law by failing to pay drivers at least minimum wage for all of the time they work," and that those policies, if implemented as written, subject drivers to Wal-Mart's "control" during layovers within the meaning of California law. ER189-90.

//

---

use truck-stop or restaurant facilities or briefly for other purposes, they were required to return to sleep in their tractor cab, absent prior permission. Drivers who obtained that permission (identified through Wal-Mart's records) did not receive $42 for the layover, and those unpaid layovers were not included in plaintiffs' damages calculations. SER143-45, 147.

### D. Trial

Trial began on October 27, 2016, and focused on plaintiffs' minimum wage claims for 11 categories of activities during the period October 10, 2004 to October 15, 2015. ER1041-42. After both sides rested, Judge Illston instructed the jury with respect to the specific tasks at issue, stating *inter alia*:

> ... A policy that does not compensate directly for all time worked does not comply with California Labor Codes, even if, if averaged out, it would pay at least minimum wage for all hours worked. Therefore, if Wal-Mart applied the policy as it is stated in the driver pay manual, such that no pay was earned for certain tasks, then it did not comply with California's minimum wage law. Wal-Mart may, however, pay drivers for certain tasks through activity codes that include those tasks.
>
> What is stated in any pay plan or written policy does not itself establish whether someone was paid the minimum wage. Rather, plaintiffs must still prove that, in accordance with the pay policy, the class members in fact were not paid for certain tasks. Plaintiffs have the burden to prove their claims.

ER97.

With respect to layovers, the instructions included:

> ... "Hours worked" is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." The level of the employer's control over its employees, rather than the mere fact that the employer requires the employee's activity, is determinative.
>
> The Court has previously found that the policies stated in Wal-Mart's driver pay manuals subjected drivers to Wal-Mart's control during layover periods. Under California law, the drivers must be paid for all of the time that they were subject to Wal-Mart's control. Therefore, if plaintiffs prove by a preponderance of the

> evidence that Wal-Mart applied the policy as it is stated in the driver pay manuals, then plaintiffs are entitled to the amount of additional pay that will bring Wal-Mart's payment for each 10-hour layover up to the amount of the minimum wage that was applicable at the time.

ER98. In response to a jury question, the court later supplemented this instruction by explaining:

> There is no clear definition of 'control' in the California Labor Code. The cases from the California courts have stated that the level of the employer's control over its employees, rather than the mere fact that the employer requires the employee's activity, is determinative. To determine if a driver was subject to Wal-Mart's control during the layover, *you must determine whether the driver was able to use that time effectively for his or her own purposes*…

ER299-300 (emphasis added). Although *plaintiffs'* lawyers objected that there was no need for any supplemental instruction, Judge Illston explained to the parties that the jury "need[s] to be comfortable that whatever they find Wal-Mart in fact did amounts to control," ER289, and Wal-Mart's lawyers told Judge Illston that the supplemental instruction was "a fair compromise" and one Wal-Mart "could live with." ER295.

The court's damage instructions included:

> … The plaintiffs have the burden of proving damages by a preponderance of the evidence. ...
>
> Your award must be based upon evidence and not upon speculation, guesswork or conjecture.
>
> In instances where Wal-Mart did not maintain records of the number of times certain work duties were performed or the amount of time it took class members to perform those duties, the

> plaintiffs can satisfy their burden of proof if they produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. Wal-Mart may dispute the reasonableness of the inference to be drawn from the plaintiffs' evidence.

ER101. Finally, the court also instructed the jury that, if it found liability, it should determine (for purposes of plaintiffs' claim for civil penalties under Labor Code §1197.1) whether Wal-Mart acted "intentionally" (and not in good faith) in failing to pay class members the minimum wage. ER102; *see infra* 57-58 n.16.

After deliberations, the jury issued special verdicts in favor of plaintiffs on four of 11 tasks in dispute, awarded damages for each named plaintiff and the class as a whole, and found that Wal-Mart's violations were "intentional." ER914-36.

### E. Post-Trial Motions

After the jury's special verdicts, the court awarded plaintiffs an additional year of restitution under the UCL, ER67-72, but denied plaintiffs' motion for liquidated damages under Labor Code §1194.2. Despite the jury's finding that Wal-Mart had acted intentionally and not in good faith when it violated California's minimum wage laws, the court concluded that Wal-Mart had acted in good faith after all, without any evidence of Wal-Mart's actual good faith intent or whether it "had reasonable grounds for believing" that its unlawful practices were legal other than a foundationless, hearsay post-trial declaration from a witness whom plaintiffs were not allowed to cross-examine. *See infra* 61-62.

Wal-Mart filed post-trial motions seeking judgment as a matter of law, a new trial, and decertification. Each were denied. ER48. The court found that substantial evidence supported the jury's findings, that the verdict was not against the weight of the evidence, and that the trial was not otherwise unfair to Wal-Mart. ER48-60. Noting that most of Wal-Mart's legal challenges had been raised and rejected several times before and that Wal-Mart's challenges to the sufficiency of the evidence were "manifestly incorrect," ER52 & n.1, the court cited the extensive trial record while criticizing Wal-Mart for "simply rehash[ing] its jury arguments, which the jury did not accept," and for making factual assertions without evidentiary support. ER54 & n.2.

Rejecting Wal-Mart's challenge to the jury's "layover" findings, the court reiterated its prior conclusion that "Wal-Mart's policy designating places to take layovers—in the tractor unless a driver obtained permission to go elsewhere—constituted control if such a policy was implemented," ER57, but emphasized that its prior partial summary judgment ruling "did not... determine liability as to plaintiffs' minimum wage claims." ER59. To the contrary, the court stated that it had allowed both parties to present considerable evidence at trial about how, or to what extent, Wal-Mart implemented control over the drivers during their away-from-home layovers, *id.*; and the court cited much of that evidence, including evidence of additional restrictions imposed by Wal-Mart during the layovers

(including prohibitions against consuming alcohol, carrying a personal weapon, allowing pets in the truck cab, limiting spousal visits, and requiring drivers to sleep in the cab unless given permission to the contrary). ER59-60 & n.7. The court also made clear that "the question of whether during layovers the drivers were in fact under Wal-Mart's control, within the meaning of the governing California labor law provision, was presented to the jury" for decision. ER59-60.

After entry of judgment, this appeal and cross-appeal followed.

## STANDARD OF REVIEW

Plaintiffs agree that this Court reviews de novo the trial court's legal determinations that an Article III case or controversy existed; that the Federal Aviation Administration Authorization Act (FAAAA) did not preempt plaintiffs' layover-time claim; and that Wal-Mart was not entitled to judgment as a matter of law. AOB 21. Review of the trial court's conclusion that plaintiffs were entitled to partial summary judgment is also de novo, *id.* (although review of that order is unnecessary, as the trial court ultimately left the determination of liability and damages to the jury, *infra* 23-29).

Plaintiffs also agree that this Court applies an abuse-of-discretion standard of review to the jury instructions, based on those instructions viewed as a whole. *Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 606 (9th Cir. 1993). "An error in the jury instructions does not require reversal if it is more probable than not that the error

was harmless." *Masson v. New Yorker Magazine, Inc.*, 85 F.3d 1394, 1397 (9th Cir. 1996).

The trial court's decision not to exclude plaintiffs' expert testimony is also reviewed for abuse of discretion. AOB 21. Any error in the admission of that evidence does not require reversal unless it was prejudicial, meaning that it "more probably than not tainted the verdict." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1009 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008).

The jury's special verdicts, including the jury's calculation of damages, must be upheld if supported by "substantial evidence." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2010). In evaluating a challenge to a jury's verdict, the Court "must view all evidence in the light most favorable to the nonmoving party [here, plaintiffs], draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

For plaintiffs' cross-appeal, the trial court's underlying fact findings are reviewed for clear error, but to the extent the court's "determination that [Wal-Mart] satisfied [its] burden of demonstrating that [it] acted in good faith and on reasonable grounds requires the application of legal principles to established facts," review is de novo. *Brock v. Shirk*, 833 F.2d 1326, 1330 (9th Cir. 1987) (discussing analogous liquidated damages provision in federal Fair Labor Standards Act (FLSA)), *vacated*

*on other grounds*, *Shirk v. McLaughlin*, 488 U.S. 806 (1988); *Bratt v. Cty. of Los Angeles*, 912 F.2d 1066, 1071 (9th Cir. 1990) (same).

## I. The Trial Court Had Article III Jurisdiction Throughout the Litigation

Wal-Mart first argues that the district court "lost jurisdiction" once it lifted the three-year stay it had imposed pending *Brinker*, because by then, two of the four original plaintiffs had died and concerns had been expressed about the other two as class representatives. AOB 2, 4-6, 22-27. Wal-Mart further contends that once the court lost jurisdiction, it also lost discretionary authority to grant plaintiffs' motion for pre-certification communication with putative class members. ER1448-50. Alternatively, Wal-Mart argues that even if the court had jurisdiction, it abused its discretion in granting plaintiffs' motion to authorize pre-certification communications. AOB 22-27.

Each of these arguments rests on the same false premise—that at the time of the order permitting pre-certification communications, "the named plaintiffs no longer ha[d] any dispute with the defendants [and therefore] their claims no longer 'exist.'" AOB 24 (quoting ER243). In fact, the district court held that those claims "continue[d] to exist," not that they "no longer exist." ER243. The record fully supports the court's conclusion that it never lost jurisdiction.

This was never a "headless" case. AOB 26. As Judge Illston explained in her September 12, 2012 Order:

> The Court recognizes that this is a unique case. This is not one where the named plaintiffs were inadequate representatives from the beginning or where plaintiffs' counsel are attempting to secure new class representatives because of deficiencies that have become apparent after the fling of their complaint. Instead, this is a case where, due to the significant passage of time, the apparently adequate named plaintiffs have either died or have reconsidered their ability to serve as class representatives. Moreover, unlike many of the inapposite cases relied on by defendant, *there is an existing case and controversy here.* While the deceased plaintiffs' claims have been extinguished, *the claims of the remaining two plaintiffs, and of any similarly situated putative class member, continue to exist.*
>
> In these unique circumstances, the Court finds it appropriate to grant plaintiffs the relief they seek.

ER243 (emphases added). Ultimately, the order rejected Wal-Mart's "case-or-controversy" argument, required Wal-Mart to produce contact information for the putative class, and authorized plaintiffs to send those drivers a court-approved letter "for the purpose of securing discovery ["regarding the defendant's practices"] and identifying new plaintiffs and potential class representatives".

It is true that during the three years this case was stayed, two plaintiffs died, one informed plaintiffs' counsel that he had "lost interest" in continuing as a class representative, and the fourth was the subject of some "concerns" by plaintiffs' counsel about whether he could "continue to adequately represent the class" going forward. ER242. But none of these four individuals actually withdrew or were dismissed from the case, and plaintiffs' Second Amended Complaint simply replaced the four original plaintiffs with 14 new class representatives. Although

three of these were later dismissed by stipulation, the remaining representatives—each of whom unquestionably had standing—were later held to be "adequate" and "typical" under Rule 23(a). *See* ER193-94, 202.

Although Wal-Mart argues that the two deceased plaintiffs ceased to have any claims once they died, state and federal law holds to the contrary. In California, a decedent's wage-and-hour claims are not extinguished upon death, but become property of the decedent's estate. Cal. Code Civ. Proc. §§377.20, 377.30, 377.31. Since the deceased plaintiffs' claims continued to exist even after death, the decedents' estates could have been substituted as plaintiffs once the stay of litigation was lifted. *See* Fed.R.Civ.Pro. 25(a)(1) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper party...."). Instead, plaintiffs chose to amend the complaint by substituting and adding plaintiffs with identical claims, thus avoiding any potential future litigation over the estates' "adequacy" under Rule 23(a)(4). At no time prior to amendment did the claims of the two deceased plaintiffs "no longer 'exist.'" AOB 24.

Wal-Mart's Article III argument is even weaker as to the two other plaintiffs. While plaintiffs' counsel reported to the court that one plaintiff had "lost interest in continuing as a class representative," ER242, counsel did *not* seek to dismiss that plaintiff's substantive claims against Wal-Mart (which would have required a Rule 41 dismissal). Instead, counsel simply informed the court that plaintiffs were

beginning to undertake the process of replacing him with a different class representative whose claims would be just as typical but who could more adequately represent the interests of the class under Rule 23(a)(4). Counsel similarly informed the court that upon amending the complaint, a new named plaintiff would be added to replace the fourth original plaintiff, because of counsels' "'concerns' about the ability of th[at] fourth named plaintiff *to continue to adequately represent the class*." ER242 (emphasis added). In other words, not only did the fourth plaintiff still have, and still assert, his wage-and-hour claims against Wal-Mart at the time plaintiffs filed their motion, but plaintiffs' counsel represented to the court in that motion that he was *still* an adequate class representative, although they had concerns about whether he could continue to serve in the long-term.

Wal-Mart confuses the appropriateness of an individual serving as a class representative (and thus being able to satisfy each of the requirements of Rule 23(a)), with whether a named plaintiff/putative class representative has a live case or controversy under Article III. At no time during this litigation did any named plaintiff *not* have a live case or controversy against Wal-Mart. For that reason, the district court never lost jurisdiction.

Wal-Mart's case authorities are entirely distinguishable. Plaintiffs do not dispute that for a class representative's claims to be typical, the representative must have suffered the same types of injuries that other class members suffered. *See* AOB

24 (citing *Warth v. Seldin*, 422 U.S. 490 (1975), and *O'Shea v. Littleton*, 414 U.S. 488 (1974)). Plaintiffs also agree that a class representative whose claim has become moot or who has suffered no injury cannot be an adequate class representative. *See* AOB 23 (citing *Campbell-Ewald v. Gomez,* 136 S.Ct. 663, 669, 672 (2016), *Reed v. Bowen*, 849 F.2d 1307, 1311-14 (10th Cir. 1988), and *Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 626 (7th Cir. 1986)). Nothing in *Glidden* or any other cited cases, however, supports Wal-Mart's assertion that if named plaintiffs "have passed away, grown weary of the case, no longer wish to represent the class because their claims are not cognizable, or are no longer adequate representatives[,] then their claims no longer 'exist'…" AOB 24 (quoting in part *Glidden*, 808 F.2d at 626).

Plaintiffs' claims in this case did not become moot or atypical, for the reasons stated above (although no inquiry into typicality would become relevant until almost two years later, when class certification briefing was completed). Nor did plaintiffs "abandon" their claims, AOB 23 (citing *Spokeo v. Robins*, 136 S.Ct. 1540, 1547-48 (2016)), "voluntarily dismiss" them, AOB 23-24 (citing *Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors,* 498 F.3d 920, 924 (9th Cir. 2007)), or assert "hypothetical" claims without any "affected parties" being "before the court," AOB 23 (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). Consequently, even if Wal-Mart had moved to dismiss plaintiffs' Second Amended complaint for lack of standing, the district court would have been required to deny

that motion because all four original plaintiffs, followed in turn by the additional plaintiffs, had live claims against Wal-Mart at all times they served as class representatives.

Wal-Mart asserts two grounds for challenging the district court's pre-certification discovery order. The first ground, the court's supposed lack of Article III jurisdiction, is refuted above. The second ground, the court's supposed abuse of discretion, fails to survive the highly deferential standard of review governing a trial court's discretionary rulings.[3]

Judge Illston found that plaintiffs' request for contact information and their proposed letter to putative class members "includes clearly relevant and appropriate discovery regarding [Wal-Mart's] practices." ER243. That finding was well within the court's discretionary authority, especially given the "unique circumstances" of this case – which had been stayed shortly after filing for more than three years and which alleged a series of California Labor Code violations that affected more than 800 similarly situated California Wal-Mart delivery drivers. *See, e.g.*, *Hatch v.*

[3] Wal-Mart does *not* contend that the court erred in permitting plaintiffs to amend under Rule 15 to add new plaintiffs in place of the four original plaintiffs. Consequently, any error in permitting pre-amendment discovery or communications is necessarily harmless, as Wal-Mart has not shown that but for the prior ruling, plaintiffs would have been unable to amend.

*Reliance Ins. Co.*, 758 F.2d 409, 416 (9th Cir. 1985). Nor has Wal-Mart shown, or even alleged, any legally cognizable prejudice resulting from the court's order.[4]

Even if plaintiffs' motion had been limited to seeking information about other potential class representatives, the court would have been within its discretion to grant the requested relief, especially considering the early stage (in process, if not in time) of the litigation. Wal-Mart relies on the unpublished *Falcon v. Philips Electronics N.A. Corp.*, 304 Fed. Appx. 896 (2d Cir. 2008), which affirmed a trial court's denial of class certification (because the named plaintiff did not have the legal claim she sought to assert on behalf of the class) and then denied plaintiffs' motion to *reopen* discovery after the denial of certification to find a replacement plaintiff. *Id.* at 898. The Second Circuit in *Falcon* concluded that the trial court had not abused its discretion in part because the plaintiff had many opportunities to find additional class representatives earlier. *Id.* While *Falcon* concluded that there was no *right* to compel such discovery "in a suit which has no party plaintiff" (i.e., where plaintiff does not have the very claim she alleged), *id.* (quotation marks omitted), nothing in *Falcon* suggests that a trial court would lack discretion to allow such

[4] Wal-Mart quotes a fragment of a sentence from a district court order that states, "... a plaintiff may not seek information from a defendant to find a proper representative to keep the case alive," AOB 26 n.1, but ignores the very next sentence in that opinion: "But where a plaintiff also legitimately seeks such identifying information to support her motion for class certification, she is entitled to relief." *In re Facebook Privacy Litigation*, 2015 WL 3640518, at *3 (N.D. Cal. June 11, 2015).

discovery where, as here, the request came far earlier in the litigation and the existing plaintiffs did in fact have the claims they alleged. *See also Douglas v. Talk America*, 266 F.R.D. 464, 466 (C.D. Cal. 2010).

For each of these reasons, the district court had jurisdiction under Article III and acted well within its discretion in allowing plaintiffs to communicate with putative class members during pre-certification discovery.

## II. The Jury Had Ample Basis to Find that Wal-Mart Failed to Pay Minimum Wage for Layovers, Rest Breaks, and Pre- and Post-Trip Truck Inspections

The six-person jury unanimously found that Wal-Mart violated California wage law by failing to pay its drivers at least minimum wage for time spent taking 10-hour layovers away from home, taking 10-minute rest breaks, and performing pre-trip and post-trip inspections. ER914-16. Wal-Mart's challenges to those findings are meritless.

### A. Wal-Mart Exercised Control Over Drivers During Layovers, and Did Not Pay for Rest Breaks or Inspections

A jury's verdict must be upheld if supported by "substantial evidence." *Harper*, 533 F.3d at 1021. In rejecting Wal-Mart's post-trial motions, Judge Illston cited considerable evidence supporting the jury's findings that Wal-Mart exercised control over drivers during their 10-hour away-from-home layovers (making that time compensable under California law) and failed to compensate drivers for rest-break and pre- and post-trip inspection time. *See* ER53-60 & nn.2-7 (citing

evidence). That evidence fully supports the properly-instructed jury's verdict.[5]

### B. The Jury Had Ample Grounds to Find Wal-Mart Liable for Failing to Pay for Layover Time

#### 1. Wal-Mart Waived Any Challenge to the Jury Instructions Regarding the Compensability of Layover Time

The jury found Wal-Mart liable for failing to pay drivers at least minimum wage for layovers taken away from home because the drivers were subject to Wal-Mart's control within the meaning of IWC Wage Order No. 9-2001, §2(H). ER915-16. Wal-Mart challenges these findings—not because it disputes the sufficiency of the supporting evidence—but because it contends that the trial court committed instructional error by preventing the jury from deciding for itself whether Wal-Mart subjected the drivers to its "control." AOB at 35-39. Wal-Mart is wrong, but in any event it waived that challenge by expressly agreeing to the Court's instruction defining "control" under California wage law.

---

[5] Judge Illston also independently evaluated the evidence in support of her decision to award restitution under California's UCL for an additional year preceding the Labor Code's three-year statute of limitations. ER67-72. Except for a single footnote in Wal-Mart's argument that it did in fact pay for rest breaks and inspection time, AOB 44 n.3, Wal-Mart does not separately challenge the trial court's independent determination of liability for that additional year of unpaid minimum wages for layover, rest-break, and pre- and post-trip inspection time. That portion of the judgment must be affirmed regardless of the outcome of Wal-Mart's other challenges.

A party's failure to object to a jury instruction waives the right to challenge the instruction on appeal. *See* Fed.R.Civ.Pro. 51(c); *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1493 (9th Cir. 1996); *Aves v. Shah,* 997 F.2d 762, 766 (10th Cir. 1993); *Gong v. Hirsch,* 913 F.2d 1269, 1277 (7th Cir. 1990).

During deliberations, the jury asked the court to define the term "control" as it pertains to whether Wal-Mart was liable for failing to pay minimum wage for time spent during layovers. ER284-85. Although plaintiffs' counsel took the position that no responsive instruction was necessary, the court disagreed, explaining that without a supplemental instruction the jury might not understand why the parties had presented so much witness testimony and documentary evidence about how Wal-Mart actually implemented its layover-pay policies. ER288-89. Rejecting plaintiffs' position that "the only question for the jury should be, '[D]id [Wal-Mart] apply the policy or not?,'" *id.*, the court responded: "I don't think it's fair to say, 'You don't have to worry about what control is because I've already found that as long as the policy is implemented,' because they still do. *They need to be comfortable that whatever they find Wal-Mart in fact did amounts to control*." ER289 (emphasis added). The court also explained: "There is a lot of information in this record about [what Wal-Mart did], and the jury is still going to have access to that information, take what they find to be the actual implementation, and figure out if that amounts to control." *Id.*

In light of this discussion, the court proposed (and subsequently issued) the following supplemental instruction:

> There is no clear definition of control in the California Labor Code. The cases from the California courts have stated that the level of the employer's control over its employees, rather than the mere fact that the employer requires the employees activity, is determinative. *To determine if a driver was subject to Wal-Mart's control during the layover, you must determine whether the driver was able to use that time effectively for his or her own purposes.*
>
> I will give you two examples from other cases. These involve different factual situations, and they may be helpful to you as guidance only. They may be helpful to you as analogies. The facts in those cases were different from these facts.
>
> But here are the two examples.
>
> When an employer directs, commands or restrains an employee from leaving the workplace during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, the employee remains subject to the employer's control.
>
> And here is the second example.
>
> When agricultural worker employees were required by their employer to meet at designated places to take the employer's buses to work and were prohibited from taking their own transportation, the employees were subject to the control of the employer, although they could read on the bus or perform other personal activities.

ER299-300 (emphasis added).

Wal-Mart not only failed to object to that supplemental instruction, but it affirmatively *endorsed* the court's language. After Judge Illston explained that the

jury "need[s] to be comfortable that whatever they find Wal-Mart in fact did amounts to control," ER289, Wal-Mart's counsel stated, "I think what you just proposed is a fair compromise." ER295; *see also* ER296 (Wal-Mart's counsel: "[W]e can live with that."). Having accepted this instruction as a "fair compromise," Wal-Mart cannot now assert that the court's instructions failed to give the jury the "opportunity to decide control." AOB 38.

### 2. The Court Properly Let the Jury Decide Whether Wal-Mart In Fact Exercised Control During Layovers

Wal-Mart's challenge to the trial court's "control" instructions fails even without waiver. An appellate court cannot reverse a jury verdict based on allegedly inadequate or misleading jury instructions if those instructions, considered as a whole, "fairly and adequately cover the issues presented." *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1337 (9th Cir.), *amended at* 773 F.2d 1049 (9th Cir. 1985); *see Oglesby*, 6 F.3d at 606 ("instructions are considered as a whole and an abuse of discretion standard is applied to determine if they are misleading or inadequate"). "An error in the jury instructions does not require reversal if it is more probable than not that the error was harmless." *Masson,* 85 F.3d at 1397 (quotation marks omitted).

Wal-Mart does not contend that the court misstated the elements of plaintiffs' claims. Nor does it dispute the trial court's statement of California law regarding the degree of employer "control" required. *See* ER295-96. Instead, Wal-Mart

complains that the trial court abused its discretion by limiting the jury's inquiry to "only the question whether Wal-Mart applied [its] pay plans in practice." AOB 35. That is not a fair characterization of the court's instructions.

In its initial set of jury instructions, the court informed the jury:

> Under California law, employers must pay employees at least the minimum wage per hour for all hours worked. *"Hours worked" is defined as "the time during which an employee is subject to the control of an employer,* and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *The level of the employer's control over its employees, rather than the mere fact that the employer requires the employee's activity, is determinative.*
>
> The Court has previously found that the policies stated in Wal-Mart's driver pay manuals subjected drivers to Wal-Mart's control during layover periods. *Under California law, the drivers must be paid for all of the time that they were subject to Wal-Mart's control.* Therefore, if plaintiffs prove by a preponderance of the evidence that Wal-Mart applied the policy as it is stated in the driver pay manuals, then plaintiffs are entitled to the amount of additional pay that will bring Wal-Mart's payment for each 10-hour layover up to the amount of the minimum wage that was applicable at that time.

ER98 (emphases added).

The jury later asked the court to clarify the statement in this instruction that "[t]he Court has previously found that the policies stated in Wal-Mart's driver pay manuals subjected drivers to Wal-Mart's control during layovers." Referring to this statement by page and line number, the jury asked: "On Page 17, Line 12 and 13 of Jury Instruction No. 16, we would like a definition regarding Wal-Mart's control

during layover periods." ER284-85. The jury would not have asked this question unless it understood that its task was to determine whether Wal-Mart did, in fact, subject drivers to its control during their layovers. That is how the court and the parties understood the jury's question, which is why the court's supplemental instruction explained how "[t]o determine if a driver was subject to Wal-Mart's control during the layover[s]," and specifically telling the jury that it "must determine whether the driver was able to use that time effectively for his or her own purposes." ER299-300.

Wal-Mart does not dispute that the supplemental "control" instruction accurately stated California law (which may be why it endorsed that instruction), and never objected that it was an inaccurate or inadequate response to the jury's question. Because a "jury is presumed to understand a judge's answer to its question," *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), the court's layover and control instructions, considered as a whole, "fairly and adequately cover[ed] the issues presented." *Coursen*, 764 F.2d at 1337.

Even were there some ambiguity in the court's instructions, and even if that ambiguity amounted to error, such error would have been harmless. *See City of Long Beach v. Standard Oil Co.*, 46 F.3d 929, 933, 935 (9th Cir. 1995). After all, Wal-Mart itself acknowledges that the trial court "would have properly given the question of control to the jury" *if* the court had "allowed each side to present testimony at trial

regarding the meaning of the language in the pay plan, and the actual layover practices," AOB 39; *and that is precisely what happened*. The trial record demonstrates that nearly every witness, whether called by plaintiffs or defendant, testified at trial (often at length) about Wal-Mart's layover policy and how it was implemented in practice. ER53-60 & nn.2-7; SER306-51, 360-449, 472-74, 493-94, 511-12, 521-27, 528-31, 562-64, 598-99, 604.

The jury thus had ample factual basis to find 'actual control' within the meaning of California law, and Wal-Mart had a full and fair opportunity to challenge that evidence and to present contrary evidence of its own. Judge Illston was undoubtedly correct when she concluded that "the question of whether during layovers the drivers were in fact under Wal-Mart's control, within the meaning of the governing California labor law provisions, was presented to the jury" to resolve. ER59.[6]

//

[6] Wal-Mart separately complains that during closing argument, plaintiffs' counsel stated that "the only question remaining" with respect to the 10-hour layover periods was "whether Wal-Mart applied the policy as stated in the Driver Pay manuals." ER330. But Wal-Mart did not object to that statement – which in any event *preceded* the court's supplemental "control" instructions – thus waiving any challenge. Besides, it is well-established that "arguments of counsel generally carry less weight with a jury than do instructions from the court," *Boyde v. California*, 494 U.S. 370, 384 (1990), and that "[a] jury is presumed to follow its instructions," *Weeks*, 528 U.S. at 234.

### 3. The Extent of Control Exercised by Wal-Mart During Layovers Made That Time Compensable

Wal-Mart further argues that, despite the jury's findings, it was not liable for unpaid layover-time wages under California's "control" test because the degree of control established by the facts was inadequate to constitute "control" as a matter of law. AOB 35-38. Governing California case law holds otherwise.

The California Supreme Court has consistently recognized that the worker-protective provisions of the IWC Wage Orders and California Labor Code must "be liberally construed with an eye to promoting such protection." *Brinker*, 53 Cal.4th at 1026-27; *see Augustus v. ABM Sec. Servs., Inc.,* 2 Cal.5th 257, 262 (2016); *Murphy v. Kenneth Cole Productions, Inc.,* 40 Cal.4th 1094, 1103 (2007). Under California law, all "'time during which an employee is subject to the control of an employer'" is compensable, including time when the employee is not performing physical job duties in the conventional sense. *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 582 (2000) (quoting IWC Wage Order).

Consistent with these principles, the California Supreme Court concluded in *Morillion* that where an employer required its employees "to meet at designated places to take its buses to work" and "prohibit[ed] them from taking their own transportation," the employees were "subject to the control of an employer" and entitled to compensation for those hours "worked." *Id.* at 587. Similarly, in *Bono Enterprises, Inc. v. Bradshaw,* 32 Cal.App.4th 968 (1995), the Court of Appeal

explained that "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control" and must be paid. *Id.* at 975.

Applying California's worker-protective "control" test, Judge Illston concluded in her partial summary judgment order that the restrictions in Wal-Mart's Driver Pay Manuals (which stated the parties' rights and obligations during DOT-mandated 10-hour layover periods) would be sufficient to establish Wal-Mart's "control" over the drivers' freedom of movement *if Wal-Mart implemented and enforced those restrictions in actual practice*—a factual issue that the court left for the jury to decide based on actual trial evidence. *Supra* 26-29.

Judge Illston noted that, under those policies, "[w]hile drivers may have been able to leave their trucks to eat a meal, shop, or exercise, the physical location of the layover—inside the tractor cab and not at the driver's residence—was specified and controlled by Wal-Mart." ER189. Like the restrictions imposed on the employees in *Morillion* and *Bono*, these restrictions (if found by the jury to have been implemented in practice) would sufficiently establish Wal-Mart's control over its drivers "by specifying the location for a paid layover and prohibiting payment for layovers taken at the driver's residence without prior authorization." *Id.*

Wal-Mart contends that the trial court pre-judged the "control" issue and

prevented the jury from considering the evidence. But the jury had untrammeled authority to decide for itself based on the trial evidence how Wal-Mart actually implemented its layover policies and whether the degree of control it exercised over its drivers during these away-from-home layovers was sufficient to constitute "control" under California law. *Supra* 26-29. The complete trial record amply supported the jury's special verdict on that issue.

Based on the trial testimony, a reasonable jury could conclude that drivers who did *not* obtain prior approval to spend a 10-hour layover at home or in a hotel were required to sleep in their tractor cabs, ER59-60 & n.7, and that those drivers were only paid $42 per layover (far below minimum wage) *except* when authorized to spend the layover at home or at a hotel. ER977. Wal-Mart's written policy expressly stated: "The intent [behind these $42 per layover payments] is to pay Drivers for layovers taken in the tractor cab." *Id.* Extensive evidence (much from Wal-Mart's own witnesses) demonstrated that this restrictive policy was implemented as written, and showed that during away-from-home layovers drivers were: required to keep their tractors "park[ed] in a safe, legal and secure location"; made responsible for the safekeeping of the vehicle at all times; required to report any accidents promptly; and were prohibited from using alcohol, having visitors (including spouses), pets, or other animals. ER59-60 & n.7. The record as a whole fully supports the jury's finding that Wal-Mart was liable for failing to pay the

minimum hourly wage, and not just a flat $42, for those away-from-home layovers.

It makes no difference whether Wal-Mart's drivers were relieved of physical work duties during their layovers or whether they were able to relax, eat meals, or sleep in their tractor cabs. Based on the evidence that Wal-Mart exercised control over where the drivers could and could not spend their layovers, there was ample basis for the jury to find "control" under California law. *See Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal.4th 833, 837, 842 (2015) (on-call security guards who were required to remain in or near trailers at construction sites were subject to employer "control," despite being able to "engage[] in personal activities, even sleeping, showering, eating, reading, watching television, and browsing the Internet").

Under California law, "[a]llowing plaintiffs the circumscribed activities of reading or sleeping does not affect, much less eliminate, the control [an employer] exercises by requiring them to travel on its buses." *Id.* at 842 (citing *Morillion*, 22 Cal.4th at 546). Similarly, "time [an] employee is required to remain at [the] workplace during lunch constitutes hours worked even when [the employee is] relieved of all job duties." *Id.* (citing *Bono*, 32 Cal.App.4th at 971-72). And time during which an "employee is required to remain at [the] workplace is hours worked even if [the employee is] permitted to sleep." *Id.* (citing *Aguilar v. Association for Retarded Citizens*, 234 Cal.App.3d 21, 30 (1991)). The case law thus supports both the jury and trial court's findings that Wal-Mart was required to compensate its

drivers at the minimum wage rate for away-from-home layovers, even if the drivers did nothing but eat and sleep during that time.

Wal-Mart argues that it did not actually control its drivers' freedom of movement because it allowed them to seek "permission" to take a layover at home. AOB at 36. The jury found otherwise, and under California law a requirement that an employee must remain at a certain location unless and until granted permission to leave constitutes an exercise of control sufficient to make the employee's time compensable. In *Mendiola*, for example, the California Supreme Court held that guards who were required to remain on site and respond if contacted by a dispatcher were subject to employer control even though they could request permission "to leave the worksite" and could ask to be relieved by another guard. 60 Cal.4th at 837, 841.

Wal-Mart also argues that "practical limitations on an employee's movement" during a work break are insufficient to establish employer control. AOB 32 (citing *Augustus*, 2 Cal.5th at 270). But the 10-minute rest breaks in *Augustus* are readily distinguishable from the 10-hour layovers here. *Augustus* noted that, because rest periods are only 10 minutes long, "an employee generally can travel at most five minutes from a work post before returning to make it back on time." 2 Cal.5th at 270. Standing alone, that 'practical reality' did not establish employer control because "one would expect that employees will ordinarily have to remain onsite or

nearby" even without restriction. *Id.* When an employer imposes "additional constraints" on its employees such that they are "tethered by time and policy to particular locations or communications devices", however, "[t]hese obligations are irreconcilable with employees' retention of freedom to use rest periods for their own purposes." *Id.* at 269-70.

No "practical limitations" required plaintiffs to remain *in or near their tractors* during 10-hour layovers. Only Wal-Mart's policies required that. Only Wal-Mart's policies forbade plaintiffs from being picked up and going home, to a friend's or relative's, to a hotel, or elsewhere. Wal-Mart's argument that it did not subject drivers to "control" as a matter of law must therefore be rejected.

#### 4. Federal Law Does Not Preempt California Law Regarding the Compensability of Layover Time In Which Drivers Are Subject to Wal-Mart's Control

Wal-Mart next argues that the jury's finding regarding Wal-Mart's control over layover time is "incompatible with the federal regulatory scheme" governing delivery truck drivers, because federal DOT regulations require drivers to be "off duty" during their 10-hour layovers. AOB 27-33. There is no incompatibility. Nothing in the federal regulations prohibits a company from paying drivers, or a State from requiring payment, for "off duty" time during which no physical work is performed but the employee is still subject to the employer's control.

The federal regulations require that during 10-hour layovers, drivers must be

"relieved from all responsibility for performing work." 49 C.F.R. §395.2. Under California law, though, an employee can be relieved from all responsibility for performing job duties and still be entitled to receive wages, because (as Wal-Mart concedes) California broadly defines compensable work to include all time during which an "employee is suffered or permitted to work" and all "time during which an employee is subject to the control of an employer." IWC Wage Order No. 9-2001, §2(H); *see* AOB 32. In California, "an employee who is subject to an employer's control does not have to be working during that time to be compensated." *Mendiola*, 60 Cal.4th at 839 (quotation marks omitted). Thus, even assuming Wal-Mart's drivers were in fact relieved of all physical job duties during their 10-hour layover periods, that would not be inconsistent with the jury's conclusion that Wal-Mart exercised control over drivers during those layovers and was therefore required to pay for that time under California law.

Wal-Mart largely relies on the unpublished *Nance v. May Trucking Co.*, 685 Fed. Appx. 602 (9th Cir. 2017). But as Judge Illston noted, the memorandum disposition in *Nance* never considered California's "control" test because that case was based exclusively on the FLSA and Oregon law, neither of which defines "compensable time" to include time spent under an employer's control. *See* ER39; *Nance*, 685 Fed. Appx. at 605-06.[7]

---

[7] *Nance* was decided under federal and Oregon regulations that specifically exclude

Wal-Mart also argues that to the extent California law requires compensation for driver layover time it is preempted by the FAAAA. AOB 33-35. That argument is precluded by *Dilts v. Penske Logistics, LLC*, 769 F.3d 637 (9th Cir. 2014), which held that the FAAAA does not preempt California's meal-and-rest-break laws because those laws "do not set prices, mandate or prohibit certain routes, or tell motor carriers what services they may or may not provide, either directly or indirectly." *Id.* at 647. The same reasoning applies to California's minimum wage law. Indeed, this Court in *Dilts* repeatedly stated that "state wage laws" are not preempted by the FAAAA. *Id.* at 644, 647, 648.

Wal-Mart attempts to distinguish *Dilts* by arguing that here "there is an actual conflict between state and federal law." AOB at 34. But that assumes the conclusion Wal-Mart is asserting. Nothing in the federal regulatory scheme prohibits a State from requiring a company to pay for "off duty" layover time—whether $42 for the period, or at the State's minimum hourly wage—or prohibits a company from exercising the type of control that might be considered compensable under one State's law but not under another's or under the FLSA.

Wal-Mart finally speculates, without any evidentiary basis, that if the verdict

---

from the definition of "work" the time during which an assistant or helper sleeps "in adequate facilities furnished by the employer," while riding with the driver in a *moving* truck. *Nance*, Fed. Appx. at 605 (citing 29 C.F.R. §785.41; Or.Admin.R. 839-020-0045(7)). Here, no layover time occurred while the trucks were in transit, and California law has no special rules governing pay for layover time.

stands, employers "may" respond by imposing greater restrictions on drivers' leisure time (instead of the more likely response: exercising less control to avoid paying for layovers). AOB 35. That fanciful prediction is entirely inadequate to support a finding of preemption. Besides, this Court has already concluded that generally applicable background laws like state wage laws are not preempted by the FAAAA "even if employers must factor those provisions into their decisions about the prices they set, the routes that they use, or the services that they provide." *Dilts*, 769 F.3d at 646.

### C. The Jury Had Ample Grounds to Find Wal-Mart Liable for Failing to Pay for Rest-Breaks and Pre- and Post-Trip Inspection Time

#### 1. The Trial Court Applied the Correct Legal Standard

The jury also found Wal-Mart liable for failing to pay its drivers for the time they spent on 10-minute rest breaks and pre- and post-trip truck inspections. ER915-16. Wal-Mart contends that the trial court instructed the jury using "the wrong standard" for these claims. AOB at 40. But Wal-Mart's quarrel is with California law, not the jury instructions.

Plaintiffs' unpaid-wages claims arose because Wal-Mart had a series of pay codes that covered most, but not all, of the work-related activities it required drivers to perform. Under California law, an employer must pay for all work it suffers or permits to be performed and for all time its employees are subject to its control.

*Supra* 4. Plaintiffs alleged 10 categories of work (in addition to time spent on layovers) that they performed without compensation under Wal-Mart's pay codes; Wal-Mart responded that its pay codes should be construed to encompass each of those categories of work. The jury agreed with plaintiffs as to three categories (rest breaks, pre-trip inspections, and post-trip inspections) and disagreed as to the remaining seven (truck fueling, washing, weighing, performing adjustments after weighing, undergoing DOT roadside inspections, meeting with driver coordinators, and waiting at a vendor or store). ER915-16.

Substantial evidence supports the jury's findings that Wal-Mart's pay codes failed to compensate drivers for rest-break time and pre- and post-trip inspection time. SER218-305.[8] Wal-Mart does not contend otherwise. Instead, it argues as a legal matter that its wage rates as a whole were sufficiently high that, when any driver's wages were totaled and then divided by the number of hours worked (i.e., averaged), the driver's average wage per hour exceeded the California minimum wage. AOB 40-42.

The critical flaw in this argument is that California law *prohibits* averaging. Unlike the procedure for calculating minimum wages under the FLSA, which

[8] As with the trial court's judgment for the additional year of unpaid 10-hour layover time, *supra* 23 n.5, the record also includes substantial evidence to support Judge Illston's award of restitution to plaintiffs for an additional year under the UCL. ER70.

permits averaging, "California law does not allow an employer to avoid paying its employees for all hours worked by averaging total compensation over total hours worked in a given pay period." *Gonzalez v. Downtown LA Motors, LP*, 215 Cal.App.4th 36, 40 (2013). Instead, the California minimum wage must be paid "for each hour worked," *Armenta v. Osmose, Inc.*, 135 Cal.App.4th 314, 323 (2005), whether the employees are paid by the hour, by the piece, or by commission. *Id.; Gonzalez,* 215 Cal.App.4th at 41; *Vaquero v. Stoneledge Furniture LLC*, 9 Cal.App.5th 98, 109-11 (2017).

If, for example, a driver performs a compensable 15-minute pre-trip truck inspection at the start of a shift, the employer must pay at least one-quarter hour at the minimum wage rate for that time, no matter how much the employer may pay that driver for any other period of time. Rest breaks are treated no differently than other periods of work that must be independently compensated. *See, e.g., Bluford v. Safeway Stores, Inc.*, 216 Cal.App.4th 864, 872 (2013). "[A] piece-rate compensation formula that does not compensate separately for rest periods does not comply with California minimum wage law." *Id.*

The trial court's jury instructions were accurate and straightforward: "A policy that does not compensate directly for all time worked does not comply with California Labor Codes, even if, averaged out, it would pay at least minimum wage for all hours worked," and if "no pay was earned for certain tasks," then Wal-Mart

"did not comply with California's minimum wage law." ER97. These instructions are entirely consistent with controlling law. Indeed, the California Court of Appeal recently cited Judge Illston's analysis of the minimum wage calculations *in this very case* as an example of how California law is correctly applied. *See Vaquero*, 9 Cal.App.5th at 110, 111, 115 (repeatedly citing *Ridgeway*).

Wal-Mart's challenge to the instructions relies almost exclusively on federal case law, which is contrary to governing California law. *See, e.g.*, AOB 41-42.[9] Although Wal-Mart contends that California law permits averaging *within* any hour—*i.e.*, that an employer can pay *nothing* for certain compensable tasks if it pays the minimum wage for each hour *as a whole*—that contention cannot be reconciled with *Bluford*, 216 Cal.App.4th at 872, or the other California appellate cases that require compensation for all time worked, even 10-minute rest breaks.[10]

---

[9] One of those cases, *Medrano v. D'Arrigo Bros. Co. of Cal.*, 336 F.Supp.2d 1053 (N.D. Cal. 2004), was expressly rejected in *Armenta*, 135 Cal.App.4th at 322-23. Another, *Cole v. CRST, Inc.*, 2012 WL 4479237, *7 (C.D. Cal. Sept. 27, 2012), was unpublished, cited no authority, and was decided before *Gonzalez*, *Bluford*, and *Vaquero*.

[10] California Labor Code §§221 and 223, which have no federal counterparts, do not permit pay averaging. Those statutes require payment for all time worked "at either the statutory or agreed rate and prohibit an employer from using any part of that rate as a credit against its minimum wage obligation." *Gonzalez*, 215 Cal.App.4th at 47-48. "[A]llowing the employer to average its employees' compensation over their total hours worked 'contravenes these code sections' by effectively reducing the employees' contractual rate of compensation." *Id.* (quoting *Armenta*, 135 Cal.App.4th at 323); *see id.* at 50 (providing example). The same reasoning precludes averaging compensation over any period of time,

Wal-Mart's averaging argument is also precluded by the plain language of the IWC Wage Order, which requires employers to pay the minimum wage "for all hours worked" and specifically defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes *all the time* the employee is suffered or permitted to work…" IWC Wage Order No. 9-2001, §§2(H), 4 (emphasis added).

Wal-Mart also seeks support from Labor Code §226.2, a statute that did not go into effect until *after* the close of the class period (*see* ER60, finding §226.2 irrelevant for that reason), which requires employers to pay piece-rate workers "for rest and recovery periods and other nonproductive time separate from any piece-rate compensation." *See* AOB 42-43; Cal. Stats. 2015, c. 754 (A.B.1513), §4, eff. Jan. 1, 2016.

Wal-Mart asserts that under §226.2, it should have been allowed to demonstrate that it paid for drivers' rest breaks and pre- and post-trip inspections because those tasks were "directly related" to other tasks that it compensated under its pay codes. But the court's instructions permitted Wal-Mart to make precisely that argument. Indeed, almost every trial witness, manager and employee alike, reviewed a large demonstrative chart listing the pay codes in the pay manuals and stated which tasks at issue—including rest breaks and truck inspections—were

---

including averaging across each full hour of work.

related to a task that had an authorized pay code. *See, e.g.*, SER450-616. After considering that testimony, the jury agreed with Wal-Mart as to seven tasks (such as fueling and washing the trucks and undergoing roadside inspections) and with plaintiffs as to the three now at issue. ER915-16.

### 2. The Trial Court Properly Allowed the Jury to Decide Whether Wal-Mart Paid for Rest Breaks and Inspections

Wal-Mart also argues that the trial court committed reversible error by instructing that Wal-Mart's manuals "do not separately specify pay for rest breaks." AOB at 44-45; ER60. But that instruction was factually accurate. The manuals make no reference to payment for rest breaks and Wal-Mart has never contended otherwise. *See* ER61.

Wal-Mart's argument fails to quote the instructions at issue, which directed the jury to decide whether Wal-Mart paid drivers for time spent during rest breaks and pre- and post-trip inspections. Jury Instruction No. 15 informed the jury that if "no pay was earned for certain tasks, then [Wal-Mart] did not comply with California's minimum wage law. Wal-Mart may, however, pay drivers for certain takes through activity codes that include those tasks." ER97. That instruction also provided that "[w]hat is stated in any pay plan or written policy does not itself establish whether someone was paid the minimum wage. Rather, plaintiffs must still prove that, in accordance with the pay policy, the class members *in fact were not*

*paid for certain tasks*. Plaintiffs have the burden to prove their claims." *Id.* (emphasis added). Instruction No. 17 reiterated the point, stating: "*If you find* that class members took rest breaks, and that Wal-Mart applied the policy as it is stated in the driver pay manuals, *such that minimum wage was not earned for rest breaks*, then plaintiffs are entitled to recovery of [minimum] wages…" ER99 (emphases added). These instructions, viewed as a whole, correctly informed the jury that plaintiffs had the burden of proving that Wal-Mart failed to pay for each task at issue; and the jury found that plaintiffs had satisfied that burden.

Finally, Wal-Mart argues in passing that the trial court "prejudiced" Wal-Mart's ability to defend against plaintiffs' claim for pre- and post-trip inspection time by referring to the court's prior summary judgment order, "thereby suggesting that the court had already found that Wal-Mart violated the law." AOB 45. But the court's instructions regarding plaintiffs' minimum wage claims made clear that it was for the jury itself to determine whether plaintiffs had met their burden of proving that "the class members in fact were not paid for certain tasks." ER97. Those instructions said nothing about pre- and post-trip inspections beyond noting that those were two of the tasks in dispute. ER96. None of those instructions, including the court's references to *other* activities like rest breaks and layover time, constituted legal error, let alone sufficient prejudice to warrant reversal.

## III. The Jury's Damages Calculations Were Fully Supported

Wal-Mart claims that plaintiffs failed to provide "classwide proof in this case," an argument that rests on its assertion that Dr. G. Michael Phillips' damages calculations were "the sole classwide proof supporting the verdict." AOB 46, 53. This is incorrect. Plaintiffs presented substantial classwide evidence, including Wal-Mart's own written policies and testimony from both of Wal-Mart's designated 30(b)(6) witnesses, which established to the jury's satisfaction—and to Judge Illston's—that Wal-Mart applied its payment plans and policies to all class members. ER65, 179-81; SER624-26, 633-38. Plaintiffs also presented extensive testimony from individual drivers and supervisors who confirmed those uniform classwide practices. SER21-634.

Wal-Mart argues that the true facts are otherwise, relying heavily on snippets of testimony that it believes the jury should have found more credible. *See, e.g.*, AOB 49-50. But based on the record as a whole, the jury had considerable basis to find that Wal-Mart did not pay for rest breaks and pre- and post-trip truck inspection time (ER54-55 & nn.3-5), that Wal-Mart paid only $42 but not the minimum hourly wage for 10-hour layovers away from home (SER150-53), and that Wal-Mart's drivers averaged two unpaid rest breaks per day (ER54 & n.3), conducted truck inspections before and after every trip (ER55), and were subject to Wal-Mart's "control" within the meaning of California law during the 10-hour layovers for

which they were paid only $42 (ER56-60 & n.7). *See In re First All. Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) (affirming class judgment based on substantial evidence at trial supporting jury's classwide liability finding).[11]

### A. Dr. Phillips' Calculations Relied on Wal-Mart's Records and Were Supported by Substantial Evidence

Wal-Mart's assertion that Dr. Phillips' testimony was the only basis for the jury's damages calculations ignores most of what happened during the 16-day trial, where Dr. Phillips' testimony was just part of the evidence establishing damages, along with Wal-Mart's own records and testimony from many witnesses about layovers, rest breaks, and inspections.

Dr. Phillips' method of calculating damages for layover time was straightforward and based on simple arithmetic. Using Wal-Mart's own data showing each date on which each class member was paid $42 for a 10-hour layover, SER143-45, 147, Dr. Phillips subtracted the $42 that Wal-Mart actually paid for each layover from the amount that Wal-Mart should have paid for each layover had it paid the minimum hourly wage rate then in effect. SER151-53. By counting only those layovers for which a driver was paid $42, Dr. Phillips limited his damages

[11] Rule 23 does not require plaintiffs to prove damages through common evidence. *See Vaquero v. Ashley Furn. Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Thus, even if there were grounds for questioning the jury's damages calculations (there are none), there would still be no basis to disturb the jury's findings of classwide liability.

calculations to those layovers during which the drivers were subject to Wal-Mart's control according to the jury, and thus entitled to be paid the minimum wage. There was nothing complicated about this approach.

Dr. Phillips' calculation of pre- and post- trip truck inspection time was even more straightforward. The evidence was undisputed that every driver performed a pre-trip truck inspection before each daily trip and a post-trip truck inspection after each daily trip. ER55; SER618, 627, 631-32. Those inspections were mandatory, and considerable evidence showed the drivers complied with that important safety requirement—which was in their own self-interest as well as Wal-Mart's. *Id.*

Dr. Phillips calculated the total number of pre- and post-trip inspections performed by each class member by counting each day that each driver actually drove for Wal-Mart, based on Wal-Mart's own records. SER151-53. Dr. Phillips testified that if each inspection lasted an average of 15 minutes, the total damages owed by Wal-Mart for pre-trip inspection time would be $2,971,220 and total damages owed for post-trip inspection time would also be $2,971,220, which he calculated by taking the number of days the drivers drove during the class period, multiplied by one-quarter of the then-applicable minimum hourly wage (because 15 minutes equals one-quarter hour). SER87-99.

Wal-Mart challenges Dr. Phillips use of the 15-minute average. But that average is well-supported by the record, including by testimony from many class

members (including approximately 40 randomly selected class member deponents), several Wal-Mart managers, a Wal-Mart training video, plaintiffs' trucking safety expert, and Dr. Phillips. ER55; SER92, 218-78, 628-29, 639-42. The jury was free to accept or reject any or all of this evidence as it saw fit. *See* ER85-92, 94, 97, 101. Moreover, Dr. Phillips also calculated and testified about a "per-minute" damages value, which the jury could have used instead, had it found that the average duration of either type of inspection was higher or lower than the number used by Dr. Phillips. SER96, 99-100.

Dr. Phillips' calculation of rest break damages followed the same basic approach. Using Wal-Mart's own payroll records, Dr. Phillips counted the number of days worked by each class member and multiplied that amount by the value of two 10-minute rest breaks per day (one-sixth of an hour per break, times the applicable minimum wage). SER58-59, 102-03, 211-14. Wal-Mart challenges the validity of Dr. Phillips' assumption that the drivers averaged two unpaid rest breaks per day. But the jury accepted that assumption based on substantial trial evidence.

Wal-Mart's own payroll data provided the basis for Dr. Phillips' testimony that the usual workday for each driver during the class period was "at least 10 hours." SER102. In addition, many class members testified that they typically worked all or nearly the full 14 hours per day permitted by federal regulations. SER352-59. Because California law requires employers to provide two paid 10-minute rest

breaks for an eight-hour workday and three paid 10-minute rest breaks for a 12-hour workday, *Brinker*, 53 Cal.4th at 1029, this evidence was sufficient to establish that Wal-Mart's drivers were entitled to at least two, and often three, paid rest breaks every day they drove for Wal-Mart.

The record further demonstrated (and the jury again agreed) that the drivers in this case did in fact take an average of two 10-minute rest breaks per day, but were not paid for that break time. *See supra* 39-40, 43-45. Many class members and several Wal-Mart managers testified that Wal-Mart's California drivers took at least two unpaid breaks per day and that each break generally lasted 10 minutes *or longer*. SER279-305. That testimony was consistent with the testimony of the 40 randomly selected class members who had previously been deposed, whose testimony was one of the stated grounds for Dr. Phillips' expert opinions. SER59-86, 102-03.

The jury had considerable leeway under the court's instructions to accept, reject, or change the average number and/or length of the class members' daily rest breaks based on the evidence, just as it had leeway to make findings with respect to the number and/or length of pre- and post-trip inspections. *See* ER101 ("It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not upon speculation, guesswork, or conjecture. … Wal-Mart may dispute the reasonableness of the inference to be drawn from the plaintiffs' evidence."). While Wal-Mart had a full and fair opportunity to present its own

damages expert and its own evidence (much of which it highlights in its brief), the jury was free to reject that evidence and accept plaintiffs' instead, which is what it did.

### B. Wal-Mart's Challenges to Dr. Phillips' Testimony Are Meritless

Wal-Mart complains that Dr. Phillips improperly based his damages calculations for rest breaks and inspections on *estimated averages* rather than an *individualized analysis* of every rest break and every inspection taken by every class member on every day between October 10, 2004 and October 15, 2015, and that without such granular proof, the judgment cannot stand.

As this Court and the U.S. Supreme Court have repeatedly stated, however, due process does not require that level of detail—either in a class action like this or an individual or multi-plaintiff action—because in the absence of accurate, contemporaneous payroll or other business records, no witness in a wage-and-hour case could possibly recall the precise circumstance of each separate workday's activities covering such a multi-year period. That is why it has been settled for decades that where an employer "failed to maintain accurate payroll records[,] an employee carries his burden … if he shows he performed work for which he was improperly compensated and produces *some evidence* to show the amount and extent of that work 'as a matter of just and reasonable inference.'" *McLaughlin v. Ho Fat*

*Seto*, 850 F.2d 586, 588 (9th Cir. 1988) (quoting *Mt. Clemens*, 328 U.S. at 687) (emphasis added).[12]

This Court has repeatedly "approved 'approximated' awards where plaintiffs can establish, to an imperfect degree of certainty, that they 'have performed work and have not been paid in accordance with the [law].'" *Alvarez v. IBP, Inc.*, 339 F.3d 894, 914-15 (9th Cir. 2003) (quoting *Brock v. Seto,* 790 F.2d 1446, 1448 (9th Cir. 1986)) (brackets omitted). "Where an 'approximate award based on reasonable inferences' forms a satisfactory surrogate for unquantified and unrecorded 'actual' times, an approximated award is permissible." *Id.* (quoting *Brock*, 790 F.2d at 1449) (brackets omitted); *see Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 967 (9th Cir. 2013) (permissible to use time records to "extrapolate" whether meal break was on- or off-duty and to calculate damages); *Bell v. Farmers Ins. Exch.*, 115 Cal.App.4th 715, 748 & n.22 (2004) (citing cases from this and other circuits).

In *Tyson Foods,* 136 S.Ct. 1036, the Supreme Court applied these same principles in permitting a class of plaintiffs to use representative testimony and averaging to establish a meatpacking plant employer's liability for statutory overtime. The Supreme Court affirmed the trial court's liability ruling, concluding that "[i]n a case where representative evidence is relevant in proving a plaintiff's

[12] *McLaughlin* and *Mt. Clemens* involved claims under the FLSA, but the same principle applies under California wage laws. *See Hernandez v. Mendoza*, 199 Cal.App.3d 721, 726 (1988).

individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class." *Id.* at 1046-47; *see also id.* (where "each employee worked in the same facility, did similar work, and was paid under the same policy, … the experiences of a subset of employees can be probative as to the experiences of all of them").

*Tyson Foods* makes clear that even when an employer's challenged workplace practices do not cause the same harm to all class members, and even when those practices do not cause any legally cognizable harm to some class members (as in *Tyson Foods* but not here), plaintiffs may prove liability and damages through statistical sampling, surveys, representative testimony, and similar evidence—as long as that evidence would be sufficient to establish plaintiffs' claims through "just and reasonable inference," even if considerable variation exists among the impacts of those practices on different class members. *See* ER101.[13]

[13] As Justice Thomas pointed out in his *Tyson Foods* dissent, the record in that case established considerable variation in the extent of donning-and-doffing time spent by class members, which differed by a ratio of more than 20-1 and resulted in some class members having no right to overtime at all. 136 S.Ct. at 1055 (Thomas, J., dissenting) (plaintiffs' "study estimated that kill department employees took an average 6.4 minutes to don equipment at their lockers before their shift – but employee Donald Brown testified that this activity took him around 2 minutes" [less than one-third the time of the others]; that "[c]ut and retrim employees took between 0.583 minutes and over 10 minutes to don preshift equipment at their lockers" [a variation of nearly 2,000%]; and that "[p]ostshift doffing took one employee less than two minutes, and another over nine minutes").

Here, plaintiffs proved classwide liability by demonstrating to the jury's satisfaction that Wal-Mart failed to pay any wages for four categories of work activity. Dr. Phillips' calculations had nothing to do with those liability determinations. They only came into play in determining the appropriate amount of aggregate damages. For purposes of this appeal, then, the question raised by Wal-Mart's attacks on Dr. Phillips comes down to whether his damages calculations were supported by substantial evidence.[14]

Wal-Mart argues that despite *Mt. Clemens* and 70 years of consistent state and federal case law, employees may not prove damages through just and reasonable inference *unless* "the employer 'violate[s] [it]s *statutory* duty to keep proper records.'" AOB 54 (emphasis in original). That is not the law, and it would make no logical sense in a case like this where the employer could easily have maintained more comprehensive records. *See, e.g., Amaral v. Cintas Corp. No. 2*, 163

---

[14] Wal-Mart complains that Dr. Phillips did not offer an opinion about "whether the rest breaks and inspections were performed during paid or unpaid time, and whether all layover time … was in fact spent in the truck." AOB 52.

But plaintiffs did not ask Dr. Phillips to formulate an opinion as to these potentially disputed facts, only to calculate damages based on stated assumptions (which the jury later accepted). The trial court was thus correct not to exclude Dr. Phillips' calculations. ER125-28. The court was also correct to allow plaintiffs to rely on *other* evidence to prove that Wal-Mart's pay codes did not cover rest breaks and inspection time and that the drivers were subject to Wal-Mart's control during away-from-home layovers, leaving Dr. Phillips to testify about potential damages only.

Cal.App.4th 1157, 1189-90 (2008) ("[T]he underlying rationale for burden-shifting is not the employer's duty of recordkeeping but the 'fundamental principle of American jurisprudence that for every wrong there is a remedy, and that, unless countered by public policy, an injured party should be compensated for all damage proximately caused by the wrongdoer.'") (quoting *Hernandez*, 199 Cal.App.3d at 726). Where, as here, the "fact of damage is certain and [the] only uncertainty concerns the amount of damage, 'it would be a perversion of justice to deny all relief to the injured person, thereby relieving the wrongdoer from making any restitution for his wrongful act.'" *Id.* (quoting *Hernandez* at 726-27). But the Court need not reach that issue for two reasons.

First, under California law, Wal-Mart *did* have a statutory duty to maintain accurate, contemporaneous records of all compensable work time. *See* IWC Wage Order No. 9-2001, §7(A)(3) (employer must maintain "[t]ime records showing when the employee begins and ends each work period"); Cal. Labor Code §1174 (employer must maintain "payroll records showing the hours worked daily by … employees"); *id.* §226(a) (1), (2), (9) (employer must provide wage statements showing "wages earned," "total hours worked" and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee"). While Wal-Mart asserted that it had no obligation to

pay for—and thus maintain records for—layovers, rest breaks, and pre- and post-trip inspections, the jury and judge held otherwise.

Second, the record shows that, to a large extent, Dr. Phillips' damages calculations *did* rely on Wal-Mart's records, including records establishing when layovers were taken and paid, which days each driver started and ended a trip, and how much they were paid under each pay code. The only estimated averages involved were 15 minutes for each pre- and post-trip inspection and two 10-minute rest breaks each day, which were supported by the trial evidence. *Supra* 47-50.[15]

The jury here relied on precisely the same types of evidence that the Supreme Court in *Tyson Foods* found legally sufficient and consistent with due process. *See, e.g,* 136 S.Ct. at 1048 (plaintiffs' use of a study to calculate damages based on average classwide donning-and-doffing time "could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action"). While Wal-Mart implicitly suggests that hour-by-hour, driver-by-driver

---

[15] Judge Illston noted:

> Dr. Phillips "relied on a wide range of data, including ... electronic payroll data, hard copies of payroll documentation, GasBoy data, data of approximately 1200 DOT inspections, a driver log database, a trip detail database, and a GPS database" [as well as] a survey/questionnaire of approximately 40 randomly selected drivers ... [that h]e "recorded and analyzed ... based on their initial responses to the survey/questionnaire tool and any clarifications or modifications provided at deposition."

ER126 (quoting Dist. Ct. Dkt. No. 417 [denying motion to strike Phillips' report]).

testimony would have been more accurate, that is just speculation – and few, if any, wage-and-hour cases could proceed if that level of precision were required. *See Mt. Clemens,* 328 U.S. at 688.

Wal-Mart had ample opportunity to present its case and to try to rebut plaintiffs' evidence. As Judge Illston concluded in denying Wal-Mart's motions for judgment as a matter of law, for a new trial, and for decertification, Wal-Mart "was able to, and quite capably did, cross-examine Dr. Phillips" on his methods and results, and Wal-Mart also called its own witness, "Dr. Jonathan Walker, who reviewed and criticized Dr. Phillips' work. … Both parties argued strenuously to the jury about these questions, and the jury's verdict reflected its conclusions." ER53. Nothing more was required:

> Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury. Reasonable minds may differ as to whether the average time [plaintiffs' expert] calculated is probative as to the time actually worked by each employee. Resolving that question, however, is the near-exclusive province of the jury.

*Tyson Foods,* 136 S.Ct. at 1049; *see also McLaughlin,* 850 F.2d at 586.

## IV. The District Court's Order Denying Liquidated Damages Must Be Reversed

California law requires courts to award "liquidated damages" to employees who prevail in an action for unpaid minimum wages, unless the defendant

establishes that it acted in good faith and with a reasonable belief in the legality of its unlawful conduct. Labor Code §1194.2 thus provides:

> (a) In any action ... to recover wages because of the payment of a wage less than the minimum wage, ... an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon. ...
>
> (b) Notwithstanding subdivision (a), if the employer demonstrates to the satisfaction of the court ... that the act or omission giving rise to the action was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of any provision of the Labor Code relating to minimum wage, ... the court ... may, as a matter of discretion, refuse to award liquidated damages or award any amount of liquidated damages not exceeding the amount specified in subdivision (a).

Plaintiffs sought liquidated damages under this statute based on a showing that Wal-Mart had not presented any evidence of its subjective "good faith" or "reasonable grounds for believing" that California law allowed it not to pay for rest breaks, pre- and post-trip inspections, and layovers subject to its control, SER2-15, 645-50, 659-67, and further noting the jury's findings (with respect to civil penalties under Labor Code §1197.1) that Wal-Mart's minimum wage violations were "intentional" and *not* made in "good faith." *See* SER14-15, 18-19.[16]

---

[16] The court instructed the jury that, if it found liability, it should also determine whether Wal-Mart acted "intentionally" in failing to pay class members the minimum wage from October 10, 2007 onward, stating:

> A party acts "intentionally" when the party acts willfully or with a conscious objective to engage in particular conduct.
>
> A "good faith dispute" exists where an employer presents a

Wal-Mart opposed plaintiffs' motion, principally relying on two post-trial declarations: one from trial counsel Rachel Brass, which authenticated three public documents that purported to show that California minimum wage law was unsettled during much of the class period (but without citing any evidence that Wal-Mart relied upon, or was even aware of, those documents when it committed its minimum wage violations), SER651-52; and one from Ed Parrish, the Wal-Mart human resources director who "recruit[ed] and hir[ed]" drivers and "assisted with the administration" of Wal-Mart's pay policies, who stated that Wal-Mart "intended" to pay legally compliant wages and "understood" that its pay policies were near the top of the industry pay scale, SER653-57.

Plaintiffs objected to Parrish's declaration and contended that because plaintiffs were not allowed to cross-examine him, the trial court could not consider his declaration in deciding whether to award liquidated damages. SER2-6, 18-19, 646-48.

---

> defense based in law or fact that would, if successful, preclude any recovery by the employees. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute existed.
>
> *Where a "good faith dispute" exists, an employer has not "intentionally" failed to pay wages.*"

ER102 (emphasis added). Although the court gave this instruction for the purpose of determining the appropriateness of civil penalties under Labor Code §1197.1, it later declined to award those penalties upon concluding that §1197.1 did not give rise to a private right of action. ER81.

The trial court disagreed and refused to "limit its review" to only "evidence that Wal-Mart put on at trial." ER72. The court then concluded that plaintiffs were not entitled to liquidated damages because Wal-Mart had sufficiently established its "good faith" and "reasonable belief" in the legality of its unlawful acts. ER74-76. This was reversible error, because it rested on evidence that was both inadmissible and irrelevant.

### A. Defendants Must Overcome a Heavy Burden to Avoid Liquidated Damages under Labor Code §1194.2

Trial courts have discretion to deny or reduce liquidated damages under §1194.2(b) only if the employer first proves "that the act or omission [violating California minimum wage law] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of any provision of the Labor Code relating to minimum wage, or an order of the commission."

Thus, before the trial court could consider whether to reduce or eliminate liquidated damages, Wal-Mart first had to prove that its failure to pay minimum wage for each of the four categories of violations found by the jury "was in good faith" (a subjective inquiry based on Wal-Mart's state of mind throughout the class period) and that Wal-Mart "had reasonable grounds for believing" it was not violating the law (both a subjective inquiry—because the standard is whether Wal-

Mart in fact "had reasonable grounds," not "whether reasonable grounds existed"—*and* an objective inquiry based on what was reasonable).

Labor Code §1194.2 largely tracks the language of the analogous liquidated damages provision in the FLSA. *See* 29 U.S.C. §§206(b), 260. Under the FLSA's liquidated damages rule, "liquidated damages represent compensation, and not a penalty. Double damages are the norm, single damages the exception." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003) (quotation marks omitted); *see Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991) ("defendant employer's burden of proof [to avoid liquidated damages] is 'a difficult one to meet'") (quoting *Brock v. Wilamowsky,* 833 F.2d 11, 19 (2d Cir. 1987)). Case law applying the federal liquidated damages provision should, at minimum, inform the inquiry into the proper application of the more worker-protective provisions of the California Labor Code. *See Brinker, supra*, 53 Cal.4th at 1026-27.

### B. The District Court Erroneously Relied on Post-Trial Hearsay Evidence that Lacked Foundation and Was Not Subject to Cross-Examination

Wal-Mart did not present any evidence at trial to establish its good faith belief that California law allowed it to avoid paying the minimum wage for rest-break, inspection, or layover time.

The only such "evidence" was in the post-trial declaration of Ed Parrish, whom plaintiffs were not permitted to cross-examine about the statements in his

declaration, and which were mostly conclusory and lacking in foundation. Parrish's declaration asserted (without explaining how he knew, or what basis he had for concluding) that Wal-Mart "understood" throughout the class period that its "driver pay process complied with all applicable minimum wage laws," SER654 ¶4; that Wal-Mart "always intended to pay its drivers more than what they would have earned had they been compensated at the minimum wage for each hour worked," *id.* ¶7; that "Wal-Mart ... understands that those tasks ["pre-trip inspections, post-trip inspection, ... or taking rest breaks"] were compensated as part of the activity and mileage pay earned by the drivers," *id.* ¶8; that "Wal-Mart intends and has always intended to pay drivers far in excess of the minimum wage," *id.*; and that "we [Wal-Mart] had no belief that our approach to compensation violated any minimum wage law," *id.* ¶12.

By rejecting plaintiffs' objections to Parrish's out-of-court declaration, the trial court committed reversible error. *See* ER72; SER18-19, 646. Except for limited exceptions not applicable here, a declaration is inadmissible hearsay and cannot be admitted for the truth of the statements asserted. *See* Fed.R.Evid. 801(c), 802; Fed.R.Civ.Pro. 43 ("At trial, the witnesses' testimony must be taken in open court"); *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 223 (9th Cir. 2013); *United*

*Commercial Ins. Service, Inc. v. Paymaster Corp.*, 962 F.2d 853, 858 (9th Cir. 1992); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312-13 (7th Cir. 1986).[17]

The court's denial of plaintiffs' right to cross-examine Parrish was particularly crucial, given the lack of foundation and lack of personal knowledge for many of the statements in his declaration, *none* of which had been included in his earlier trial testimony (as Wal-Mart's counsel later conceded, SER16-17).

### C. The District Court's Error Was Prejudicial

The trial court's reliance on Parrish's post-trial hearsay declaration was highly prejudicial, because that error "more probably than not tainted" the court's finding that Wal-Mart acted in good faith, *Engquist*, 478 F.3d at 1009—particularly because Wal-Mart did not present any direct evidence at trial of its subjective good faith beliefs.

The court offered five reasons for concluding that "Wal-Mart implemented its pay policy in good faith": (1) "Wal-Mart's pay policy included discretionary pay for drivers who unexpectedly fell short of daily averages"; (2) Wal-Mart "modified its piece-rate pay policies" following the enactment of Assembly Bill 1513 in 2015; (3) Wal-Mart's activity codes "compensated drivers for certain tasks" *other* than rest

[17] If the choice of procedural rules determines the outcome of a diversity action, state procedure governs. *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945). No conflict exists here because California also considers declarations to be inadmissible hearsay. *Elkins v. Sup. Ct.*, 41 Cal.4th 1337, 1354-62 (2007).

breaks, inspections, and layovers; (4) "Wal-Mart's compensation is among the highest in the trucking industry"; and (5) "Wal-Mart's attrition rates are much lower than industry average." ER74.

The Parrish declaration provided the principal factual support for two of those findings, regarding the purpose of "discretionary pay" (SER656 ¶11) and how Wal-Mart's pay practices compared with its competitors' (*id.* ¶¶5, 6, 10, 15).[18] More important, Parrish's declaration provided the *only* direct "evidence" of Wal-Mart's subjective beliefs, including (without explanation for how he knew) what Wal-Mart "understood" (¶4), "understands" (¶8), "understood and expected" (¶12), "intended" (¶7), "intends" (¶¶8, 11), "did [not] intend" (¶12), and "has always intended" (¶8). The court's reliance on the Parrish declaration requires reversal.

Even if the trial court had not committed error by relying on inadmissible statements in the Parrish declaration for its good faith findings, reversal would still

[18] The trial court cited pg. 1000:24 of the trial transcript in support of its findings regarding discretionary pay, but the relevant testimony does not support the court's findings, stating only that the discretionary pay activity code was designed for "emergency situations" such as "a snow day or something where the driver just can't get over the road or something like that," SER638, or other "extraordinary circumstances or special circumstances" where there was "something that might cause us to need to make sure we make our drivers whole for the day." SER637. The trial court also cited the trial transcript in support of its findings regarding comparative compensation and low attrition, ER74, but that was improper, too, as the court had previously struck that testimony (which rested on comparisons with Wal-Mart's competitors) as lacking foundation and resting on hearsay. SER619-21.

be required because the factual underpinnings for the court's order, even if true, do not establish either good faith or that Wal-Mart in fact had a reasonable belief in the lawfulness of its conduct.

The inquiry under §1194.2(b) is not whether the law-violating employer treats its workers well in other respects, or is able to retain employees despite its violations, or commits fewer minimum wage violations than its competitors. Nor is it whether the employer's overall pay scheme was adopted in good faith. If an employer violates California minimum wage law, it must pay liquidated damages under §1194.2 unless it affirmatively proves that it committed each unlawful "*act or omission giving rise to the action*" in good faith, with the actual belief that its conduct was objectively reasonable. Even an after-the-fact showing of objective reasonableness, as Wal-Mart tried to establish through the Brass declaration exhibits, is not sufficient without proof that Wal-Mart actually and in good faith based its acts on (i.e., "had") those reasonable grounds for its unlawful acts. *See Bratt v. City of Los Angeles*, *supra*, 253 F.3d 410, 420 (9th Cir. 2001) ("To satisfy the subjective 'good faith' component, the [County was] obligated to prove that [it] had 'an honest intention to ascertain what [the FLSA] requires and to act in accordance with it.'")

None of the factual findings cited by the court (even if supported by admissible evidence) were sufficient to establish subjective good faith, alone or in combination. Even if "Wal-Mart's pay policy included discretionary pay for drivers

who unexpectedly fell short of daily averages," no evidence showed that Wal-Mart ever provided such pay for any of the violations at issue. While Wal-Mart asserted that it "modified its piece-rate pay policies" in 2015 after the enactment of Assembly Bill 1513 (in some unspecified way), that claimed modification came *after* the 11-year class period had ended and cannot be evidence of what Wal-Mart believed or intended during the class period. Although the jury found that Wal-Mart's activity codes "compensated drivers for certain tasks" *other* than the four work activities at issue, the jury found that Wal-Mart had failed to pay more than $54 million for the more than 103,000 pay periods containing minimum wage violations. ER917; *see Flores v. City of San Gabriel*, 824 F.3d 890, 906 (9th Cir. 2016) (employer's "inclusion of other types of payments in the regular rate of pay" for calculating overtime did not demonstrate good faith as to employer's exclusions of payment at issue from regular rate calculation).

Assuming that "Wal-Mart's compensation is among the highest in the trucking industry," that says nothing about the company's subjective good faith intent with respect to the particular acts and omissions at issue. *See Flores*, 824 F.3d at 906 ("Evidence that [employer] agreed to pay overtime more generously than required by law" not relevant to whether violation of FLSA was in good faith). And whether "Wal-Mart's attrition rates are much lower than industry average" is a function of its employees' beliefs and understandings about their legal rights and

potential alternative work opportunities, not Wal-Mart's understanding of the lawfulness of the particular portions of its pay policies at issue (particularly given Wal-Mart's assertion that other trucking companies violate California's minimum wage laws, too).

Wal-Mart also failed to meet its independent obligation to prove that it "had" objectively reasonable grounds for each of its minimum wage violations. The trial court acknowledged that California law has prohibited "averaging" as a defense to minimum wage violations since at least 2005, shortly after the class period began in October 2004, ER74-75 (citing *Armenta*, 135 Cal.App.4th 314), but noted that the California appellate courts did not specifically apply that no-averaging principle to piece-rate pay plans until 2013, *id.* (citing *Gonzalez,* 215 Cal.App.4th 36, and *Bluford*, 216 Cal.App.4th 864). Even if *Armenta* were not sufficient to put Wal-Mart on notice, *Gonzalez* and *Bluford* certainly were. So, at a minimum, the trial court should have concluded that Wal-Mart's failure to pay its drivers for rest breaks and pre- and post-trip inspections was unreasonable during the last two years of the class period, 2013-15.[19]

---

[19] The court also noted that the California Legislature clarified the law in 2015 to confirm the correctness of *Armenta*, *Gonzalez*, and *Bluford* after "many employers … expressed concern about liability" stemming from their failure to pay for nonproductive work time. ER75.

That is no basis for finding objective reasonableness either. Unsuccessful efforts by unidentified employers to amend California minimum wage law based on

With respect to Wal-Mart's minimum wage violations concerning layover time, the trial court did not cite *any* case law but relied solely upon the fact that "[a]t trial, a number of drivers testified that other long-haul trucking employers do not pay for layovers." ER75-76. Widespread legal violations in an industry do not establish objective reasonableness. *See Martin*, 940 F.2d at 910 ("that [employer's] violations conformed to 'well-established and widely accepted industry practice' is not ground for finding a reasonable good faith violation of the [FLSA]"). Even if that were not the case, no evidence showed that any of Wal-Mart's competitors subjected drivers to the types of "control" that the jury found determinative under California law. *Cf.* SER657 (Parrish Decl. ¶15 re: other trucking companies' "detention pay").

Because that was the *only* evidence the court cited in support of the objective reasonableness of Wal-Mart's layover-pay violations, and because no evidence was presented regarding whether Wal-Mart *actually* had "reasonable grounds to believe that its layover policies did not violate the law," ER76, the trial court's denial of liquidated damages for Wal-Mart's layover-time violations should be reversed as

concerns that several appellate decisions in the preceding 10 years might make them liable for previous pay violations does not make those violations "reasonable." Besides, nothing in the record suggests that Wal-Mart was one of those employers or that it ever considered whether California law required it to pay for any of the four disputed categories of work activity.

well. *See Walton v. United Consumers Club, Inc.*, *supra,* 786 F.2d 303, 312 (7th Cir. 1986) ("A good heart but an empty head does not produce a defense").

**CONCLUSION**

For all these reasons, the judgment against Wal-Mart should be affirmed, and the court's denial of liquidated damages under Labor Code §1194.2 should be reversed.

Respectfully submitted,

Dated: April 30, 2018

/s/ *Lawrence M. Artenian*
Lawrence M. Artenian
Laura E. Brown
WAGNER, JONES, KOPFMAN
& ARTENIAN LLP
1111 East Herndon Avenue, Suite 317
Fresno, CA 93720

Michael Rubin
Matthew Murray
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108

Stanley Saltzman
MARLIN & SALTZMAN
29229 Canwood Street, Suite 208
Agoura Hills, CA 91301

Jacob M. Weisberg
LAW OFFICES OF
JACOB M. WEISBERG
844 N. Van Ness Avenue
Fresno, CA 93728

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs, Appellees, and Cross-Appellants CHARLES RIDGEWAY, et al., state they are not aware of any related cases pending before this Court.

Dated: April 30, 2018

By: *    /s/   Lawrence M. Artenian*
Lawrence M. Artenian

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, the foregoing brief is proportionally spaced in a typeface of 14-points and contains 16,493 words excluding those portions excepted by Rule 32(a)(7)(B)(iii). The word count was generated using Microsoft Word.

Dated: April 30, 2018

By: *___/s/ Lawrence M. Artenian*
Lawrence M. Artenian

## CERTIFICATE OF SERVICE

I certify that on April 30, 2018, I filed the foregoing Appellees' Principal and Response Brief with the Clerk for the United States Court of Appeals in the Ninth Circuit using the court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: April 30, 2018 By: *____/s/ Lawrence M. Artenian*
Lawrence M. Artenian

## **ADDENDUM**

### TABLE OF CONTENTS

California Labor Code §1194.2 …………………………………………………… 73

IWC Wage Order No. 9-2001 ……………………………………………………….. 74

§1194.2. Liquidated damages

(a) In any action under Section 98, 1193.6, 1194, or 1197.1 to recover wages because of the payment of a wage less than the minimum wage fixed by an order of the commission or by statute, an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon. Nothing in this subdivision shall be construed to authorize the recovery of liquidated damages for failure to pay overtime compensation. A suit may be filed for liquidated damages at any time before the expiration of the statute of limitations on an action for wages from which the liquidated damages arise.

(b) Notwithstanding subdivision (a), if the employer demonstrates to the satisfaction of the court or the Labor Commissioner that the act or omission giving rise to the action was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of any provision of the Labor Code relating to minimum wage, or an order of the commission, the court or the Labor Commissioner may, as a matter of discretion, refuse to award liquidated damages or award any amount of liquidated damages not exceeding the amount specified in subdivision (a).

(c) This section applies only to civil actions commenced on or after January 1, 1992.

- Cal. Lab. Code § 1194.2 (West)

**Please Post With This Side Showing**

# OFFICIAL NOTICE

*Effective July 1, 2002 as amended*

*Sections 4(A) and 10(C) amended and republished by the Department of Industrial Relations, effective January 1, 2017 pursuant to SB 3, Chapter 4, Statutes of 2016 and section 1182.13 of the Labor Code*

## INDUSTRIAL WELFARE COMMISSION
## ORDER NO. 9-2001
## REGULATING
## WAGES, HOURS AND WORKING CONDITIONS IN THE

# TRANSPORTATION INDUSTRY

**TAKE NOTICE:** To employers and representatives of persons working in industries and occupations in the State of California: The Department of Industrial Relations amends and republishes the minimum wage and meals and lodging credits in the Industrial Welfare Commission's Orders as a result of legislation enacted (SB 3, Ch. 4, Stats of 2016, amending section 1182.12 of the California Labor Code), and pursuant to section 1182.13 of the California Labor Code. The amendments and republishing make no other changes to the IWC's Orders.

## 1. APPLICABILITY OF ORDER

This order shall apply to all persons employed in the transportation industry whether paid on a time, piece rate, commission, or other basis, except that:

(A) Provisions of Sections 3 through 12 of this order shall not apply to persons employed in administrative, executive, or professional capacities. The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption from those sections:

(1) Executive Exemption. A person employed in an executive capacity means any employee:

(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretion and independent judgment; and

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(2) Administrative Exemption. A person employed in an administrative capacity means any employee:

(a) Whose duties and responsibilities involve either:

(i) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his/her employer's customers; or

(ii) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or

(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

(e) Who executes under only general supervision special assignments and tasks; and

(f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(3) Professional Exemption. A person employed in a professional capacity means any employee who meets *all* of the following requirements:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or

(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:

(i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or

(ii) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and

(iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraphs (a) and (b).

(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515 (c) as 40 hours per week.

(e) Subparagraph (b) above is intended to be construed in accordance with the following provisions of federal law as they existed as of the date of this wage order: 29 C.F.R. Sections 541.207, 541.301(a)-(d), 541.302, 541.306, 541.307, 541.308, and 541.310.

(f) Notwithstanding the provisions of this subparagraph, pharmacists employed to engage in the practice of pharmacy, and registered nurses employed to engage in the practice of nursing, shall not be considered exempt professional employees, nor shall they be considered exempt from coverage for the purposes of this subparagraph unless they individually meet the criteria established for exemption as executive or administrative employees.

(g) Subparagraph (f) above shall not apply to the following advanced practice nurses:

(i) Certified nurse midwives who are primarily engaged in performing duties for which certification is required pursuant to Article 2.5 (commencing with Section 2746) of Chapter 6 of Division 2 of the Business and Professions Code.

(ii) Certified nurse anesthetists who are primarily engaged in performing duties for which certification is required pursuant to Article 7 (commencing with Section 2825) of Chapter 6 of Division 2 of the Business and Professions Code.

(iii) Certified nurse practitioners who are primarily engaged in performing duties for which certification is required pursuant to Article 8 (commencing with Section 2834) of Chapter 6 of Division 2 of the Business and Professions Code.

(iv) Nothing in this subparagraph shall exempt the occupations set forth in clauses (i), (ii), and (iii) from meeting the requirements of subsection 1(A)(3)(a)-(d) above.

(h) Except, as provided in subparagraph (i), an employee in the computer software field who is paid on an hourly basis shall be exempt, if *all* of the following apply:

(i) The employee is primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment.

(ii) The employee is primarily engaged in duties that consist of one or more of the following:

—The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications.

—The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.

—The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.

(iii) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering. A job title shall not be determinative of the applicability of this exemption.

(iv) The employee's hourly rate of pay is not less than forty-one dollars ($41.00). The Office of Policy, Research and Legislation shall adjust this pay rate on October 1 of each year to be effective on January 1 of the following year by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers.*

(i) The exemption provided in subparagraph (h) does not apply to an employee if *any* of the following apply:

(i) The employee is a trainee or employee in an entry-level position who is learning to become proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering.

(ii) The employee is in a computer-related occupation but has not attained the level of skill and expertise necessary to work independently and without close supervision.

(iii) The employee is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment.

---

* Pursuant to Labor Code section 515.5, subdivision (a)(4), the Office of Policy, Research and Legislation, Department of Industrial Relations, has adjusted the minimum hourly rate of pay specified in this subdivision to be $49.77, effective January 1, 2007. This hourly rate of pay is adjusted on October 1 of each year to be effective on January 1, of the following year, and may be obtained at www.dir.ca.gov/IWC or by mail from the Department of Industrial Relations.

(iv) The employee is an engineer, drafter, machinist, or other professional whose work is highly dependent upon or facilitated by the use of computers and computer software programs and who is skilled in computer-aided design software, including CAD/CAM, but who is not in a computer systems analysis or programming occupation.

(v) The employee is a writer engaged in writing material, including box labels, product descriptions, documentation, promotional material, setup and installation instructions, and other similar written information, either for print or for on screen media or who writes or provides content material intended to be read by customers, subscribers, or visitors to computer-related media such as the World Wide Web or CD-ROMs.

(vi) The employee is engaged in any of the activities set forth in subparagraph (h) for the purpose of creating imagery for effects used in the motion picture, television, or theatrical industry.

(B) Except as provided in Sections 1, 2, 4, 10, and 20, and with regard to commercial drivers, Sections 11 and 12, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district. The application of Sections 11 and 12 for commercial drivers employed by governmental entities shall become effective July 1, 2004 or following the expiration date of any valid collective bargaining agreement applicable to such commercial drivers then in effect but, in any event, no later than August 1, 2005. Notwithstanding Section 21, the application of Sections 11 or 12 to public transit bus drivers shall be null and void in the event the IWC or any court of competent jurisdiction invalidates the collective bargaining exemption established by Sections 11 or 12 for those drivers.

(C) The provisions of this order shall not apply to outside salespersons.

(D) The provisions of this order shall not apply to any individual who is the parent, spouse, child, or legally adopted child of the employer.

(E) Except as provided in Sections 4, 10, 11, 12, and 20 through 22, this order shall not be deemed to cover those employees who have entered into a collective bargaining agreement under and in accordance with the provisions of the Railway Labor Act, 45 U.S.C. Sections 151 et seq.

(F) The provisions of this Order shall not apply to any individual participating in a national service program, such as AmeriCorps, carried out using assistance provided under Section 12571 of Title 42 of the United States Code. (See Stats. 2000, ch. 365, amending Labor Code § 1171.)

## 2. DEFINITIONS

(A) An "alternative workweek schedule" means any regularly scheduled workweek requiring an employee to work more than eight (8) hours in a 24-hour period.

(B) "Commission" means the Industrial Welfare Commission of the State of California.

(C) "Commercial driver" means an employee who operates a vehicle described in subdivision (b) of Section 15210 of the Vehicle Code.

(D) "Division" means the Division of Labor Standards Enforcement of the State of California.

(E) "Employ" means to engage, suffer, or permit to work.

(F) "Employee" means any person employed by an employer.

(G) "Employer" means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.

(H) "Hours worked" means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.

(I) "Minor" means, for the purpose of this order, any person under the age of 18 years.

(J) "Outside salesperson" means any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

(K) "Primarily" as used in Section 1, Applicability, means more than one-half the employee's work time.

(L) "Public Transit Bus Driver" means a commercial driver who operates a transit bus and is employed by a governmental entity.

(M) "Shift" means designated hours of work by an employee, with a designated beginning time and quitting time.

(N) "Split shift" means a work schedule, which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods.

(O) "Teaching" means, for the purpose of Section 1 of this order, the profession of teaching under a certificate from the Commission for Teacher Preparation and Licensing or teaching in an accredited college or university.

(P) "Transportation Industry" means any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles.

(Q) "Wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.

(R) "Workday" and "day" mean any consecutive 24-hour period beginning at the same time each calendar day.

(S) "Workweek" and "week" mean any seven (7) consecutive days, starting with the same calendar day each week. "Workweek" is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods.

## 3. HOURS AND DAYS OF WORK

(A) Daily Overtime-General Provisions

(1) The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half ($1^1/_2$) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek.

Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

(a) One and one-half ($1^1/_2$) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

(b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

(c) The overtime rate of compensation required to be paid to a nonexempt full-time salaried employee shall be computed by using the employee's regular hourly salary as one-fortieth (1/40) of the employee's weekly salary.

(B) Alternative Workweek Schedules

(1) No employer shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order, a regularly scheduled alternative workweek schedule of not more than ten (10) hours per day within a 40 hour workweek without the payment of an overtime rate of compensation. All work performed in any workday beyond the schedule established by the agreement up to 12 hours a day or beyond 40 hours per week shall be paid at one and one-half ($1^1/_2$) times the employee's regular rate of pay. All work performed in excess of 12 hours per day and any work in excess of eight (8) hours on those days worked beyond the regularly scheduled number of workdays established by the alternative workweek agreement shall be paid at double the employee's regular rate of pay. Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift. Nothing in this section shall prohibit an employer, at the request of the employee, to substitute one day of work for another day of the same length in the shift provided by the alternative workweek agreement on an occasional basis to meet the personal needs of the employee without the payment of overtime. No hours paid at either one and one-half ($1^1/_2$) or double the regular rate of pay shall be included in determining when 40 hours have been worked for the purpose of computing overtime compensation.

(2) If an employer whose employees have adopted an alternative workweek agreement permitted by this order requires an employee to work fewer hours than those that are regularly scheduled by the agreement, the employer shall pay the employee overtime compensation at a rate of one and one-half ($1^1/_2$) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours, and double the employee's regular rate of pay for all hours worked in excess of 12 hours for the day the employee is required to work the reduced hours.

(3) An employer shall not reduce an employee's regular rate of hourly pay as a result of the adoption, repeal or nullification of an alternative workweek schedule.

(4) An employer shall explore any available reasonable alternative means of accommodating the religious belief or observance of an affected employee that conflicts with an adopted alternative workweek schedule, in the manner provided by subdivision(j) of Section 12940 of the Government Code.

(5) An employer shall make a reasonable effort to find a work schedule not to exceed eight (8) hours in a workday, in order to accommodate any affected employee who was eligible to vote in an election authorized by this section and who is unable to work the alternative workweek schedule established as the result of that election.

(6) An employer shall be permitted, but not required, to provide a work schedule not to exceed eight (8) hours in a workday to accommodate any employee who is hired after the date of the election and who is unable to work the alternative workweek schedule established by the election.

(7) Arrangements adopted in a secret ballot election held pursuant to this order prior to 1998, or under the rules in effect prior to 1998, and before the performance of the work, shall remain valid after July 1, 2000 provided that the results of the election are reported by the employer to the Office of Policy, Research and Legislation by January 1, 2001, in accordance with the requirements of subsection (C) below (Election Procedures). If an employee was voluntarily working an alternative workweek schedule of not more than ten (10) hours a day as of July 1, 1999, that alternative workweek schedule was based on an individual agreement made after January 1, 1998 between the employee and employer, and the employee submitted, and the employer approved, a written request on or before May 30, 2000 to continue the agreement, the employee may continue to work that alternative workweek schedule without payment of an overtime rate of compensation for the hours provided in the agreement. The employee may revoke his/her voluntary authorization to continue such a schedule with 30 days written notice to the employer. New arrangements can only be entered into pursuant to the provisions of this section.

(C) Election Procedures

Election procedures for the adoption and repeal of alternative workweek schedules require the following:

(1) Each proposal for an alternative workweek schedule shall be in the form of a written agreement proposed by the employer. The proposed agreement must designate a regularly scheduled alternative workweek in which the specified number of work days and work hours are regularly recurring. The actual days worked within that alternative workweek schedule need not be specified. The employer may propose a single work schedule that would become the standard schedule for workers in the work unit, or a menu of work schedule options, from which each employee in the unit would be entitled to choose. If the employer proposes a menu of work schedule options, the employee may, with the approval of the employer, move from one menu option to another.

(2) In order to be valid, the proposed alternative workweek schedule must be adopted in a secret ballot election, before the performance of work, by at least a two-thirds (2/3) vote of the affected employees in the work unit. The election shall be held during regular working hours at the employees' work site. For purposes of this subsection, "affected employees in the work unit" may include all employees in a readily identifiable work unit, such as a division, a department, a job classification, a shift, a separate physical location, or a recognized subdivision of any such work unit. A work unit may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection are met.

(3) Prior to the secret ballot vote, any employer who proposed to institute an alternative workweek schedule shall have made a disclosure in writing to the affected employees, including the effects of the proposed arrangement on the employees' wages, hours, and benefits. Such a disclosure shall include meeting(s), duly noticed, held at least 14 days prior to voting, for the specific purpose of discussing the effects of the alternative workweek schedule. An employer shall provide that disclosure in a non-English language, as well as in English, if at least five (5) percent of the affected employees primarily speak that non-English language. The employer

shall mail the written disclosure to employees who do not attend the meeting. Failure to comply with this paragraph shall make the election null and void.

(4) Any election to establish or repeal an alternative workweek schedule shall be held at the work site of the affected employees. The employer shall bear the costs of conducting any election held pursuant to this section. Upon a complaint by an affected employee, and after an investigation by the labor commissioner, the labor commissioner may require the employer to select a neutral third party to conduct the election.

(5) Any type of alternative workweek schedule that is authorized by the California Labor Code may be repealed by the affected employees. Upon a petition of one-third (1/3) of the affected employees, a new secret ballot election shall be held and a two- thirds (2/3) vote of the affected employees shall be required to reverse the alternative workweek schedule. The election to repeal the alternative workweek schedule shall be held not more than 30 days after the petition is submitted to the employer, except that the election shall be held not less than 12 months after the date that the same group of employees voted in an election held to adopt or repeal an alternative workweek schedule. The election shall take place during regular working hours at the employees' work site. If the alternative workweek schedule is revoked, the employer shall comply within 60 days. Upon proper showing of undue hardship, the Division of Labor Standards Enforcement may grant an extension of time for compliance.

(6) Only secret ballots may be cast by affected employees in the work unit at any election held pursuant to this section. The results of any election conducted pursuant to this section shall be reported by the employer to the Office of Policy, Research and Legislation within 30 days after the results are final, and the report of election results shall be a public document. The report shall include the final tally of the vote, the size of the unit, and the nature of the business of the employer.

(7) Employees affected by a change in the work hours resulting from the adoption of an alternative workweek schedule may not be required to work those new work hours for at least 30 days after the announcement of the final results of the election.

(8) Employers shall not intimidate or coerce employees to vote either in support of or in opposition to a proposed alternative workweek. No employees shall be discharged or discriminated against for expressing opinions concerning the alternative workweek election or for opposing or supporting its adoption or repeal. However, nothing in this section shall prohibit an employer from expressing his/her position concerning that alternative workweek to the affected employees. A violation of this paragraph shall be subject to California Labor Code Section 98 et seq.

(D) One and one-half ($1^1/_2$) times a minor's regular rate of pay shall be paid for all work over 40 hours in any workweek except minors 16 or 17 years old who are not required by law to attend school and may therefore by employed for the same hours as an adult are subject to subsection (A) or (B) and (C) above.

(**VIOLATIONS OF CHILD LABOR LAWS** are subject to civil penalties of from $500 to $10,000 as well as to criminal penalties. Refer to California Labor Code Sections 1285 to 1312 and 1390 to 1399 for additional restrictions on the employment of minors and for descriptions of criminal and civil penalties for violation of the child labor laws. Employers should ask school districts about any required work permits.)

(E) An employee may be employed on seven (7) workdays in one workweek when the total hours of employment during such workweek do not exceed 30 and the total hours of employment in any one workday thereof do not exceed six (6).

(F) If a meal period occurs on a shift beginning or ending at or between the hours of 10 p.m. and 6 a.m., facilities shall be available for securing hot food and drink or for heating food or drink, and a suitable sheltered place shall be provided in which to consume such food or drink.

(G) The provisions of Labor Code Sections 551 and 552 regarding one (1) day's rest in seven (7) shall not be construed to prevent an accumulation of days of rest when the nature of the employment reasonably requires the employee to work seven (7) or more consecutive days; provided, however, that in each calendar month, the employee shall receive the equivalent of one (1) day's rest in seven (7).

(H) Except as provided in subsections (E) and (G), this section shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

(I) Notwithstanding subsection (H) above, where the employer and a labor organization representing employees of the employer have entered into a valid collective bargaining agreement pertaining to the hours of work of the employees, the requirement regarding the equivalent of one (1) day's rest in seven (7) (see subsection (G) above) shall apply, unless the agreement expressly provides otherwise.

(J) If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that makeup work time, if performed in the same workweek in which the work time was lost, may not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 11 hours of work in one (1) day or 40 hours of work in one (1) workweek. If an employee knows in advance that he/she will be requesting makeup time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to make up work time for up to four (4) weeks in advance; provided, however, that the makeup work must be performed in the same week that the work time was lost. An employee shall provide a signed written request for each occasion that the employee makes a request to make up work time pursuant to this subsection. While an employer may inform an employee of this makeup time option, the employer is prohibited from encouraging or otherwise soliciting an employee to request the employer's approval to take personal time off and make up the work hours within the same workweek pursuant to this subsection.

(K) The daily overtime provision of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for 24-hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one (1) hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule.

(L) The provisions of this section are not applicable to employees whose hours of service are regulated by:

(1) The United States Department of Transportation Code of Federal Regulations, Title 49, Sections 395.1 to 395.13, Hours of Service of Drivers, or;

(2) Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200 and the following sections, regulating hours of drivers.

(M) The provisions of this section shall not apply to taxicab drivers.

(N) The provisions of this section shall not apply where any employee of an airline certified by the federal or state government works over 40 hours but not more than 60 hours in a workweek due to a temporary modification in the employee's normal work schedule not required by the employer but arranged at the request of the employee, including but not limited to situations where the employee requests a change in days off or trades days off with another employee.

## 4. MINIMUM WAGES

(A) Every employer shall pay to each employee wages not less than the following:

(1) Any employer who employs 26 or more employees shall pay to each employee wages not less than the following:

(a) Ten dollars and fifty cents ($10.50) per hour for all hours worked, effective January 1, 2017; and

(b) Eleven dollars ($11.00) per hour for all hours worked, effective January 1, 2018;

(2) Any employer who employs 25 or fewer employees shall pay to each employee wages not less than the following:

(a) Ten dollars ($10.00) per hour for all hours worked, effective January 1, 2016 through December 31, 2017; and

(b) Ten dollars and fifty cents ($10.50) per hour for all hours worked, effective January 1, 2018

Employees treated as employed by a single qualified taxpayer pursuant to Revenue and Taxation Code section 23626 are treated as employees of that single taxpayer. LEARNERS: Employees during their first 160 hours of employment in occupations in which they have no previous similar or related experience, may be paid not less than 85 percent of the minimum wage rounded to the nearest nickel.

(B) Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

(C) When an employee works a split shift, one (1) hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment.

(D) The provisions of this section shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

## 5. REPORTING TIME PAY

(A) Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

(B) If an employee is required to report for work a second time in any one workday and is furnished less than two (2) hours of work on the second reporting, said employee shall be paid for two (2) hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

ties; or

(C) The foregoing reporting time pay provisions are not applicable when:

(1) Operations cannot commence or continue due to threats to employees or property; or when recommended by civil autho

(2) Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or

(3) The interruption of work is caused by an Act of God or other cause not within the employer's control.

(D) This section shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time.

## 6. LICENSES FOR DISABLED WORKERS

(A) A license may be issued by the Division authorizing employment of a person whose earning capacity is impaired by physical disability or mental deficiency at less than the minimum wage. Such licenses shall be granted only upon joint application of employer and employee and employee's representative if any.

(B) A special license may be issued to a nonprofit organization such as a sheltered workshop or rehabilitation facility fixing special minimum rates to enable the employment of such persons without requiring individual licenses of such employees.

(C) All such licenses and special licenses shall be renewed on a yearly basis or more frequently at the discretion of the Division.

(See California Labor Code, Sections 1191 and 1191.5)

## 7. RECORDS

(A) Every employer shall keep accurate information with respect to each employee including the following:

(1) Full name, home address, occupation and social security number.

(2) Birth date, if under 18 years, and designation as a minor.

(3) Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded. Meal periods during which operations cease and authorized rest periods need not be recorded.

(4) Total wages paid each payroll period, including value of board, lodging, or other compensation actually furnished to the employee.

(5) Total hours worked in the payroll period and applicable rates of pay. This information shall be made readily available to the employee upon reasonable request.

(6) When a piece rate or incentive plan is in operation, piece rates or an explanation of the incentive plan formula shall be provided to employees. An accurate production record shall be maintained by the employer.

(B) Every employer shall semimonthly or at the time of each payment of wages furnish each employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately, an itemized statement in writing showing: (1) all deductions; (2) the inclusive dates of the period for which the employee is paid; (3) the name of the employee or the employee's social security number; and (4) the name of the employer, provided all deductions made on written orders of the employee may be aggregated and shown as one item.

(C) All required records shall be in the English language and in ink or other indelible form, properly dated, showing month, day and year, and shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California. An employee's records shall be available for inspection by the employee upon reasonable request.

(D) Clocks shall be provided in all major work areas or within a reasonable distance thereto insofar as practicable.

## 8. CASH SHORTAGE AND BREAKAGE

No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

## 9. UNIFORMS AND EQUIPMENT

(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. The term "uniform" includes wearing apparel and accessories of distinctive design or color.

**NOTE:** This section shall not apply to protective apparel regulated by the Occupational Safety and Health Standards Board.

(B) When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

**NOTE:** This section shall not apply to protective equipment and safety devices on tools regulated by the Occupational Safety and Health Standards Board.

(C) A reasonable deposit may be required as security for the return of the items furnished by the employer under provisions of subsections (A) and (B) of this section upon issuance of a receipt to the employee for such deposit. Such deposits shall be made pursuant to Section 400 and following of the Labor Code or an employer with the prior written authorization of the employee may deduct from the employee's last check the cost of an item furnished pursuant to (A) and (B) above in the event said item is not returned. No deduction shall be made at any time for normal wear and tear. All items furnished by the employer shall be returned by the employee upon completion of the job.

## 10. MEALS AND LODGING

(A) "Meal" means an adequate, well-balanced serving of a variety of wholesome, nutritious foods.

(B) "Lodging" means living accommodations available to the employee for full-time occupancy which are adequate, decent, and sanitary according to usual and customary standards. Employees shall not be required to share a bed.

(C) Meals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee. When credit for meals or lodging is used to meet part of the employer's minimum wage obligation, the amounts so credited may not be more than the following:

| | Effective January 1, 2017 | | Effective January 1, 2018 | |
|---|---|---|---|---|
| For an employer who employs: | 26 or More Employees | 25 or Fewer Employees | 26 or More Employees | 25 or Fewer Employees |
| **Lodging:** | | | | |
| Room occupied alone | $49.38/week | $47.03/week | $51.73/week | $49.38/week |
| Room shared | $40.76/week | $38.82/week | $42.70/week | $40.76/week |
| Apartment—two-thirds (2/3) of the ordinary rental value, and in no event more than | $593.05/month | $564.81/month | $621.29/month | $593.05/month |
| Where a couple are both employed by the employer, two-thirds (2/3) of the ordinary rental value, and in no event more than | $877.27/month | $835.49/month | $919.04/month | $877.26/month |
| **Meals:** | | | | |
| Breakfast | $3.80 | $3.62 | $3.98 | $3.80 |
| Lunch | $5.22 | $4.97 | $5.47 | $5.22 |
| Dinner | $7.01 | $6.68 | $7.35 | $7.01 |

(D) Meals evaluated as part of the minimum wage must be bona fide meals consistent with the employee's work shift. Deductions shall not be made for meals not received or lodging not used.

(E) If, as a condition of employment, the employee must live at the place of employment or occupy quarters owned or under the control of the employer, then the employer may not charge rent in excess of the values listed herein.

## 11. MEAL PERIODS

(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee.

(B) An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee

with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

(C) Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(D) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

(E) In all places of employment where employees are required to eat on the premises, a suitable place for that purpose shall be designated.

(F) The section shall not apply to any public transit bus driver covered by a valid collective bargaining agreement if the agreement expressly provides for meal periods for those employees, final and binding arbitration of disputes concerning application of its meal period provisions, premium wage rates for all overtime hours worked, and regular hourly rate of pay of not less than 30 percent more than the State minimum wage rate.

## 12. REST PERIODS

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half ($3\frac{1}{2}$) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

(C) This section shall not apply to any public transit bus driver covered by a valid collective bargaining agreement if the agreement expressly provides for rest periods for those employees, final and binding arbitration of disputes concerning application of its rest period provisions, premium wage rates for all overtime hours worked, and regular hourly rate of pay of not less than 30 percent more than the State minimum wage rate.

## 13. CHANGE ROOMS AND RESTING FACILITIES

(A) Employers shall provide suitable lockers, closets, or equivalent for the safekeeping of employees' outer clothing during working hours, and when required, for their work clothing during non-working hours. When the occupation requires a change of clothing, change rooms or equivalent space shall be provided in order that employees may change their clothing in reasonable privacy and comfort. These rooms or spaces may be adjacent to but shall be separate from toilet rooms and shall be kept clean.

**NOTE:** This section shall not apply to change rooms and storage facilities regulated by the Occupational Safety and Health Standards Board.

(B) Suitable resting facilities shall be provided in an area separate from the toilet rooms and shall be available to employees during work hours.

## 14. SEATS

(A) All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.

(B) When employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties.

## 15. TEMPERATURE

(A) The temperature maintained in each work area shall provide reasonable comfort consistent with industry-wide standards for the nature of the process and the work performed.

(B) If excessive heat or humidity is created by the work process, the employer shall take all feasible means to reduce such excessive heat or humidity to a degree providing reasonable comfort. Where the nature of the employment requires a temperature of less than 60° F., a heated room shall be provided to which employees may retire for warmth, and such room shall be maintained at not less than 68°.

(C) A temperature of not less than 68° shall be maintained in the toilet rooms, resting rooms, and change rooms during hours of use.

(D) Federal and State energy guidelines shall prevail over any conflicting provision of this section.

## 16. ELEVATORS

Adequate elevator, escalator or similar service consistent with industry-wide standards for the nature of the process and the work performed shall be provided when employees are employed four floors or more above or below ground level.

## 17. EXEMPTIONS

If, in the opinion of the Division after due investigation, it is found that the enforcement of any provision contained in Section 7, Records; Section 12, Rest Periods; Section 13, Change Rooms and Resting Facilities; Section 14, Seats; Section 15, Temperature;

or Section 16, Elevators, would not materially affect the welfare or comfort of employees and would work an undue hardship on the employer, exemption may be made at the discretion of the Division. Such exemptions shall be in writing to be effective and may be revoked after reasonable notice is given in writing. Application for exemption shall be made by the employer or by the employee and/or the employee's representative to the Division in writing. A copy of the application shall be posted at the place of employment at the time the application is filed with the Division.

## 18. FILING REPORTS

(See California Labor Code, Section 1174(a))

## 19. INSPECTION

(See California Labor Code, Section 1174)

## 20. PENALTIES

(See California Labor Code, Section 1199)

(A) In addition to any other civil penalties provided by law, any employer or any other person acting on behalf of the employer who violates, or causes to be violated, the provisions of this order, shall be subject to the civil penalty of:

(1) Initial Violation — $50.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to the amount which is sufficient to recover unpaid wages.

(2) Subsequent Violations — $100.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to an amount which is sufficient to recover unpaid wages.

(3) The affected employee shall receive payment of all wages recovered.

(B) The labor commissioner may also issue citations pursuant to California Labor Code Section 1197.1 for non-payment of wages for overtime work in violation of this order.

## 21. SEPARABILITY

If the application of any provision of this order, or any section, subsection, subdivision, sentence, clause, phrase, word, or portion of this order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein.

## 22. POSTING OF ORDER

Every employer shall keep a copy of this order posted in an area frequented by employees where it may be easily read during the workday. Where the location of work or other conditions make this impractical, every employer shall keep a copy of this order and make it available to every employee upon request.

**QUESTIONS ABOUT ENFORCEMENT** of the Industrial Welfare Commission orders and reports of violations should be directed to the Labor Commissioner's Office. A listing of offices is on the back of this wage order. For the address and telephone number of the office nearest you, information can be found on the internet at http://www.dir.ca.gov/DLSE/dlse.html or under a search for "California Labor Commissioner's Office" on the internet or any other directory. The Labor Commissioner has offices in the following cities: Bakersfield, El Centro, Fresno, Long Beach, Los Angeles, Oakland, Redding, Sacramento, Salinas, San Bernardino, San Diego, San Francisco, San Jose, Santa Ana, Santa Barbara, Santa Rosa, Stockton, Van Nuys.

### SUMMARIES IN OTHER LANGUAGES

**The Department of Industrial Relations will make summaries of wage and hour requirements in this Order available in Spanish, Chinese and certain other languages when it is feasible to do so. Mail your request for such summaries to the Department at: P.O. Box 420603, San Francisco, CA 94142-0603.**

### RESUMEN EN OTROS IDIOMAS

**El Departamento de Relaciones Industriales confeccionará un resumen sobre los requisitos de salario y horario de esta Disposición en español, chino y algunos otros idiomas cuando sea posible hacerlo. Envíe por correo su pedido por dichos resúmenes al Departamento a: P.O. Box 420603, San Francisco, CA 94142-0603.**

其它文字的摘錄

工業關係處將摘錄本規則中有關工資和工時的規定，用西班牙文、中文印出。其它文字如有需要，也將同樣辦理。如果您有需要，可以來信索閱，請寄到：

**Department of Industrial Relations**
**P.O. Box 420603**
**San Francisco, CA 94142-0603**

All complaints are handled confidentially. For further information or to file your complaints, contact the State of California at the following department offices:

**California Labor Commissioner's Office**, also known as, **Division of Labor Standards Enforcement (DLSE)**

**BAKERSFIELD**
Labor Commissioner's Office/DLSE
7718 Meany Ave.
Bakersfield, CA 93308
661-587-3060

**EL CENTRO**
Labor Commissioner's Office/DLSE
1550 W. Main St.
El Centro, CA 92643
760-353-0607

**FRESNO**
Labor Commissioner's Office/DLSE
770 E. Shaw Ave., Suite 222
Fresno, CA 93710
559-244-5340

**LONG BEACH**
Labor Commissioner's Office/DLSE
300 Oceangate, 3rd Floor
Long Beach, CA 90802
562-590-5048

**LOS ANGELES**
Labor Commissioner's Office/DLSE
320 W. Fourth St., Suite 450
Los Angeles, CA 90013
213-620-6330

**OAKLAND**
Labor Commissioner's Office/DLSE
1515 Clay Street, Room 801
Oakland, CA 94612
510-622-3273

**OAKLAND – HEADQUARTERS**
Labor Commissioner's Office/DLSE
1515 Clay Street, Room 401
Oakland, CA 94612
510-285-2118
DLSE2@dir.ca.gov

**REDDING**
Labor Commissioner's Office/DLSE
250 Hemsted Drive, 2nd Floor, Suite A
Redding, CA 96002
530-225-2655

**SACRAMENTO**
Labor Commissioner's Office/DLSE
2031 Howe Ave, Suite 100
Sacramento, CA 95825
916-263-1811

**SALINAS**
Labor Commissioner's Office/DLSE
950 E. Blanco Rd., Suite 204
Salinas, CA 93901
831-443-3041

**SAN BERNARDINO**
Labor Commissioner's Office/DLSE
464 West 4th Street, Room 348
San Bernardino, CA 92401
909-383-4334

**SAN DIEGO**
Labor Commissioner's Office/DLSE
7575 Metropolitan, Room 210
San Diego, CA 92108
619-220-5451

**SAN FRANCISCO**
Labor Commissioner's Office/DLSE
455 Golden Gate Ave. 10th Floor
San Francisco, CA 94102
415-703-5300

**SAN JOSE**
Labor Commissioner's Office/DLSE
100 Paseo De San Antonio, Room 120
San Jose, CA 95113
408-277-1266

**SANTA ANA**
Labor Commissioner's Office/DLSE
605 West Santa Ana Blvd., Bldg. 28, Room 625
Santa Ana, CA 92701
714-558-4910

**SANTA BARBARA**
Labor Commissioner's Office/DLSE
411 E. Canon Perdido, Room 3
Santa Barbara, CA 93101
805-568-1222

**SANTA ROSA**
Labor Commissioner's Office/DLSE
50 "D" Street, Suite 360
Santa Rosa, CA 95404
707-576-2362

**STOCKTON**
Labor Commissioner's Office/DLSE
31 E. Channel Street, Room 317
Stockton, CA 95202
209-948-7771

**VAN NUYS**
Labor Commissioner's Office/DLSE
6150 Van Nuys Boulevard, Room 206
Van Nuys, CA 91401
818-901-5315

EMPLOYERS: Do not send copies of your alternative workweek election ballots or election procedures.

Only the results of the alternative workweek election shall be mailed to:

Department of Industrial Relations
Office of Policy, Research and Legislation
P.O. Box 420603
San Francisco, CA 94142-0603
(415) 703-4780

Prevailing Wage Hotline (415) 703-4774