ALTSHULER BERZON LLP
ATTORNEYS AT LAW
177 POST STREET, SUITE 300
SAN FRANCISCO, CALIFORNIA 94108
(415) 421-7151
FAX (415) 362-8064
www.altshulerberzon.com

STEPHEN P. BERZON
HAMILTON CANDEE
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
JAMES M. FINBERG
EILEEN B. GOLDSMITH
MEREDITH A. JOHNSON
SCOTT A. KRONLAND
ANDREW KUSHNER
REBECCA C. LEE
DANIELLE E. LEONARD
STACEY M. LEYTON
AMANDA C. LYNCH
MATTHEW J. MURRAY
ZOE PALITZ
P. CASEY PITTS
DANIEL T. PURTELL
MICHAEL RUBIN
MEGAN WACHSPRESS
STEFANIE L. WILSON

FRED H. ALTSHULER
FOUNDING PARTNER EMERITUS

PETER D. NUSSBAUM
PARTNER EMERITUS

CORINNE JOHNSON
FELLOW

August 30, 2019

**VIA ECF**

Molly C. Dwyer, Clerk of Court
United States Court of Appeals for the Ninth Circuit
P.O. Box 193939
95 Seventh Street
San Francisco, CA 94119-3939

Re: Rule 28(j) Notice of Subsequent Authority
*Charles Ridgeway, et al. v. Wal-Mart Stores, Inc.*, Nos. 17-15983 & 17-16142
Oral Argument August 6, 2019 (O'Scannlain, Nguyen, Siler, JJ).

Dear Ms. Dwyer:

Plaintiffs write pursuant to Rule 28(j) to notify the panel of the recent opinion in *Senne v. Kansas City Royals Baseball*, Nos. 17-16245, 17-16267, 17-16276 (9th Cir. Aug. 16, 2019), attached as Ex. A ("Slip Op.").

In *Senne,* this Court reaffirmed that under California law, compensable "work" includes all time subject to an employer's "control" – a standard that is far more expansive than the FLSA standard that Wal-Mart purports to rely upon. *See* Slip Op. at 54-57 & n.25; Appellees' Principal Br. (Dkt. 23) at 30-35; Response to 28(j) Letter (Dkt. 58) at 1-2.

The *Senne* decision also strongly supports plaintiffs' arguments for affirming Judge Illston's class certification rulings and the jury's damages calculations. *See* Dkt. 23 at 45-56. *Senne* recognizes that representative evidence and approximations of time worked are sufficient to establish liability and damages in a wage-and-hour class action, even if substantial variation exists in the amounts of time worked by individual class members, as it did in *Tyson Foods, Inc. v. Bouaphakeo,* 136 S.Ct. 1036 (2016). *See* Slip Op. at 43. *Senne* thus requires rejection of Wal-Mart's fact-based challenges to the jury's damages verdicts, by emphasizing that representative evidence can support class certification (and, in turn, a verdict on liability and damages) unless

"no reasonable juror" could find that the evidence is sufficient to establish liability or damages. Slip Op. at 44-45, 53, 57-58. "[E]ven where 'reasonable minds may differ' about whether representative evidence is sufficiently probative …—in *Tyson*, whether it was probative of the 'time actually worked by each employee'—that question is to be resolved by the jury, *not* at the class certification stage." Slip Op. at 44 (emphasis in original). In *Ridgeway*, Judge Illston properly let the jury decide what weight to give to plaintiffs' expert damages testimony and the considerable additional classwide evidence pertaining to liability and damages. Dkt. 23 at 45-46.

Respectfully submitted,

/s/ Michael Rubin

Lawrence M. Artenian
Laura E. Brown
WAGNER JONES KOPFMAN & ARTENIAN LLP
1111 E. Herndon Ave., Suite 317
Fresno, CA 93720
(559) 449-1800
lartenian@wagnerjones.com

Jacob M. Weisberg
LAW OFFICES OF JACOB M. WEISBERG
844 N. Van Ness Ave.
Fresno, CA 93728
(559) 441-0201
jmw@jweisberglaw.com

Stanley Saltzman
MARLIN & SALTZMAN LLP
29229 Canwood Street, Suite 208
Agoura Hills, CA 91301
(818) 991-8080
ssaltzman@marlinsaltzman.com

Michael Rubin
Matthew J. Murray
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
mrubin@altber.com

*Attorneys for Plaintiffs/Appellees/Cross-Appellants Charles Ridgeway, et al.*

# EXHIBIT A

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AARON SENNE; MICHAEL LIBERTO; OLIVER ODLE; BRAD MCATEE; CRAIG BENNIGSON; MATT LAWSON; KYLE WOODRUFF; RYAN KIEL; KYLE NICHOLSON; BRAD STONE; MATT DALY; AARON MEADE; JUSTIN MURRAY; JAKE KAHAULELIO; RYAN KHOURY; DUSTIN PEASE; JEFF NADEAU; JON GASTON; BRANDON HENDERSON; TIM PAHUTA; LEE SMITH; JOSEPH NEWBY; RYAN HUTSON; MATT FREVERT; ROBERTO ORTIZ; WITER JIMENEZ; KRIS WATTS; MITCH HILLIGOSS; DANIEL BRITT; YADEL MARTI; HELDER VELAQUEZ; JORGE JIMENEZ; JORGE MINYETY; EDWIN MAYSONET; JOSE DIAZ; NICK GIARRAPUTO; LAUREN GAGNIER; LEONARD DAVIS; GASPAR SANTIAGO; GRANT DUFF; OMAR AGUILAR; MARK WAGNER; DAVID QUINOWSKI; BRANDON PINCKNEY, Individually and on Behalf of All Those Similarly Situated; JAKE OPITZ; BRETT NEWSOME,

*Plaintiffs-Appellants,*

v.

Nos. 17-16245
17-16267
17-16276

D.C. No.
3:14-cv-00608-JCS

OPINION

KANSAS CITY ROYALS BASEBALL CORP.; MARLINS TEAMCO LLC; SAN FRANCISCO BASEBALL ASSOCIATES, LLC; OFFICE OF THE COMMISSIONER OF BASEBALL, DBA Major League Baseball, an unincorporated association; ALLAN HUBER SELIG, "BUD"; ANGELS BASEBALL LP; ST. LOUIS CARDINALS, LLC; COLORADO ROCKIES BASEBALL CLUB, LTD.; CINCINNATI REDS, LLC; HOUSTON BASEBALL PARTNERS LLC; ATHLETICS INVESTMENT GROUP, LLC; ROGERS BLUE JAYS BASEBALL PARTNERSHIP; PADRES L.P.; SAN DIEGO PADRES BASEBALL CLUB, L.P.; MINNESOTA TWINS, LLC; DETROIT TIGERS, INC.; LOS ANGELES DODGERS LLC; STERLING METS L.P.; AZPB L.P.; NEW YORK YANKEES P'SHIP; RANGERS BASEBALL EXPRESS, LLC; MILWAUKEE BREWERS BASEBALL CLUB, INC.; CHICAGO CUBS BASEBALL CLUB, LLC; PITTSBURGH ASSOCIATES, LP; BASEBALL CLUB OF SEATTLE, LLP; LOS ANGELES DODGERS HOLDING COMPANY LLC; RANGERS BASEBALL, LLC,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Northern District of California
Joseph C. Spero, Magistrate Judge, Presiding

Argued and Submitted June 13, 2018
San Francisco, California

Filed August 16, 2019

Before: Michael R. Murphy,* Richard A. Paez,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Ikuta

* The Honorable Michael R. Murphy, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY**

### Labor Law / Class and Collective Certification

The panel affirmed in part and reversed in part the district court's orders certifying a class and a collective action for wage-and-hour claims brought by minor league baseball players under the Fair Labor Standards Act and state law.

The district court certified a California class under Federal Rule of Civil Procedure 23(b)(3) but denied certification for Arizona and Florida classes and for a Rule 23(b)(2) class. The district court also certified an FLSA collective.

The panel held that, as to the state law claims, California choice-of-law rules applied. The panel held that under *Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011), California law applied to the Rule 23(b)(3) California class. The panel reversed the district court's determination that choice-of-law considerations defeated the predominance and adequacy requirements for the proposed Arizona and Florida Rule 23(b)(3) classes. Applying California's three-step governmental interest analysis for choice-of-law questions, the panel concluded that Arizona law should apply to the work performed in Arizona, and Florida law to the work performed in Florida.

The panel reversed the district court's refusal to certify a Rule 23(b)(2) class for unpaid work at defendants' training


** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

facilities in Arizona and Florida on the basis that choice-of-law issues undermined "cohesiveness" and therefore made injunctive and declaratory relief inappropriate. The panel concluded that the district court's errors in its choice-of-law analysis relating to the proposed Arizona and Florida Rule 23(b)(3) classes applied equally to its refusal to certify the Rule 23(b)(2) class. The panel further held that the district court erred in imposing a "cohesiveness" requirement for the proposed Rule 23(b)(2) class. The panel remanded for the district court to consider anew whether to certify the Rule 23(b)(2) class.

The panel held that plaintiffs could meet the predominance requirement for the proposed California, Florida, and Arizona Rule 23(b)(3) classes through a combination of representative evidence and application of the "continuous workday" rule. The panel applied the *Mt. Clemens* burden-shifting framework and the holding of *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036 (2016), that representative evidence may be used at the class certification stage and may be used to establish liability in addition to damages. The panel explained that the continuous workday rule presumes that once the beginning of the workday is triggered, an employee performs compensable work throughout the rest of the day until the employee completes their last principal activity. Any activity that is "integral and indispensable" to principal activities triggers the beginning of the workday. As to the Arizona and Florida classes, covering alleged minimum wage violations in the lack of any pay for time spent participating in spring training, extended spring training, and instructional leagues, the panel affirmed the determination that the predominance requirement was met. As to the California class, covering overtime and minimum wage claims relating to work performed during the championship season, the panel held that the district court

did not abuse its discretion in concluding that defendants' uniform pay policy, the team schedules, and representative evidence, including an expert survey known as the "Main Survey," established predominance. The panel held that the district court was not required to "rigorously analyze" the Main Survey, rather than evaluating its admissibility under *Daubert* and its appropriateness for meeting class certification requirements under *Tyson*.

Affirming the district court's certification of the FLSA collective action, the panel applied the standard set forth in *Campbell v. City of L.A.*, 903 F.3d 1090 (9th Cir. 2018), which postdated the district court's ruling, and held that the district court's use of the ad hoc approach was harmless error. The panel concluded that collective certification was proper because plaintiffs shared similar issues of law or fact material to the disposition of their FLSA claims and thus were similarly situated.

The panel affirmed the district court's certification of the California Rule 23(b)(3) class and the FLSA collective action, reversed the district court's refusal to certify Arizona and Florida classes and a Rule 23(b)(2) class, and remanded for further proceedings.

Dissenting, Judge Ikuta wrote that the district court correctly concluded that consideration of plaintiffs' claims on a classwide basis would be overwhelmed by individualized choice-of-law inquiries. She wrote that the majority's rule, applying the law of the jurisdiction where the work took place, was contrary to the court's framework for analyzing the intersection of class action and choice-of-law issues, overlooked the complexity of California's choice-of-law rules, and created significant practical and logistical problems.

## COUNSEL

Robert L. King (argued) and Garrett R. Broshuis, Korein Tillery LLC, St. Louis, Missouri; Bruce L. Simon and Benjamin E. Shiftan, Pearson Simon & Warshaw LLP, San Francisco, California; Daniel L. Warshaw and Bobby Pouya, Pearson Simon & Warshaw LLP, Sherman Oaks, California; for Plaintiffs-Appellants.

Elise M. Bloom (argued), Adam M. Lupion, and Mark D. Harris, Proskauer Rose LLP, New York, New York; John E. Roberts, Proskauer Rose LLP, Boston, Massachusetts; for Defendants-Apellees.

David C. Frederick and Jeffrey A. Love, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C., for Amici Curiae Professors Peter Hay and Patrick J. Borchers.

Allan Steyer and Donald Scott MacRae, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, California, for Amici Curiae Professional Hockey Players Assocation; Association of Minor League Umpires; Office and Professional Employee's International Union; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied and Industrial Service Workers International Union.

## OPINION

PAEZ, Circuit Judge:

It is often said that baseball is America's pastime. In this case, current and former minor league baseball players allege that the American tradition of baseball collides with a tradition far less benign: the exploitation of workers. We are tasked with deciding whether these minor league players may properly bring their wage-and-hour claims on a collective and classwide basis.

## BACKGROUND

### I.

Most major professional sports in America have their own "farm system" for developing talent: for the National Basketball Association, it's the G-League; for the National Hockey League, it's the American Hockey League; and for Major League Baseball (MLB), it's Minor League Baseball. MLB and its thirty franchise teams rely heavily on this extensive minor league system, which has nearly 200 affiliates across the country and employs approximately 6,000 minor league players. Nearly all MLB players begin their careers in the minor leagues. Each minor league club is associated with one of the thirty franchise MLB teams.

The minor league system is governed by the Major League Rules (MLRs), which dictate the terms of employment and compensation for both minor and major league players. Under the MLRs, all minor league players are required to sign a seven-year Uniform Player Contract (UPC). Ostensibly, players are required to sign the UPC for "morale" and "to produce the similarity of conditions necessary for keen competition."

The UPC "obligates Player[s] to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season." It describes its scope as setting "the terms and conditions of employment during all periods in which Player is employed by Club as a Minor League Player." Players are paid by the MLB franchise affiliated with the minor league team for which they play. Under the UPC, first-year players are paid a fixed salary of $1,100 per month during the regular ("championship") season that runs from April through September. In addition to their salaries during the championship season, some players receive signing or performance-related bonuses and college scholarships.

Beginning in early March each year, the minor league affiliates conduct spring training in Arizona and Florida; every MLB franchise operates a minor league training complex in one of these two states. The parties dispute whether spring training is required, but the UPC strongly indicates that it is mandatory.[1] Virtually all players are unpaid during spring training.

Spring training lasts approximately four weeks, until the championship season begins in April. Some players attest that spring training entails working seven days a week, with no days off. During spring training, teams typically have

[1] The UPC provides that "Player's duties and obligations under [the UPC] continue in full force and effect throughout the calendar year, including Club's championship playing season, Club's training season, Club's exhibition games, Club's instructional, post-season training or winter league games, any official play-off series, any other official post-season series in which Player shall be required to participate . . . and any remaining portions of the calendar year."

scheduled activities in the morning prior to playing games in the afternoon. For example, a team spring training schedule for one of the San Francisco Giants' affiliates describes that at 6:30 AM, there was an "Early Van for Treatment and Early Work" [2]; at 7:00 AM, the "Regular Van" departed; at 7:45 AM, the "Early Work" began; and then between 9:00 AM and 11:00 AM, the team would perform activities such as "Stretch," "Throwing Program," and "Batting Practice." Lunch was to be at 11:00 AM, before a 12:10 PM bus to a neighboring city for a 1:00 PM away game.

At the conclusion of spring training in early April, some players are assigned to minor league affiliates, and begin playing games in the championship season. During the championship season, minor league teams play games either six or seven days per week. The championship season lasts around five months, beginning in April and ending in September. One of the regular season leagues within minor league baseball is the California League, which—as the name implies—plays games exclusively within California.

Players who are not assigned to play for affiliates in the championship season stay at the Arizona or Florida facilities for "extended spring training." Extended spring training continues until June, and involves similar activities to spring training. Although most players do not get paid during extended spring training, as many as seven MLB clubs do pay for work during extended spring training due to an ambiguity in the MLRs over when players are permitted to be paid.

[2] The schedule instructed players to "CHECK [the] BOARD FOR EARLY WORK."

After the championship season ends in September, some players participate in the "instructional leagues," which run from approximately mid-September to mid-October. The parties dispute whether participation in the instructional leagues is mandatory for the players involved, although as with spring training, the UPC strongly implies that participation is required. Activities and schedules during the instructional league are similar to spring training. And just as with spring training, players are virtually never paid for participation in the instructional league.

## II.

Plaintiffs are forty-five current and former minor league baseball players who bring claims under the federal Fair Labor Standards Act (FLSA) and the wage-and-hour laws of California, Arizona, and Florida against MLB, MLB Commissioner Bud Selig, and a number[3] of MLB franchises. Plaintiffs allege that defendants do not pay the players at all during spring training, extended spring training, or the instructional leagues. They further allege that because players are "employees" and the activities the players perform during those periods constitute compensable work, defendants have unlawfully failed to pay them at least minimum wage. And according to plaintiffs, while the players are paid—albeit not much—during the championship season, they routinely work overtime, for which they are never compensated as a matter of policy.

In May 2015, plaintiffs filed their Second Amended Consolidated Class Action Complaint, which alleged wage-

[3] Plaintiffs originally named all 30 MLB franchises as defendants, but eight of the franchises were subsequently dismissed for lack of personal jurisdiction.

and-hour claims under the laws of eight states and the FLSA; plaintiffs also sought certification of a FLSA collective action. The district court preliminarily certified the FLSA collective in October 2015. Notice was sent to approximately 15,000 current and former minor league players, of which more than 2,200 opted in.

In 2016, defendants moved to decertify the FLSA collective, while plaintiffs moved to certify a Rule 23(b)(2) class as well as Rule 23(b)(3) classes under the laws of eight states. The district court denied certification for all proposed Rule 23(b)(3) classes, concluding that predominance was not satisfied for two primary reasons. *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 572, 577–84 (N.D. Cal. 2016). First, the court concluded that predominance was defeated by the choice-of-law issues presented by the proposed classes, given that (1) the winter off-season training claims entailed work performed in dozens of different states with no common schedule or situs; and (2) the championship season claims involved frequent travel between state lines for away games. *Id.* at 580–81. The district court also determined that the inclusion of claims for winter off-season work fatally undermined predominance, as the court would be required to undertake an overwhelming number of individualized inquiries to determine which activities constituted compensable "work" and how much time was spent doing "work." *Id.* at 577–84. For similar reasons, the court held that plaintiffs were not "similarly situated" and therefore decertified the FLSA collective. *Id.* at 585–86. The court also granted the defendants' motion to exclude an expert survey (the "Pilot Survey") submitted by plaintiffs, finding that its methodology and results did not satisfy the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Id.* at 586–90. The court further refused to

certify the proposed Rule 23(b)(2) class, concluding that because the plaintiffs were all former—rather than current—players, they lacked standing to represent a (b)(2) class. *Id.* at 584–85.

Plaintiffs moved for reconsideration, narrowing their proposed classes significantly in response to the concerns the district court expressed in its initial certification order. Plaintiffs requested Rule 23(b)(3) certification of an Arizona class and a Florida class for work performed during spring training, extended spring training, and the instructional leagues in those states. Plaintiffs also moved for certification of a 23(b)(3) California class, covering players who participated in the California League during the championship season. Additionally, plaintiffs sought to certify a reworked FLSA collective of players who participated in the California League or in spring training, extended spring training, and the instructional leagues. In addition to the 23(b)(3) classes and FLSA collective, plaintiffs requested certification of a Rule 23(b)(2) injunctive relief class consisting of current minor league players who participate in spring training, extended spring training, or the instructional leagues in Florida or Arizona. To cure the court's earlier concerns about standing, four current minor league players moved to intervene to represent the proposed (b)(2) class.

On reconsideration, plaintiffs argued that they could meet Rule 23(b)(3)'s predominance requirement and FLSA's "similarly situated" requirement through a combination of the use of representative evidence and application of the so-called "continuous workday" rule.[4]

[4] As we shall explain, the continuous workday rule presumes that once the beginning of the workday is triggered, an employee performs

Plaintiffs' representative evidence took a variety of forms, including an expert survey (the "Main Survey"), hundreds of team schedules, payroll data, and testimony from both players and league officials. The most controversial piece of evidence was the Main Survey, which plaintiffs argued served as representative evidence of hours worked, particularly when used in concert with a continuous workday theory.

The Main Survey asked players to report the times they "most often" arrived and departed from the ballpark or training facility during the championship season, spring training, extended spring training, and the instructional leagues, and asked players to estimate how much time they spent eating meals while at the ballpark. The survey did not, however, ask players about the kinds of activities they performed at the facilities, or how much time they spent performing particular activities. Given these purported shortcomings, defendants moved to exclude the Main Survey, and further argued that even if the survey were admissible under *Daubert*, it still could not be used to meet the predominance and "similarly situated" requirements due to its alleged flaws. The district court denied defendants' motion to exclude the Main Survey, finding it admissible under *Daubert* and concluding that defendants' challenges went "to the weight of the Survey and not its admissibility" and were "better left to a jury to evaluate." The district court further concluded that the Main Survey could be used in combination with other evidence—such as team schedules, testimony, and payroll data—to meet Rule 23(b)(3)'s

compensable work throughout the rest of the day until the employee completes their last principal activity or the last activity which is "integral and indispensable" to the employee's principal activities. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28, 32–37 (2005).

predominance and FLSA's "similarly situated" requirements, observing that certifying the classes and the FLSA collective "will not preclude Defendants from challenging the sufficiency of the Main Survey and Plaintiffs' damages model on summary judgment and/or at trial."

Because it concluded that the predominance and "similarly situated" requirements could be met with the use of representative evidence and application of the continuous workday rule, the district court recertified the narrowed FLSA collective and certified a California (b)(3) class. However, the district court denied certification for the Arizona, Florida, and (b)(2) classes, holding that choice-of-law concerns defeated predominance for the Arizona and Florida classes and undermined "cohesiveness" for the (b)(2) class.

At defendants' request, the district court certified the FLSA collective certification order for interlocutory review under 28 U.S.C. § 1292. Plaintiffs petitioned us for permission to appeal the denial of certification for the Arizona, Florida, and Rule 23(b)(2) classes, and defendants likewise petitioned to appeal the certification of the California class; we granted both petitions, consolidating those cross-appeals with the FLSA collective appeal.

## STANDARD OF REVIEW

We review for abuse of discretion the district court's class certification rulings, and review for clear error any findings of fact the district court relied upon in its certification order. *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014). A district court's choice of law determinations, however, are reviewed de novo. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012). A district court

abuses its discretion where it commits an error of law, relies on an improper factor, omits a substantial factor, or engages in a clear error of judgment in weighing the correct mix of factors. *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1113 (9th Cir. 2014) (citing *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010)). When we review a grant of class certification, "we accord the district court noticeably more deference than when we review a denial." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010)).

## ANALYSIS

To paraphrase the Chief Justice, these complex appeals require us to call a great number of balls and strikes, as both parties raise numerous challenges to the district court's certification order. For their part, plaintiffs challenge the district court's decision to deny certification for the Arizona and Florida Rule 23(b)(3) classes and the Rule 23(b)(2) class on the grounds that choice-of-law issues defeated the predominance requirement for the Arizona and Florida (b)(3) classes and also thwarted "cohesiveness" for the proposed (b)(2) class. Defendants, on the other hand, contest the district court's certification of the California (b)(3) class, arguing first that choice-of-law issues defeat both predominance and adequacy, and second, that plaintiffs cannot meet the predominance requirement through the use of their proffered representative evidence: the Main Survey, team schedules, payroll records, deposition testimony, and declarations. Defendants further charge that the district court erred in certifying the FLSA collective because plaintiffs' representative evidence does not show that the collective members are "similarly situated." Defendants also contend that the district court erred by not "rigorously

analyzing" plaintiffs' expert evidence at the class and collective certification stage. We address each argument in turn.

## I.

Class certification is governed by Federal Rule of Civil Procedure 23. As a threshold matter, a party seeking class certification must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[5] "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Parsons*, 754 F.3d at 674 (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542–43 (9th Cir. 2013)).

In addition to the requirements of Rule 23(a), a proposed class must also meet the requirements of one or more of the "three different types of classes" set forth in Rule 23(b). *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). Here, plaintiffs proposed classes under two of Rule 23(b)'s class types: Rule 23(b)(3) and 23(b)(2). A class may be certified under Rule 23(b)(3) only if the district court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Of these two requirements—predominance and superiority—only predominance is at issue on appeal. "The predominance inquiry focuses on 'the relationship between

---

[5] Of Rule 23(a)'s four requirements, defendants contest only adequacy on appeal; their arguments pertaining to adequacy have to do with choice-of-law issues.

the common and individual issues' and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). In determining whether the predominance requirement is met, courts have a "duty to take a close look at whether common questions predominate over individual ones" to ensure that individual questions do not "overwhelm questions common to the class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (internal quotation marks and citation omitted).

Rule 23(b)(2), on the other hand, requires only that "the party opposing the class ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Although 23(b)(2) classes are most common in the civil rights context, "we have certified many different kinds of Rule 23(b)(2) classes." *Parsons*, 754 F.3d at 686.

## II.

We first address whether choice-of-law issues fatally undermine plaintiffs' proposed Rule 23 classes. The district court's decision was split on the impact of choice-of-law questions: as to the proposed Rule 23(b)(3) California class, the court held that choice-of-law concerns defeated neither Rule 23(b)(3)'s predominance requirement nor Rule 23(a)'s adequacy requirement. Yet as to the proposed 23(b)(3) Arizona and Florida classes, the district court held the opposite: that choice-of-law issues posed an insurmountable hurdle to meeting both predominance and adequacy. Similarly, the court determined that choice-of-law questions

made certification of the proposed Rule 23(b)(2) class inappropriate.

Concerns over which state's laws apply to a proposed class "do not necessarily preclude a 23(b)(3) action." *Hanlon*, 150 F.3d at 1022. But "[u]nderstanding which law will apply before making a predominance determination is important when there are variations in applicable state law," and potentially varying state laws may defeat predominance in certain circumstances. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001). We have been particularly concerned about the impact of choice-of-law inquiries in nationwide consumer class actions and products liability cases. *See, e.g.*, *Mazza*, 666 F.3d at 585, 591–94; *Zinser*, 253 F.3d at 1184–90.

A district court considering state law claims brought in federal court must utilize the choice-of-law rules of the forum state—here, California. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941). "By default, California courts apply California law unless a party litigant timely invokes the law of a foreign state, in which case it is the foreign law proponent who must shoulder the burden of demonstrating that foreign law, rather than California law, should apply to class claims." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019) (en banc) (internal quotation marks and citations omitted). To meet their burden, the objectors must satisfy California's three-step governmental interest test, used to resolve choice of law issues. *Id.*

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or

> different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied.

*Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006) (internal quotation marks and citations omitted); *see also Hairu Chen v. Los Angeles Truck Centers, LLC*, No. S240245, 2019 WL 3281346, at *3 (Cal. July 22, 2019).

In making its choice-of-law determinations, the district court relied heavily on the California Supreme Court's decision in *Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011), and the parties do not dispute that *Sullivan* provides the most helpful guidance for the choice-of-law questions before us. In *Sullivan*, the California Supreme Court answered a certified question from this court regarding whether California overtime law applied to non-resident employees of a California corporation who worked primarily in their home states of Colorado and Arizona, but also worked in California (and several other states) for "entire days or weeks" at a time. *Id.* at 239, 243. *Sullivan* first concluded that as a matter of statutory construction, California law applied to all work performed for days or

weeks at a time within the state's borders, regardless of whether it was performed by residents or non-residents. *Id.* at 241–43. Next, *Sullivan* undertook California's three-step governmental interest analysis for choice-of-law questions. *Id.* at 244–47. At the first step of the analysis—whether the relevant laws differed—the court noted that California's overtime law "clearly" differed from the laws of the plaintiffs' home states. *Id.* at 245.

At the second step—whether a "true" conflict existed—the court held that the existence of a true conflict was "doubtful, at best." *Id.* The court explained that the second step involves examining "each jurisdiction's interest in the application of its own law under the circumstances of the particular case," noting that a court "may make [its] own determination of the relevant policies and interests, without taking 'evidence' as such on the matter." *Id.* (internal quotation marks, alterations, and citations omitted). *Sullivan* observed that "California has, and has unambiguously asserted, a strong interest in applying its overtime law to all nonexempt workers, and all work performed, within its borders." *Id.* at 245. The court concluded that "neither Colorado nor Arizona has a legitimate interest in shielding Oracle from the requirements of California wage law as to work performed here." *Id.* at 246.

In so holding, the court rejected two specific arguments advanced by Oracle. First, Oracle contended that because Arizona and Colorado have workers' compensation statutes with express extraterritorial application, those statutes indicate an interest in extending the protection of their employment laws to their residents working outside the state. *Id.* Not so, *Sullivan* held. While "a state has such an interest, at least in the abstract, when the traveling, resident employee of a domestic employer would otherwise be left

without the protection of another state's law," the states had "expressed no interest in disabling their residents from receiving the full protection of California overtime law when working here, or in requiring their residents to work side-by-side with California residents in California for lower pay." *Id.*

Second, Oracle argued that Arizona and Colorado "have an interest in providing hospitable regulatory environments for their own businesses" and thus "also have an interest in shielding their own businesses from more costly and burdensome regulatory environments in other states." *Id.* Relying on principles of federalism, *Sullivan* dismissed this argument. While "a state can properly choose to create a business-friendly environment within its own boundaries," the federal Constitution does not require a state to substitute "'the conflicting statute of another state'" for its own laws that are "'applicable to persons and events'" within that state. *Id.* (quoting *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 822 (1985)). Nor does the Constitution "permit one state to project its regulatory regime into the jurisdiction of another state." *Id.* (citing *Healy v. Beer Insti., Inc.*, 491 U.S. 324, 336–37 (1989)).

Finally, although *Sullivan* held that there was almost certainly no true conflict because neither Arizona nor Colorado had a "legitimate interest" in blocking the application of California law to the work performed in California, the court nonetheless proceeded to the third step of the analysis "for the sake of argument." *Id.* at 246–47. *Sullivan* concluded that the analysis at the third step—determining which state's interest would be more impaired if its policy were subordinated to the policy of the other state—yielded a straightforward answer:

> [T]o subordinate California's interests to those of Colorado and Arizona *unquestionably* would bring about the greater impairment. To permit nonresidents to work in California without the protection of our overtime law would completely sacrifice, as to those employees, the state's important public policy goals of protecting health and safety and preventing the evils associated with overwork. Not to apply California law would also encourage employers to substitute lower paid temporary employees from other states for California employees, thus threatening California's legitimate interest in expanding the job market. By way of comparison, not to apply the overtime laws of Colorado and Arizona would impact those states' interests negligibly, or not at all . . . Alternatively, viewing Colorado's and Arizona's overtime regimens as expressions of a general interest in providing hospitable regulatory environments to businesses within their own boundaries, that interest is not perceptibly impaired by requiring a California employer to comply with California overtime law for work performed here.

*Id.* at 247 (citations omitted) (emphasis added).

**A.**

We first conclude that the district court did not err in holding that under *Sullivan*, California law should apply to

the (b)(3) California class.[6] Although defendants correctly point out that *Sullivan* is not precisely analogous to the case at hand, the two principal differences on which defendants rely are unpersuasive. Specifically, defendants first rely on the fact that while *Sullivan* involved a California corporation, "most of the MLB Club Defendants with affiliates in the California League are located outside California." But a close reading of *Sullivan* indicates that California law should apply to the California class, even though many of the employers are not headquartered in California. For example, *Sullivan* expressly contemplated that California's overtime laws may not apply to non-resident employees of an out-of-state business who enter California only "temporarily during the course of a workday," but contrasted such a scenario with employees who work in California for "entire days and weeks," who *are* covered by California law. *Id.* at 243 (emphases, internal quotation marks, and citations omitted).

Similarly, *Sullivan* specifically left open the possibility that other California employment laws, such as pay stub requirements, may not apply to non-resident employees of out-of-state employers—with the clear implication that overtime laws *would* apply to such employees. *See id.* at 243–44. Likewise, far from limiting its holding only to non-resident employees of in-state employers, *Sullivan* merely emphasized that employees of in-state employers would *especially* be covered by California law. *See id.* at 243.

[6] Contrary to the dissent's criticism, Dissent at 74, we do not shortcut the governmental interest analysis. As we explain in the text, we believe that *Sullivan* mandates application of California law to the California class. Rather than repeating *Sullivan*'s choice of law analysis, we focus on several additional considerations that further support our decision to affirm the district court's reliance on *Sullivan*.

Second, defendants characterize *Sullivan* as resting on the court's determination that "neither Arizona nor Colorado . . . has asserted an interest in regulating overtime work performed in other states." Defendants argue that here, by contrast, "numerous" states have a competing interest in regulating work performed in California. But defendants misread *Sullivan* by erroneously presuming that its conclusion at the third step—that subordinating "California's interests to those of Colorado and Arizona unquestionably would bring about the greater impairment"—hinged entirely on whether Arizona or Colorado law had asserted an interest in extraterritorial application of their wage laws. *Id.* at 247. It is certainly accurate to say that *Sullivan*'s holding was influenced by the fact that neither Arizona nor Colorado law purported to apply extraterritorially. Yet the court's discussion at step three cannot fairly be read to support the argument that California's "strong interest in applying its overtime law to . . . all work performed within its borders," *id.* at 245, would suddenly become the *lesser*-impaired interest in the event another state expressed a clear interest in applying its wage laws to work performed in California. Rather, *Sullivan* strongly indicates that California's interest in applying its laws to work performed within its borders for days or weeks at a time would reign supreme regardless of whether another state expressed an interest in applying its own wage laws instead of California's.

Although we read *Sullivan* as clearly mandating the application of California law to the California class, two additional considerations support our conclusion today.[7]

First, because the district court found that plaintiffs had met their burden of showing that California law could constitutionally be applied—a determination defendants do not contest on appeal—the burden shifted to defendants "to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Mazza*, 666 F.3d at 590 (quoting *Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1081 (Cal. 2001)). The district court held that defendants failed to meet this burden, because they had "not gone beyond speculating in a general manner that the claims of some members of the putative California Class *might* be subject to the law of another state and that the interests of another state *might* be more impaired by application of California law."

Defendants specifically point to one of the named plaintiffs—Mitch Hilligoss—as an example of the alleged "need to conduct choice of law inquiries as to every member of the California class." The district court found this example unpersuasive for several reasons, and we agree. The defendants argued that Illinois law should apply to Hilligoss' work in California because the time he spent in California was a small proportion of his overall career (around two months out of a six-year career). The district court, however, correctly read *Sullivan* as indicating that California law should nonetheless apply to Hilligoss' California work. Indeed, the proportion of time the non-

[7] Moreover, as the dissent acknowledges, the California Supreme Court has expressed a strong interest in regulating wage and hour claims within its borders. Dissent at 77.

resident employees in *Sullivan* worked in California was quite small (and in one case, even less than the proportion of Hilligoss' career spent in California): during the relevant three-year period, one worked 20 days, another 74 days, and the third 110 days. 254 P.3d at 239. Put differently, the employees in *Sullivan* worked in California approximately 1.8%, 6.7%, and 10% of the time, respectively. *Id*. What mattered in *Sullivan*—and what matters here—is that when the employees worked in California, they did so for "entire days or weeks" at a time. *Id.* at 243.

Second, practical considerations strongly support applying California law to work performed in California, at least as a general rule; to hold otherwise "would lead to bizarre and untenable results." *See* Brief for Professors Peter Hay and Patrick J. Borchers, Dkt. No. 21, at 12–13 (hereinafter "Professors' Amicus Brief"). If the law of the state in which work is performed is not the law that generally applies, employers and employees alike would be subjected to an unworkable scheme. Employers would be required to properly ascertain the residency status—itself not necessarily an easy task, as any student or seasonal worker could attest—of each of its employees. For every non-resident employee, employers would then have to determine whether the wage laws of that employee's state of residence apply extraterritorially, and then come up with *different* rules for each of its employees according to their state of residence and any extraterritorial application of their home state's laws. This would mean that at a single worksite, employees working side-by-side in the same position would not only be owed vastly different minimum wages, but also that an employer would need to set different rules for meal and rest breaks for different employees, and so on and so forth. It cannot be in any state's legitimate "interest" to foist such an

administrative nightmare upon both employers and employees.

Such a scenario would also result in an enormous competitive advantage—or disadvantage—for prospective employees based solely on their state of residency. Employers would be incentivized to hire residents of states with low minimum wages and otherwise employer-friendly wage laws, while residents of states with higher minimum wages and more protective employment laws would suddenly be far less appealing. Amici Professors Hays and Borchers persuasively point out that as defendants would have it, a college student still domiciled in Seattle while attending a Nebraska university would have to be paid $15 per hour at a part-time job in Nebraska, "nearly double Nebraska's minimum wage of $8 per hour." Professors' Amicus Brief at 13. This, of course, would put the student at a crushing disadvantage; what rational employer would hire her?

Moreover, given the administrative cost involved in attempting to comply with a patchwork of multiple states' wage laws at a single workplace, some employers might instead choose to stick to hiring only resident employees, or perhaps only non-resident employees from a particular state (presumably one with a low minimum wage and minimally protective employment laws).[8]

[8] The California class consisted of those players who participated in the California League, which plays games exclusively within California during the championship season. The Arizona and Florida classes consisted of those who performed during spring training, extended spring training, and the instructional leagues in those states. Thus, the dissent's fear that employers will be required to research applicable state

We do not foreclose the possibility that there could be some circumstances in which a proper application of California's choice-of-law rules might lead to the application of another state's wage and hour laws to work performed in California. Nor do we create a per se rule or an unrebuttable presumption. We hold only that, given the above considerations, we are more than satisfied that the district court did not err in concluding that under *Sullivan*, California law applies to the California class.

**B.**

We next address whether the district court erred in determining that choice-of-law considerations defeated predominance and adequacy for the proposed Arizona and Florida Rule 23(b)(3) classes, and conclude that the district court's determination must be reversed. Our conclusion is animated in part by several of the considerations outlined above, which apply with equal force to the Arizona and Florida classes. Moreover, the aforementioned enormous practical implications of a contrary holding would be just as problematic and unworkable in Arizona and Florida as in California.

**1.**

With those considerations in mind, we apply California's three-step governmental interest analysis, and conclude that Arizona law should apply to the work performed in Arizona, and Florida law to the work performed in Florida. At the first step, we agree with defendants that the differences in state law are "material," meaning that "they make a

laws whenever an employee crosses state lines is overstated. Dissent at 84.

difference in this litigation." *Mazza*, 666 F.3d at 590. For example, some states have more expansive definitions of "work," others have differing available defenses, and we have previously held that the elements for a quantum meruit claim—alleged in both the Arizona and Florida classes—"vary materially from state to state." *Id.* at 591 (citing Candace S. Kovacic, *A Proposal to Simplify Quantum Meruit Litigation*, 35 Am. U.L. Rev. 547, 558–60 (1986)).

**2.**

"Because the relevant laws differ," we must "next examine each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Sullivan*, 254 P.3d at 245 (alteration, internal quotation marks, and citation omitted). We are not persuaded, as defendants contend, that a "true" conflict exists.

First, under California's choice-of-law principles, "a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders."[9] *Mazza*, 666 F.3d at 592 (internal quotation marks omitted) (quoting *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010)). The dissent contends that "California has long rejected" this approach. Dissent at 71. In noting these principles, we do not ignore the evolution of California's choice of law doctrine. We recognize that the California Supreme Court "renounced the prior rule, adhered to by courts for many years, that in tort actions the law of the place

[9] Wage and hour laws are typically categorized as "conduct-regulating," as opposed to "loss-allocating." *See* Professors' Amicus Brief at 15–16 (citing Hay, Borchers & Symeonides, Conflict of Laws 874–78 (5th ed. 2010)).

of the wrong was the applicable law in a California forum regardless of the issues before the court" when it adopted the governmental interest approach. *Hurtado v. Superior Court*, 522 P.2d 666 (Cal. 1974). Yet the California Supreme Court has acknowledged that while it "no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred *without regard to the nature of the issue that was before the court* . . . California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." *McCann* 225 P.3d at 534 (internal quotation marks and citation omitted) (emphasis in original).

Thus, when conducting the governmental interest analysis, we must also recognize that a state ordinarily has the predominant interest in regulating conduct within its borders. We draw this conclusion not from California's interest in regulating conduct within its own borders, but from California's choice-of-law principles.[10] Thus these

[10] *See e.g.*, *McCann*, 225 P.3d at 534, 537 (recognizing that although California no longer uniformly applied the law of the jurisdiction in which the allegedly tortious conduct occurred, Oklahoma's interests "would be more impaired if its law were not applied" as the plaintiff's exposure to asbestos occurred in Oklahoma); *Reich v. Purcell*, 67 432 P.2d 727, 730 (Cal. 1967) ("Missouri is concerned with conduct within her borders and as to such conduct she has the predominant interest of the states involved."); *Castro v. Budget Rent-A-Car Sys., Inc.*, 65 Cal. Rptr. 3d 430, 442 (Cal. Ct. App. 2007) ("The accident and Castro's injury occurred within Alabama's borders, thus giving Alabama a presumptive interest in controlling the conduct of those persons who use its roadways, absent some other compelling interest to be served by applying California law."); *Hernandez v. Burger*, 162 Cal. Rptr. 564, 568 (Cal. Ct. App. 1980) ("It is true that the place of the wrong is no longer treated as a controlling factor where application of the law of another jurisdiction

principles are not limited to the California class but apply to the Florida and Arizona classes as well. *See Mazza*, 666 F.3d at 593 ("The district court did not adequately recognize that each foreign state [not just California] has an interest in applying its law to transactions within its borders."). The district court erred in ignoring these principles as a starting point, instead faulting plaintiffs for not addressing "in detail the interests of either Arizona or Florida in applying their law" and focusing on the absence of Florida or Arizona cases akin to *Sullivan*—despite the strong indications that Arizona and Florida have the "predominant interest" in applying their laws to work performed within their state. *See Mazza*, 666 F.3d at 592.

Second, *Sullivan* relied on several different considerations to arrive at its conclusion that the existence of a true conflict was "doubtful, at best": (1) the states in which the employees resided did not express an intent to apply their laws extraterritorially; (2) the employees' states of residence did not have a "legitimate interest" in shielding an employer from California's wage laws as to work performed in California; and (3) federalism and due process made extraterritorial reach doubtful under the circumstances. *See* 254 P.3d at 245–47. Although defendants vigorously argue that the first of those rationales is inapplicable here—as discussed in greater detail below—at a minimum, the second and third rationales *do* apply, and weigh against the existence of a true conflict.

---

having a connection with the accident will serve a legitimate interest or policy of the other jurisdiction. However, the situs of the injury remains a relevant consideration."); *Cable v. Sahara Tahoe Corp.*, 155 Cal. Rptr. 770, 777 (Cal. Ct. App. 1979) ("The state with the 'predominant' interest in controlling conduct normally is the state in which such conduct occurs and is most likely to cause injury.").

As to the first rationale, both defendants and the dissent contend that several states have expressed an interest in applying their wage and hour laws to work performed outside the state. In support of their position, they cite to a handful of cases where courts (largely district courts or intermediate state courts, with the exceptions of West Virginia and Washington)[11] have applied one state's wage laws to work performed at least partially in another state. For several reasons, we are unpersuaded by defendants' arguments. For one, we read *Sullivan* as indicating that under California's choice-of-law principles, a state has a legitimate interest in applying its wage laws extraterritorially only in two limited circumstances, neither of which apply here: one, when a state's resident employee of that state's resident employer leaves the state "temporarily during the course of the normal workday," and two, "when the traveling, resident employee of a domestic employer would otherwise be left without the protection of another state's

[11] In *New v. Tac & C Energy, Inc.*, 355 S.E.2d 629 (W. Va. 1987), the West Virginia Supreme Court of Appeals applied its own conflict-of-laws principles—relying on the Restatement (Second) of Conflicts § 196—to conclude that while there was a presumption that the law of the state where services were rendered applies, the presumption could be overcome by showing that another state had a "more significant relationship to the transaction and the parties." *Id.* at 631. Where all parties were residents of West Virginia, the employment contract was made and partially performed in West Virginia, and the plaintiffs were only in Kentucky for the duration of the work, the court concluded that the presumption was overcome and that West Virginia "had the more significant connection to the employment relationship." *Id.* California's choice-of-law test, of course, does not utilize the "more significant relationship" test for choice-of-law questions in the wage and hour context. *See Sullivan*, 254 P.3d at 244. *New* is therefore unpersuasive here. We discuss the Washington Supreme Court case below.

law." *Id.* at 242, 246 (citations, internal quotation marks, and alterations omitted).

Moreover, the cases on which defendants and the dissent rely are, in large part, both factually and procedurally inapposite to the circumstances of this case.[12] For example, defendants rely heavily on *Bostain v. Food Exp., Inc.*, 153 P.3d 846, 851 (Wash. 2007) to argue that Washington has an interest in applying its wage laws extraterritorially. As the California Supreme Court held in *Sullivan*, however, *Bostain* "says nothing about a case such as this"—that is, a case which (1) involves work performed entirely in one state, and (2) presents an unavoidable conflict-of-laws issue. 254 P.3d at 243. In *Bostain*, by contrast, either Washington law applied to the work performed in both Washington and other states, or else no state's law applied. *Id.* at 243, 246. Significantly, *Bostain* interpreted an overtime statute that specifically delineated the circumstances under which its provisions would apply to interstate truck drivers; as the Washington Supreme Court noted, interstate truck drivers *by definition* perform some of their work out of state. 153 P.3d at 848–51. The statute at issue in *Bostain* did "not limit the requirement for overtime pay to hours worked" within the state's borders. *Id.* at 851. Similarly, here, defendants point

[12] Defendants' repeated citation to *Gonyou v. Tri-Wire Eng'g Sols., Inc.*, 717 F. Supp. 2d 152 (D. Mass. 2010) is illustrative. In *Gonyou*, a Massachusetts resident employee of a Massachusetts employer worked largely, although not entirely, in Connecticut. *Id.* at 153–54. The defendant filed a motion to dismiss on the ground that the Massachusetts overtime statute did not apply to work performed in Connecticut. *Id.* at 154–55. The court denied the motion but emphasized the limited nature of its ruling: "As is eminently clear, this is a motion to dismiss and this ruling is strictly limited to the facts and circumstances of this case and this motion." *Id.* at 155.

to no state statutes potentially applicable to the Arizona and Florida class members that limit their application to work performed within the state.

**3.**

Although the existence of a "true" conflict is questionable, we need not decide whether a true conflict exists, as the third step of California's governmental interest test yields a clear answer: the laws of Arizona and Florida should apply to the work performed wholly within their respective boundaries.[13] *See Sullivan*, 254 F.3d at 247. As the California Supreme Court has explained the step three inquiry:

> [T]he court does not "weigh" the conflicting governmental interests in the sense of determining which conflicting law manifested the "better" or the "worthier"

[13] Furthermore, in many of the cases cited by the dissent to demonstrate that some states have asserted an interest in applying their wage and hour laws outside of their borders, courts have looked closely at where the relevant work is performed. *See e.g.*, *Pierre v. Gts Holdings*, Inc., No. 15 CIV. 143 (PAC), 2015 WL 7736552, at *3–*4 (S.D.N.Y. Nov. 30, 2015) (concluding that New York labor laws apply because, among other things, the majority of the plaintiff's chauffeured rides were conducted in New York); *Baxi v. Ennis Knupp & Assocs., Inc.*, No. 10-CV-6346, 2011 WL 3898034, at *14 (N.D. Ill. Sept. 2, 2011) (denying a motion to dismiss Illinois labor law claims because the plaintiff, a foreign resident, performed some work in Illinois); *Friedrich v. U.S. Computer Sys., Inc.*, No. CIV. A. 90-1615, 1996 WL 32888, at *8 (E.D. Pa. Jan. 22, 1996) (concluding that a Pennsylvania labor law applies to the plaintiffs because the jury found the plaintiffs were "based in Pennsylvania," even if they were not residents of the state); *Dow*, 989 N.E.2d at 914 (concluding that Massachusetts law applied because, given the nature of the plaintiff's work, the work "sensibly may be viewed as having 'occurred' in Massachusetts").

> social policy on the specific issue. An attempted balancing of conflicting state policies in that sense is difficult to justify in the context of a federal system in which, within constitutional limits, states are empowered to mold their policies as they wish. Instead, the process can accurately be described as a problem of *allocating domains of law-making power in multi-state contexts*—by determining the appropriate limitations on the reach of state policies—as distinguished from evaluating the wisdom of those policies. Emphasis is placed on the appropriate scope of conflicting state policies rather than on the "quality" of those policies.

*McCann*, 225 P.3d at 533–34 (alterations and citations omitted) (emphasis added).

As discussed above, in *Mazza*, we faithfully applied the principle under California's choice-of-law jurisprudence that "a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." *Mazza*, 666 F.3d at 592 (internal quotation marks omitted) (quoting *McCann*, 225 P.3d at 534). We thus had no trouble concluding at step three that "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Id.* at 594. Notably, we reached this conclusion *without* specifically inquiring into the interests potentially expressed by any state's statutory language or case law. Rather, our conclusion was dictated by the principle, discussed above, that a jurisdiction ordinarily has the predominant interest in regulating conduct within its own borders. *Id.* at 591–92 (first citing *State Farm Mut. Auto.*

*Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003); and then citing *McCann*, 225 P.3d at 534).

Moreover, in *Sullivan*, the court concluded that to subordinate California's ability to apply its own wage laws to work performed within the state would "unquestionably" cause greater impairment to California than to the states that might seek to apply their wage laws to work performed by their residents within California. 254 P.3d at 247. As described previously, while this holding was *influenced* by the absence of an expression of interest by Arizona or Colorado in applying their laws extraterritorially, it did not rise or fall on that ground. *See id.* at 244–47. And although defendants point to a handful of cases that have entertained the potential application of one state's wage laws to work performed in another state, they have not pointed to a single state with a potentially-applicable statute that expresses a clear interest in applying to work performed wholly outside the state.

But even *if* defendants were able to identify any states that had unambiguously expressed an interest in applying their wage laws to work performed entirely in another state, *Sullivan* strongly militates against concluding that such an expression of interest would be adequate to overcome the principle that the state in which the conduct at issue occurs has the "predominant interest" in applying their own law. *See Mazza*, 666 F.3d at 592–94; *Sullivan*, 254 P.3d at 245–47. Forcing Arizona or Florida to allow the application of other states' wage laws in this case would be just as destructive to the balance Arizona and Florida have struck between protecting workers and fostering a hospitable business environment within their states as allowing the application of Colorado or Arizona law in *Sullivan* would have been to the balance California struck between those

same interests. *See Sullivan*, 254 P.3d at 246–47. The district court fundamentally misunderstood the proper application of California's choice-of-law principles—which, when correctly applied, indicate that Arizona law should govern the Arizona class, and Florida law the Florida class.

**C.**

We next address whether the district court erred in refusing to certify a Rule 23(b)(2) class for unpaid work at defendants' training facilities in Arizona and Florida on the sole basis that choice-of-law issues undermined "cohesiveness" and therefore made injunctive and declaratory relief inappropriate. Because the district court's errors in its choice-of-law analysis relating to the proposed Arizona and Florida Rule 23(b)(3) classes apply equally to its refusal to certify the proposed Rule 23(b)(2) class, we also reverse the denial of the (b)(2) class.

We further hold that the district court erred in imposing a "cohesiveness" requirement for the proposed Rule 23(b)(2) class. Although we have never explicitly addressed whether "cohesiveness" is required under Rule 23(b)(2), courts that have imposed such a test treat it similarly to Rule 23(b)(3)'s predominance inquiry[14]—something we have previously rejected in no uncertain terms. *See Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("[W]ith respect to 23(b)(2) in particular, the government's dogged focus on the factual differences among the class members appears to

[14] The similarity between "cohesiveness" and predominance is perhaps unsurprising, given that the Supreme Court described the predominance inquiry under 23(b)(3) as testing whether a class is "sufficiently *cohesive* to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (emphasis added).

demonstrate a fundamental misunderstanding of the rule. Although common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2)."); *see also* 2 Newberg on Class Actions § 4:34 (5th ed. 2012) (describing similarity between predominance under Rule 23(b)(3) and "cohesiveness" under Rule 23(b)(2) in courts that have adopted it). We therefore remand for the district court to consider anew whether to certify the proposed Rule 23(b)(2) class.[15]

## III.

Having addressed the impact of choice-of-law questions, we turn to the issue next up at bat: whether the district court erred in concluding that plaintiffs could meet the predominance requirement for the proposed California, Florida, and Arizona (b)(3) classes through a combination of representative evidence and application of the "continuous workday" rule.

Rule 23(b)(3)'s predominance requirement requires courts to ask "whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 Newberg on Class Actions § 4:49 (5th ed. 2012)). A proposed (b)(3) class may be certified as long as "one or more of the central issues in the action are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately, such

[15] While the parties advanced numerous arguments regarding (b)(2) certification in the district court, and advance similar arguments—along with a few new ones—before us, we decline to pass on those other issues in the first instance. *See Stockwell*, 749 F.3d at 1113, 1116–17; *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1094–95 (9th Cir. 2014).

as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005)).

"[P]redominance in employment cases is rarely defeated on the grounds of differences among employees so long as liability arises from a common practice or policy of an employer." 7 Newberg on Class Actions § 23:33 (5th ed. 2012). Although the existence of blanket corporate policies is not a guarantee that predominance will be satisfied, such policies "often bear heavily on questions of predominance and superiority." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009).

Whether the district court was correct in concluding that plaintiffs had satisfied the predominance requirement hinges on the application of two longstanding wage-and-hour doctrines to this case: first, the burden-shifting framework initially set forth in the Supreme Court's seminal decision in *Anderson v. Mt. Clemens*, 328 U.S. 680 (1946) and recently expanded upon in *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036 (2016); and second, the so-called "continuous workday" rule. We address each of these doctrines and their application to this case in turn.

**A.**

In *Mt. Clemens*, the Supreme Court acknowledged the difficult bind that employees frequently confronted when seeking to bring wage-and-hour claims against their employers: if their employers had failed to maintain proper timekeeping records, proving the hours of uncompensated work often posed "an impossible hurdle for the employee." 328 U.S. at 687. *Mt. Clemens* held that such a catch-22 was

Case: 17-16245, 08/16/2019, ID: 11399316, DktEntry: 91-1, Page 41 of 89



not in line with "the remedial nature of [the FLSA][16] and the great public policy which it embodies." *Id.* After all, "[s]uch a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation." *Id.*

To address this problem, *Mt. Clemens* established its landmark burden-shifting framework for actions in which the employer has kept inaccurate or inadequate records: if an employee "proves that he has in fact performed work for which he was improperly compensated" and "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference," then the burden "shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687–88. If the employer does not rebut the employee's evidence, damages may then be awarded to the employee, "even though the result be only approximate." *Id.* at 688.

*Mt. Clemens* explicitly rejected the notion that allowing approximate damages in such situations would be unfair due to its speculative and imprecise nature or because employers sometimes make good-faith mistakes over what constitutes compensable "work":

[16] Although *Mt. Clemens* was decided under the FLSA, its holding has been consistently applied in the context of state wage-and-hour claims as well. *See, e.g.*, *Tyson*, 136 S. Ct. at 1045–48; *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1140 (9th Cir. 2016); *Hernandez v. Mendoza*, 245 Cal. Rptr. 36, 39–40 (Cal. Ct. App. 1988) (applying *Mt. Clemens* to claims under California wage and hour law).

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the [statutory] requirements . . . And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances . . . In such a case it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.

*Id.* (internal quotation marks and citation omitted).

Seventy years after *Mt. Clemens* addressed the use of representative evidence at the trial stage to show damages, *Tyson* extended *Mt. Clemens*' holding to answer two important questions: whether representative evidence may be used at the class certification stage, and whether representative evidence may also be used to establish liability in addition to damages. In *Tyson*, employees who worked in more than 400 jobs across three departments at a meat processing plant sued under the FLSA and an Iowa wage law, alleging that Tyson had not paid them overtime for time they spent donning and doffing protective gear; the employees also sought certification of a Rule 23 class and a FLSA collective action. 136 S. Ct. at 1041–42.

The district court certified the class and collective actions, rejecting Tyson's arguments that the claims were

inappropriate for resolution on a classwide and collective basis due to the dissimilarity in the types of protective gear worn and the variations in time spent donning and doffing that gear. *Id.* at 1042–43. Because Tyson had not kept records of the donning and doffing time, plaintiffs relied on representative evidence to demonstrate both liability[17] and damages: employee testimony, video recordings, and—most significantly—an expert study that computed an estimated amount of time spent donning and doffing for each of the three departments based on hundreds of video observations. *Id.* at 1043. Although the expert estimated that the time spent donning and doffing was 18 minutes per day for two of the departments and 21.25 minutes for the other, *id.*, the survey data showed a great deal of variation in how long it took individual employees to don and doff. *Id.* at 1055 (Thomas, J., dissenting). Specifically, the time spent donning ranged from around thirty seconds to more than ten minutes, and the time doffing varied from under two minutes to over nine minutes. *Id.* After a jury verdict in the employees' favor (albeit one that awarded less than half of the damages recommended by the employees' expert based on the survey data), Tyson moved to decertify the class and set aside the jury verdict, arguing that this variance made class and collective certification inappropriate. *Id.* at 1044–

[17] Because the employees brought only overtime claims (as opposed to minimum wage or other wage claims), "each employee had to show he or she worked more than 40 hours a week, inclusive of time spent donning and doffing, in order to recover." *Tyson*, 136 S. Ct. at 1043. That the majority permitted the use of representative evidence to establish "an otherwise uncertain element of liability"—i.e., whether class members worked more than 40 hours per week—was one of the key bases for Justice Thomas's vigorous dissent. *See id.* at 1057–59 (Thomas, J., dissenting).

45. The district court denied the motion, and the Eighth Circuit affirmed. *Id.*

Tyson sought certiorari on the grounds that using representative evidence "manufactures predominance by assuming away the very differences that make the case inappropriate for classwide resolution," "absolves each employee of the responsibility to prove personal injury," and strips the employer of their ability to "litigate its defenses to individual claims." *Id.* at 1046. Rejecting these arguments, the Supreme Court affirmed the class and collective certifications. *Id.* at 1046–47. Because of Tyson's dereliction of their recordkeeping duties, the employees were entitled to "introduce a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records." *Id.* at 1047. The Court held that if the representative sample introduced were admissible and "could have sustained a reasonable jury finding as to hours worked in each employee's individual action, that sample is a permissible means of establishing the employees' hours worked in a class action." *Id.* at 1046–47.

Stated another way, *Tyson* concluded that even where "reasonable minds may differ" about whether representative evidence is sufficiently probative of the requirements for liability for a particular cause of action—in *Tyson*, whether it was probative of the "time actually worked by each employee"—that question is to be resolved by the jury, *not* at the class certification stage. *Id.* at 1049 ("The District Court could have denied class certification on this ground [whether the representative evidence was "probative as to the time actually worked by each employee"] only if it concluded that *no reasonable juror* could have believed that the employees spent roughly equal time donning and doffing.") (emphasis added). If the proffered representative

evidence, however, were "statistically inadequate or based on implausible assumptions," it "could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked." *Id.* at 1048–49. But where the evidence is admissible—for expert evidence, using the *Daubert* standard—then the "no reasonable juror" standard at the class certification stage applies. *See id.* at 1049.

### B.

Having established the parameters of when representative evidence may be used at the class certification stage, we address the second significant wage-and-hour doctrine relevant to this case: the "continuous workday" rule. The rule was first promulgated by the Department of Labor (DOL) consistent with the Supreme Court's decisions interpreting the FLSA prior to the enactment of the Portal-to-Portal Act[18] in 1947. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 27–28 (2005). It presumes that once the beginning of the

---

[18] In response to what Congress perceived as excessively expansive judicial interpretations of what constitutes compensable work under the FLSA, *IBP*, 546 U.S. at 27–28, it passed the Portal-to-Portal Act to exempt certain activities as compensable under FLSA:

> "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 61 Stat. 86–87 (codified at 29 U.S.C. § 254(a)).

workday is triggered, an employee performs compensable work throughout the rest of the day until the employee completes their last principal activity (or the last activity which is "integral and indispensable" to the employee's principal activities)—whether or not the employee actually engages in work throughout that entire period. *See id.* at 28, 32–37; *see also Alvarez v. IBP, Inc.*, 339 F.3d 894, 907 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005) (holding that under the continuous workday rule, "work time [is] continuous, not the sum of discrete periods").

Of course, this rule raises inevitable questions: when does the workday begin, and when does it end? The DOL defines the "workday" to generally mean "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 C.F.R. § 790.6(b). The Supreme Court expanded upon this definition, interpreting "principal activity or activities" to also include "all activities which are an integral and indispensable part of the principal activities." *IBP*, 546 U.S. at 29–30 (internal quotation marks and citation omitted). Thus, any activity which is "integral and indispensable" to principal activities, even if performed outside of a scheduled shift, triggers the beginning of the "workday." *Id.* at 31–37. "Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance," 29 C.F.R. § 790.8(c), such as knife-sharpening performed outside of a scheduled shift by butchers at a meatpacking plant. *Mitchell v. King Packing Co.*, 350 U.S. 260, 261–63 (1956).

**C.**

With all of that in mind, we turn to how these two doctrines impact this case, and more specifically, whether the district court was correct in concluding that the

Case: 17-16245, 08/16/2019, ID: 11399316, DktEntry: 91-1, Page 47 of 89



combination of *Tyson* and the continuous workday rule enabled plaintiffs to show that they meet Rule 23(b)(3)'s predominance requirement. Defendants contend that the district court erred in holding that plaintiffs had demonstrated predominance for two main reasons: (1) because the Main Survey asked only about arrival and departure times at the ballpark and *not* about what activities the players actually performed while at the ballpark, plaintiffs cannot rely on the continuous workday theory because there is no way to determine the beginning or end of the "workday," and (2) the Main Survey revealed significant variations in players' arrival and departure times, even among players employed by the same MLB franchise.

This task requires us to address the proposed Arizona and Florida classes separately from the California class. As an initial matter, however, we note that despite defendants' repeated suggestions to the contrary, the representative evidence offered by plaintiffs was not limited to just the Main Survey, nor are observational studies the only type of evidence permitted to fill in evidentiary gaps under *Tyson*. We reject defendants' erroneous view of the record and their cramped reading of *Tyson*.

**1.**

As to the Arizona and Florida classes, we easily affirm the district court's determination. Recall that these two classes cover time spent participating in spring training, extended spring training, and the instructional leagues—periods during which virtually all players are completely unpaid for their participation.[19] Moreover, these classes do

[19] Payroll data produced by defendants reveals that of the 21,211 players who participated in spring training between the 2009 and 2015

not bring overtime claims, but rather allege minimum wage violations.[20] Therefore—as the district court correctly held—liability can be established simply by showing that the class members performed *any* compensable work.[21] That is easily resolved on a classwide basis by answering two questions: (1) are the players employees of defendants, and (2) do the minor league team activities during these periods constitute compensable work under the laws of either Arizona or Florida? We hold that these two "common, aggregation-enabling issues in the case are more prevalent [and] important than the non-common, aggregation-defeating, individual issues," therefore making certification appropriate. *Tyson*, 136 S. Ct. at 1045 (quoting 2 Newberg on Class Actions § 4:49 (5th ed. 2012)).

Defendants do not seriously contest that their policy is to deny players compensation during spring training, extended spring training, and the instructional leagues—nor could they credibly do so, given that the MLB's own mandatory

---

seasons, only 11 were paid a salary. Put differently, a mere .005% of players received a salary during spring training, and those 11 players may be identified through payroll records and appropriately excluded from the class. Likewise, a small number of MLB franchises pay players during extended spring training, but these players are identifiable through payroll records and may either be excluded from the class or, potentially, placed into a subclass.

[20] The Arizona and Florida classes also bring quantum meruit claims, and the Arizona class alleges recordkeeping violations, but the parties do not dispute that these claims are irrelevant to this portion of our predominance analysis.

[21] We also note that the Arizona class's claims are bolstered by the fact that under Arizona law, failure to keep appropriate records of hours worked "raise[s] a rebuttable presumption that the employer did not pay the required minimum wage rate." Ariz. Rev. Stat. Ann. § 23-364.

contract "obligates Player[s] to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season." And as we have long held, such uniform corporate policies "carry great weight for certification purposes." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 958. This is not the "rare[]" case where predominance is defeated despite the existence of an employer's "common practice or policy." 7 Newberg on Class Actions § 23:33 (5th ed. 2012).

We also agree with the district court that as to these classes, many of defendants' protests go to damages, not liability. Damages may well vary, and may require individualized calculations. But "the rule is clear: the need for individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *see Tyson*, 136 S. Ct. at 1045 (holding that where "one or more of the central issues in the action are common to the class and can be said to predominate," certification may be appropriate "even though other important matters will have to be tried separately, such as damages." (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005))).

We do not, however, mean to minimize defendants' criticisms of the Main Survey. Indeed, we agree that there are a number of legitimate questions about the persuasiveness of the Main Survey, especially if it were the *only* representative evidence submitted in support of certification. But as we have mentioned, the Main Survey was but one piece of the plaintiffs' representative evidence—evidence that also included hundreds of internal

team schedules and public game schedules, payroll data, and the testimony of both players and league officials.

At minimum, if the players are "employees" under either Arizona or Florida law and defendants are unable to prove that any affirmative defenses apply, the team schedules will serve to conclusively demonstrate that the players spent time working for which they were uncompensated. *See* Ariz. Rev. Stat. Ann. § 23-362; Ariz. Admin. Code. § R20-5-1202(19) ("'Hours worked' means all hours for which an employee covered under the Act is employed and required to give to the employer, including all time during which an employee is on duty *or at a prescribed work place* and all time the employee is suffered or permitted to work."); 29 C.F.R. § 778.223 ("As a general rule the term 'hours worked' will include: (a) All time during which an employee is required to be on duty *or to be on the employer's premises or at a prescribed workplace* and (b) all time during which an employee is suffered or permitted to work whether or not he is required to do so.").[22] Moreover, if plaintiffs can persuade a jury that their workday began at a particular time—either because they were required to report at that time,[23] or because they arrived of their own volition but

[22] We rely on interpretations of the FLSA here because Florida's constitution provides that "case law, administrative interpretations, and other guiding standards developed under the federal FLSA shall guide the construction of [the constitutional amendment providing for a minimum wage] and any implementing statutes or regulations." Fla. Const. art. X, § 24.

[23] *See* 29 C.F.R. § 790.6 ("If an employee is required to report at the actual place of performance of his principal activity at a certain specific time, his 'workday' commences at the time he reports there for work in accordance with the employer's requirement.").

engaged in work activities upon arriving (i.e., were "permitted" to work)—the continuous workday doctrine eliminates the need for plaintiffs to prove which activities they engaged in throughout the day.[24] *See IBP*, 546 U.S. at 28, 32–37.

Defendants should not "be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [they] kept records in accordance with the [statutory] requirements," even if their "lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work." *Mt. Clemens*, 328 U.S. at 688. "Having received the benefits of such work, [defendants] cannot object to the payment for the work on the most accurate basis possible under the circumstances." *Id.*

**2.**

We next address whether the district court was correct to hold that predominance had been met for the California class. Given the differences in the types of claims brought by the California class as compared to the Arizona and Florida classes, certification of the California class is more complex and requires additional analysis. Unlike the Arizona and Florida classes, the California class brought claims relating to work performed during the championship season—a time when the players *do* get paid, albeit not much. As a result, in order to prove liability on their overtime claims, the California class must show that its

[24] A jury may also decide that for baseball players, activities like hitting practice with coaches and supervised weightlifting—much like knife-sharpening by butchers at a meatpacking plant— are "integral and indispensable" to the principal activity of playing baseball and therefore trigger the start of the "workday." *See Mitchell*, 350 U.S. at 261–63.

members worked more than 8 hours in a day, more than 40 hours in a week, and/or worked 7 days in a workweek. *See* Cal. Labor Code § 510; *Mendoza v. Nordstrom, Inc.*, 393 P.3d 375, 381–82 (Cal. 2017). Likewise, to establish liability on their minimum wage claims, the California class must demonstrate that they worked hours for which they were not paid at least minimum wage—but whereas the Arizona and Florida classes can demonstrate liability simply by showing they worked any hours, the California class's burden is made more challenging by the fact that the players receive some pay. *See* Cal. Labor Code §§ 1182 et seq; *Armenta v. Osmose, Inc.*, 37 Cal. Rptr. 3d 460, 466–68 (Cal. Ct. App. 2005). Nonetheless, a number of considerations lead us to affirm the district court's determination.

First, as with defendants' uniform policy of not paying players for participation outside of the championship season, defendants do not credibly dispute that their policy is to never pay overtime and to pay a fixed salary, regardless of the actual number of hours worked. We reiterate that common corporate policies like this "carry great weight for certification purposes," *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d at 958, and that predominance is "rarely" defeated in cases where such uniform policies exist. *See* 7 Newberg on Class Actions § 23:33 (5th ed. 2012).

Second, the team schedules alone—independent of the Main Survey or any other evidence—may suffice to show overtime liability. As the district court noted, plaintiffs' expert testified that approximately 65–85% of California League players had at least one workweek with games on all seven days, and that nearly half of all workweeks included games on all seven days. For those workweeks, the players

Case: 17-16245, 08/16/2019, ID: 11399316, DktEntry: 91-1, Page 53 of 89



would be entitled to overtime pay for their work on the seventh day of the workweek. *See* Cal. Labor Code § 510.

Third, and most significantly, we are persuaded that under *Tyson*, the representative evidence plaintiffs offered was adequate to meet their burden at this stage. As we observed in the preceding section, defendants do identify multiple legitimate criticisms of the Main Survey, and it is certainly possible that a jury may not find the Main Survey—even in combination with all of plaintiffs' other evidence—adequate proof of liability (or at least not to the extent plaintiffs allege). In particular, a jury may be persuaded by defendants' arguments that players did not begin compensable work upon arriving at the ballpark or that players stopped engaging in compensable work long before they left the ballpark, such that the Main Survey's estimated arrival and departure times are insufficient to clear the preponderance hurdle. As we explain below, however, *Tyson* counsels that such criticisms do not doom certification here *unless* no reasonable jury could conclude that the combination of the Main Survey and plaintiffs' other representative evidence was probative of the amount of time players actually spent performing compensable work. *See Tyson*, 136 S. Ct. at 1046–49. And while defendants correctly point out that the Main Survey revealed meaningful variations in players' arrival and departure times, the same was true of the employees' donning and doffing times in *Tyson*—yet such variation did not preclude certification there. *See id.* at 1043; *id.* at 1055 (Thomas, J., dissenting).

Because defendants do not challenge the district court's ruling on admissibility under *Daubert*, the defects they have identified with the Main Survey could only have defeated certification upon a conclusion that all of the representative evidence offered—the Main Survey, schedules, testimony,

and the like—could not have "sustained a reasonable jury finding as to hours worked in each employee's individual action." *See Tyson*, 136 S. Ct. at 1046–47. As in *Tyson*, the district court "made no such finding," *id.* at 1049, and indeed found the opposite:

> Plaintiffs will be able to use the survey data in combination with other evidence that may be sufficient to allow a jury to draw conclusions based on reasonable inference as to when players were required to be at the ballpark and how long after games they were required to remain at the ballpark. . . . Thus, as in *Tyson Foods*, it appears that representative evidence can be combined with actual records of time spent engaged in the various activities to derive a reasonable estimate of the amount of time worked by class members.

We are then left to ask whether "the record here provides [a] basis for [us] to second-guess that conclusion." *Id.*

After reviewing the record, we are satisfied that we should not disturb the district court's determination, in part due to California's expansive definition of "employ" and "hours worked."[25] Under California law, to "employ"

[25] Unlike Arizona and Florida law—the former of which is silent on the incorporation of FLSA doctrines, and the latter of which expressly incorporates them—we are not persuaded that the continuous workday rule should apply to the California class. We view California's definition of "hours worked" as more expansive and more employee-friendly than under the FLSA, even with the incorporation of the continuous workday rule. The California Supreme Court has "cautioned against confounding federal and state labor law," and has consistently held that "absent

means "to engage, suffer, *or permit* to work." Cal. Code Regs. tit. 8, §§ 11040(2)(E), 11100(2)(E) (emphasis added).[26] "Hours worked" means "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. tit. 8, §§ 11040(2)(K), 11100(2)(H). Inexplicably, however, defendants claim that under California law, "time spent engaging in activities that are not required by, or under the control of, an employer is not compensable and does not begin or extend a workday." This is a tortured and wholly unsupported reading of the law, and is manifestly contrary to one of the cases defendants themselves cite in support of their argument. *See Morillion v. Royal Packing Co.*, 995 P.2d 139, 143 (Cal. 2000) ("[T]he two phrases—'time during which an employee is subject to the control of an employer' and 'time the employee is suffered or permitted to work, whether or not required to do so'—can also be interpreted as independent factors, each of which defines whether certain time spent is compensable as 'hours worked.'") (citation omitted).

---

convincing evidence of the [California agency's] intent to adopt the federal standard for determining whether time is compensable under state law, we decline to import any federal standard, which expressly eliminates substantial protections to employees, by implication." *Troester v. Starbucks Corp.*, 421 P.3d 1114, 1119 (Cal. 2018) (alterations, citations, and internal quotation marks omitted).

[26] The California Industrial Welfare Commission's wage orders "have the force of law." *Alvarado v. Dart Container Corp. of Cal.*, 411 P.3d 528, 532 (Cal. 2018). We need not decide today which wage order applies to minor league players, as all of the most relevant orders define "employ" and "hours worked" the same way.

Indeed, *Morillion* counsels that "hours worked" includes all time the employer "permit[s]" an employee to work, even if the work is *not* required and the employee is *not* under the employer's control. *See id.* Thus, a player who arrives early or stays late at the ballpark of their own volition and performs "work" activities during that time is still owed compensation because the player was "permitted" to work, despite the work not being required.

Likewise, under *Morillion*, if players were expected to arrive or depart at a particular time—whether that requirement was de facto or official—it is immaterial what activities the players actually engaged in while at the ballpark. Even if the players spent their time at the ballpark doing things like eating or showering, they were still under their employer's control and unable "to use the time effectively for their own purposes," and thus were owed compensation. *See id.* at 146. Indeed, *Morillion* explicitly rejected an analogous argument by the employer in that case:

> We reject Royal's contention that plaintiffs were not under its control during the required bus ride because they could read on the bus, or perform other personal activities. Permitting plaintiffs to engage in limited activities such as reading or sleeping on the bus does not allow them to use the time effectively for their own purposes . . . Plaintiffs were foreclosed from numerous activities in which they might otherwise engage if they were permitted to travel to the fields by their own transportation. Allowing plaintiffs the circumscribed activities of reading or sleeping does not affect, much less eliminate, the control Royal exercises by

> requiring them to travel on its buses and by prohibiting them from effectively using their travel time for their own purposes. Similarly . . . listening to music and drinking coffee while working in an office setting can also be characterized as personal activities, which would not otherwise render the time working noncompensable.

*Id.* (alterations, internal quotation marks, and citations omitted). Thus, if plaintiffs use their representative evidence—especially the Main Survey and the testimony of players and league officials—to persuade a jury that they were required to be at the ballpark at particular times, they need not show how the players spent that time.

The fourth and final consideration weighing in favor of affirming the district court's determination is our standard of review. Abuse of discretion is always a relatively deferential standard, but when we review a grant of class certification, "we accord the district court noticeably more deference than when we review a denial." *Abdullah*, 731 F.3d at 956 (citation omitted). Were we to review de novo, this would likely be a closer call. But as they say, tie goes to the runner—and, under our deferential standard, to the district court.

**D.**

Finally, defendants, citing to *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011), contend that the district court was required to "rigorously analyze" the Main Survey, rather than evaluating its admissibility under *Daubert* and its appropriateness for meeting class certification requirements under *Tyson*. *Tyson* requires that we reject this argument. There, the Court explicitly distinguished the use of

representative evidence to establish hours worked in wage and hour claims from the use of representative evidence in cases like *Wal-Mart*. *Tyson*, 136 S. Ct. at 1048. Specifically—as we have explained—for wage and hour cases where the employer has failed to keep proper records, *Tyson* holds that once a district court has found expert evidence to be admissible, it may only deny its use to meet the requirements of Rule 23 certification if "no reasonable juror" could find it probative of whether an element of liability was met. *Id.* at 1049. Given the similarities between this case and *Tyson*, the rule set forward in *Tyson* controls, and "[defendants'] reliance on *Wal-Mart* is misplaced."[27] *Id.* (citation omitted).

## IV.

We next address whether the district court properly certified the FLSA collective action.

FLSA permits employees to bring lawsuits on behalf of "themselves and other employees similarly situated." 29 U.S.C. § 216(b). We recently delineated the appropriate standard for FLSA collective certification in *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018). As we explained in *Campbell*, "there is no established definition of the FLSA's 'similarly situated' requirement, nor is there an established test for enforcing it." *Id.* at 1111 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). In *Campbell*, we rejected both the minority approach to FLSA collective certification—which treats a FLSA collective as analogous to a Rule 23(b)(3) class—and

[27] *Tyson* expressly cautioned that this rule should be read narrowly and not assumed to apply outside of the wage and hour context. 136 S. Ct. at 1049.

the majority "ad hoc" approach. *Id.* at 1111–1117. The former approach, we observed, is inconsistent with the statute itself, as well as the choice of Congress and the Advisory Committee on Rules to distinguish FLSA collectives from Rule 23 class actions. *Id.* at 1111–1113. And while the latter approach—the so-called ad hoc approach—is a "significant improvement" over the minority approach, it has two major flaws that led us to decline to adopt it. *Id.* at 1113–1116. First, this approach inappropriately "focus[es] on differences rather than similarities among the party plaintiffs," leading district courts to "treat[] difference as disqualifying," rather than "treat[ing] the requisite kind of similarity as the basis for allowing partially distinct cases to proceed together." *Id.* at 1117. Second, because the ad hoc approach allows district courts to weigh "fairness and procedural considerations," it "invites courts to import, through a back door, requirements with no application to the FLSA," such as Rule 23's predominance, adequacy, and superiority requirements. *Id.* at 1115.

Because of the flaws in the two predominant approaches to FLSA collective certification, we instead developed our own standard: "[p]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.* at 1117. Significantly, as long as the proposed collective's "factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Id.* at 1114 (emphasis omitted).

The district court here did not have the benefit of our opinion in *Campbell*, and instead followed the vast majority of district courts in this circuit by applying the ad hoc

approach. *See, e.g.*, *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1127 (N.D. Cal. 2009) ("Although various approaches have been taken to determine whether plaintiffs are 'similarly situated,' district courts in this circuit have used the *ad hoc*, two-tiered approach."). While legally incorrect, we conclude that the district court's erroneous use of the ad hoc approach was harmless under the circumstances,[28] and we affirm the collective's certification.

The district court found that plaintiffs met their burden of demonstrating they were "similarly situated," reasoning:

> First, by eliminating the winter conditioning claims and pursuing on a classwide basis only claims that are based on the continuous workday doctrine, Plaintiffs have significantly reduced the need to engage in individualized inquiries relating to the type of work performed. Second, the Court is now persuaded that the payroll records maintained by Defendants will allow any variations in compensation to be analyzed without burdensome individualized inquiries. This is especially true as to the spring training, extended spring training and instructional league claims because players generally were not compensated for their participation in these activities and the small fraction of players who *did* receive compensation for

[28] As we explained in *Campbell*, the ad hoc approach imposes a higher bar for certification than the FLSA requires. *See Campbell*, 903 F.3d at 1114–1116. Thus, if the collective was appropriately certified under the more stringent ad hoc approach, *a fortiori* the collective would be appropriately certified under *Campbell's* more lenient approach to "similarly situated." *See id.*

> these activities can be identified using payroll records maintained by Defendants. Third, as discussed above, the Court finds that the defenses asserted by Defendants to the FLSA present common questions that are not likely to be overwhelmed by the need to conduct individualized inquiries. Finally, the possibility that the Court will be required to apply the laws of numerous states (or at a minimum, conduct numerous choice of law inquiries) is not present as to the FLSA class, which will require the Court to apply only federal wage and hour law.

Defendants' arguments in support of reversal echo those they make in relation to the Rule 23(b)(3) classes, and we reject them for largely the same reasons. *Cf. Tyson*, 136 S. Ct. at 1036 ("For purposes of this case . . . if certification of respondents' class action under [Rule 23] was proper, certification of the collective action was proper as well."). We therefore expand on our earlier reasoning only briefly.

Because the FLSA collective covers work performed during spring training, extended spring training, and the instructional leagues—that is, work for which the players received no pay—we affirm the certification of the collective for that work. Specifically, for these time periods, two common legal questions drive the litigation: are the players employees, and do the activities they perform during those times constitute compensable work? As nearly all players are unpaid during these time periods, if the answers to those two questions are resolved in plaintiffs' favor, liability may be established by showing that the players performed *any* work.

We also affirm the district court's certification of the FLSA collective as to plaintiffs' overtime claims, although this holding requires additional explanation. Critical to our decision is that plaintiffs allege a single, FLSA-violating policy—the failure to pay overtime under any circumstances—and argue a common theory of defendants' statutory violations: that defendants "suffer or permit" plaintiffs to perform compensable work before and after scheduled practice and game times. These are "similar issue[s] of law or fact material to the disposition of their FLSA claims," thus making plaintiffs "similarly situated." *Campbell*, 903 F.3d at 1117. And as previously discussed, we believe a reasonable jury could find that all of plaintiffs' evidence—not just the Main Survey, but also the schedules, testimony, and payroll data—sustains a "just and reasonable inference" as to the hours players actually worked. *See Tyson*, 136 S. Ct. at 1046–47.

Specifically, there are several overlapping ways that plaintiffs may be able to rely on their representative evidence to persuade a jury that they have worked overtime hours for which they were not compensated. Under any of these scenarios, the continuous workday rule lends significant assistance to plaintiffs by eliminating the need for plaintiffs to prove exactly which activities they engaged in throughout the day. *See IBP*, 546 U.S. at 28, 32–37.

First, plaintiffs could potentially use their evidence—particularly the Main Survey, but also the testimony of players and league officials—to establish approximate times that they were *required* to arrive at and depart from the ballpark. This would obviate the need for plaintiffs to demonstrate which activities they engaged in upon arrival or prior to departure. *See* 29 C.F.R. § 790.6 ("If an employee is required to report at the actual place of performance of his

principal activity at a certain specific time, his 'workday' commences at the time he reports there for work in accordance with the employer's requirement."); 29 C.F.R. § 778.223 ("As a general rule the term 'hours worked' will include . . . [a]ll time during which an employee is required to be on duty *or to be on the employer's premises or at a prescribed workplace*.") (emphasis added).

Second, plaintiffs could rely on their representative evidence to demonstrate that before and after the times they were *required* to be at the ballpark, they still performed activities at the ballpark that were "an integral and indispensable part of [their] principal activities" and were therefore compensable. *See IBP*, 546 U.S. at 29–30. As mentioned previously, a jury may well determine that activities like batting practice or supervised weightlifting are to baseball players what knife-sharpening is to butchers at a meatpacking plant—that is, activities that are "integral and indispensable" to the principal activity of playing baseball. *See Mitchell*, 350 U.S. at 261–63. If so, such activities would trigger the start of the "workday" within the meaning of the FLSA. Plaintiffs may have somewhat of an uphill battle proceeding under this second theory on a collective-wide basis, but we are certainly not prepared to say that *no* reasonable jury could find defendants liable for overtime violations under this theory. *See Tyson*, 136 S. Ct. at 1048–49; *cf. Campbell*, 903 F.3d at 1117–1119 (explaining that post-discovery decertification motions should be evaluated under the summary judgment standard where "overlap exists between the availability of the collective action mechanism and the merits of the underlying claim").

Finally, if internal team schedules establish that plaintiffs had required team-related activities for forty hours

a week,[29] then plaintiffs can establish liability simply by showing that they performed *any* additional work beyond those officially-scheduled times. *Cf. Tyson*, 136 S. Ct. at 1036 (Thomas, J., dissenting) (explaining that in *Mt. Clemens*, the employer was "presumptively liable to all employees because they all claimed to work 40 hours per week. All additional uncompensated work was necessarily unpaid overtime.") (citation omitted).

Under any of these theories, damages will inevitably be individualized, at least to some extent. But just as the need for individualized damage calculations is insufficient to defeat Rule 23 certification, "[i]ndividual damages amounts cannot defeat collective treatment under the more forgiving standard" for FLSA collective certification. *See Campbell*, 903 F.3d at 1117 (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). District courts are well-equipped to deal with issues of individualized calculations in the wage-and-hour context, and may use "any of the practices developed to deal with Rule 23 classes facing similar issues." *Id.* at 18 (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014)).

---

[29] Given the internal team schedules in the record, this may be an easy task, particularly for spring training and extended spring training. For example, a spring training schedule for one of the San Francisco Giants' affiliates involved a workday beginning at 6:30 AM on the day of a 1:00 PM away game, with a 50 minute window provided for transit between the training facility and the ballpark. Assuming for the sake of argument that the 1:00 PM game lasted 2.5 hours and that the return trip to the training facility took the same amount of time—50 minutes—as the outgoing trip, that day alone entailed approximately 10 hours of work *if* the players left the training facility immediately upon their return (and based on the testimony in the record, that assumption seems implausible).

As is true in all FLSA cases, underlying our decision today is the background principle that "because the FLSA is a remedial statute, it must be interpreted broadly." *Lambert v. Ackerley*, 180 F.3d 997, 1003 (9th Cir. 1999) (en banc) (citing *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)). After all, the FLSA does not deal "with mere chattels or articles of trade but with the rights of those who toil." *Tennessee Coal*, 321 U.S. at 597. We are satisfied that certification of the collective is not only appropriate under our interpretation of "similarly situated," but also that it is consistent with "the great public policy" embodied by the FLSA. *Mt. Clemens*, 328 U.S. at 687.

## V.

For the reasons explained above, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

Plaintiffs-Appellants/Cross-Appellees shall recover their costs on appeal.

---

IKUTA, Circuit Judge, dissenting:

The proposed classes here comprise employees who reside in at least 19 states, who are suing employers who are headquartered in at least 22 states, relating to work that took place in three different states. Determining whether to certify a class in these cases would (among other things) require identifying the relevant laws of each of the potentially affected jurisdictions, examining each jurisdiction's interest in the application of its own law to determine whether a true conflict exists, and then deciding which jurisdiction's interest would be most impaired if its

law were not applied. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1202–03 (2011). No wonder the district court concluded that consideration of the plaintiffs' claims on a classwide basis would be overwhelmed by individualized choice-of-law inquiries.

Yet the majority feels empowered to cut through all these complexities by applying a simple rule of its devise: just apply the law of the jurisdiction where the work took place. Under this simple formula, each class can readily be certified without any fuss. One may admire the simplicity of this rule—but unfortunately, it is contrary to our framework for analyzing the intersection of class action and choice-of-law issues, overlooks the complexity of California's choice-of-law rules, and creates significant practical and logistical problems. I therefore dissent.

**I**

The plaintiffs in this case are current or former Minor League Baseball players who played during the period from 2009 to 2015. They sued Major League Baseball (MLB) (which they argue is a joint employer of all minor league players) and the MLB Clubs for which they worked for violations of federal and state labor laws, including the federal Fair Labor Standards Act, state minimum wage laws, and state overtime laws. The plaintiffs argue that they were entitled to the minimum wage and overtime rates established by California, Arizona, or Florida for work they performed in those states.

MLB is an unincorporated association headquartered in New York. The MLB Clubs, which are corporate entities that own MLB teams, are members of the MLB. All told, there are 30 MLB Clubs, based in 17 states throughout the United States (with one Club located in Canada). The MLB

Clubs employ around 6,000 minor league players. Each of these players signs a Uniform Player Contract, which governs the employment relationship between the player and an MLB Club. The Uniform Player Contract contains a New York choice-of-law provision.

Each MLB Club is associated with at least six minor league affiliate teams; most Clubs have seven or eight. Minor league affiliate teams are loose associations or groups, rather than corporate entities; they do not function as employers. The minor league teams are located in one of 44 different states.

Each spring, each Major League Club sends its minor league players to spring training in either Arizona or Florida. Following spring training, the Club assigns selected employee-players to play on one or more of its minor league affiliate teams. Employees who are not selected to play on an affiliate team remain at the Arizona or Florida facilities for extended spring training. The Clubs reassign their employee-players to different minor league affiliate teams throughout the five-month championship season, sometimes playing on a minor league team for only a single game.

During each championship season, the affiliate minor league teams play against other teams in one of several minor leagues. One of these minor leagues, the California League, is comprised of eight to ten minor league affiliate teams. During the 2010 through the 2015 championship seasons, a total of 2,113 minor league players were assigned to play for affiliate teams in the California League. While the California League plays its championship season games only in California, the players participating in the California League are employees of MLB Clubs located in one of six different states: California, Arizona, Ohio, Colorado, Washington, or Texas. Several of the plaintiffs in this appeal

who played in the California League during the championship season worked for MLB Clubs located outside of California. For example, Ryan Kiel, who played in the California League on the Bakersfield Braves during part of the 2012 championship season, is a resident of Florida and an employee of the Cincinnati Reds, a Club headquartered in Cincinnati, Ohio. Brad McAtee, a New York resident and another representative of the California class, worked for the Colorado Rockies, a club headquartered in Denver, Colorado; he trained or played in Washington, Arizona, California, and New York. And another California class representative, Mitch Hilligoss, resides in Illinois and was employed by both the New York Yankees and the Texas Rangers. He played not only in California, but also in Arizona, Texas, and South Carolina during the 2010 and 2011 seasons. In short, the potentially affected jurisdictions include: (1) Arizona and Florida, where the employees trained for varying lengths of time; (2) the states in which the players reside, which includes at least 19 states (only accounting for the 61 class representatives); and (3) the states in which the players' employers (the 22 MLB Clubs) are located. Because the employees argue that MLB (headquartered in New York) is also an employer, and because the Uniform Player Contract provides that the laws of New York apply to any dispute under the contract, New York minimum wage and overtime law is likewise applicable.

Plaintiffs initially sought certification of eight classes under Federal Rule of Procedure 23(b)(3): a California class, a Florida class, an Arizona class, a North Carolina class, a New York class, a Pennsylvania class, a Maryland class, and an Oregon class. The district court declined to certify the plaintiffs' proposed classes, in part because they presented significant choice-of-law problems that could not

be handled on a classwide basis. The plaintiffs then moved for reconsideration, narrowing the proposed classes to the Florida and Arizona classes,[1] and the California class.[2] The proposed Arizona class consists of players who are employees of Major League Baseball Clubs located in 14 states, who are residents of at least 13 states (only accounting for the 25 class representatives), and who were assigned to spring training in Arizona for four weeks or more. The proposed Florida class consists of players who are employees of Major League Baseball Clubs located in 17 states, who are residents of at least 13 states (only accounting for the 29 class representatives), and who were assigned to spring training in Florida for four weeks or more. The proposed California class consists of 2,113 players who are employees of the 11 Major League Baseball Clubs that had affiliate teams in the California League during the 2010 through 2015 championship seasons, who are residents of at least 11 states (only accounting for the named class representatives), and who played on an affiliate team in the California League during the 2010 through 2015 championship seasons.

[1] The Florida and Arizona classes were defined (respectively) as including "[a]ny person who, while signed to a Minor League Uniform Player Contract, participated in spring training, instructional leagues, or extended spring training in [Florida or Arizona] on or after Feb 7, 2009, and had not signed a Major League Uniform Player Contract before then."

[2] The California class was defined as "[a]ny person who, while signed to a Minor League Uniform Player Contract, participated in the California League on or after February 7, 2010, and had not signed a Major League Uniform Player Contract before then."

The district court declined to certify a Florida class and an Arizona class of plaintiffs under Rule 23(b)(3) of the Federal Rules of Civil Procedure.[3] It held that under California choice-of-law principles, the problems that would have to be navigated in order to adjudicate the claims of the Florida and Arizona classes presented significant individualized issues that could not be handled on a classwide basis. We review this determination for abuse of

---

[3] Rule 23(b)(3) provides that:

> A class action may be maintained if Rule 23(a) is satisfied and if: . . .
>
> > (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> >
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. Proc. 23(b)(3).

discretion. *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 956 (9th Cir. 2013).

## II

A brief summary of the legal framework for deciding whether choice-of-law issues preclude certifying a class under Rule 23(b)(3) is helpful here. In short, before certifying a class under this provision, the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). When the plaintiffs bring a class action involving multiple jurisdictions, a court must consider the impact of potentially varying state laws. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1188–89 (9th Cir. 2001). If the forum state's substantive law may be constitutionally applied to parties in other states, the district court must apply the forum state's choice-of-law rules to determine which laws apply. *See Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589–90 (9th Cir. 2012). After applying the forum state's choice-of-law rules, if the district court determines that the laws of only one state apply, then variations in state law do not raise a barrier to class certification. *See id.* at 590–91. But if the plaintiffs' claims must be adjudicated under the laws of multiple jurisdictions, the district court will have to determine whether the complexities and managerial problems defeat predominance. *See Zinser*, 253 F.3d at 1188–89.

The forum state here is California, and thus California's choice-of-law rules apply. A brief dive into the history of California's choice-of-law jurisprudence indicates that California has long rejected the approach that the majority now adopts.

Case: 17-16245, 08/16/2019, ID: 11399316, DktEntry: 91-1, Page 72 of 89



In the first half of the twentieth century, California courts agreed that it was "the settled law in the United States that an action in tort is governed by the law of the jurisdiction where the tort was committed." *Loranger v. Nadeau*, 215 Cal. 362, 364–66 (1932), *overruled in part by Reich v. Purcell*, 67 Cal. 2d 551 (1967). California courts would therefore generally "determine the substantive matters inherent in the cause of action by adopting as their own the law of the place where the tortious acts occurred, unless it [was] contrary to the public policy of" California. *Grant v. McAuliffe*, 41 Cal. 2d 859, 862 (1953). This typical approach was reflected in the Restatement (First) of the Conflict of Laws. *See* Restatement (First) of Conflict of Laws § 377 (1934) (applying the law of "[t]he place of the wrong"). California courts "assumed that the law of the place of the wrong created the cause of action and necessarily determined the extent of the liability." *Reich*, 67 Cal. 2d at 553. Therefore, when the injury at issue occurred in California, courts would generally apply California law. *See Loranger*, 215 Cal. at 364–66.

But this approach came under fire for being an inflexible and mechanical rule. *See Travelers Ins. Co. v. Workmen's Comp. Appeals Bd.*, 68 Cal. 2d 7, 14 n.6 (1967). Moreover, "[i]n a complex situation involving multi-state contacts," California courts realized that "no single state alone can be deemed to create exclusively governing rights." *Reich*, 67 Cal. 2d at 553. In response, California courts began adopting a more flexible approach. *See, e.g.*, *id.*; *Hurtado v. Super. Ct. of Sacramento Cty.*, 11 Cal. 3d 574, 581–82 (1974). In a "landmark opinion . . . for a unanimous court in *Reich v. Purcell*," the California Supreme Court "renounced the prior rule, adhered to by courts for many years, that in tort actions the law of the place of the wrong was the applicable law in a California forum regardless of the issues before the court."

*Hurtado*, 11 Cal. 3d at 579. Instead, California concluded that each state's interest in applying its own law must be evaluated. *See id.* In 1971, the Restatement (Second) of Conflict of Laws reflected the general movement away from the law-of-the-situs approach espoused by the First Restatement by replacing it with a more flexible approach that considered each state's interest in applying its own laws. *See* Restatement (Second) of Conflict of Laws § 6 (1971); *see also id.* introduction (describing the revised approach as an "enormous change" from the "rigid rules" laid out in the First Restatement). California courts described the new approach to choice-of-law principles, which reflected the approach of the Second Restatement, as a "governmental interest approach" that required consideration of the interests of all the involved states. *See, e.g.*, *Dixon Mobile Homes, Inc. v. Walters*, 48 Cal. App. 3d 964, 972 (1975). In *Offshore Rental Co. v. Continental Oil Co.*, the California Supreme Court definitively announced that "[q]uestions of choice of law are determined in California . . . by the 'governmental interest analysis,'" which requires the court to "search to find the proper law to apply based upon the interests of the litigants and the involved states." 22 Cal. 3d 157, 161 (1978).

Today, California courts no longer apply "the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred *without regard to the nature of the issue that was before the court*." *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 97 (2010) (emphasis in original). Instead, California courts apply the three-step governmental interest test. *Hairu Chen v. Los Angeles Truck Ctrs., LLC*, No. S240245, 2019 WL 3281346, at *3 (Cal. July 22, 2019). "First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the

particular issue in question is the same or different." *Id.* (internal quotation marks omitted). If there is a difference, "the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* (internal quotation marks omitted). As the final step, "if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." *Id.* (cleaned up).

Although California choice-of-law cases "continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders," *see McCann*, 48 Cal. 4th at 97–98 (internal quotation marks omitted), California courts have not relied on this general principle to shortcut the required three-part analysis, *see, e.g.*, *Sullivan*, 51 Cal. 4th at 1202. Indeed, in *McCann*, a case on which the majority relies for its rule, Maj. Op. at 30–31, the California Supreme Court walked through each of the steps of the governmental interest analysis to determine whether to apply the law of Oklahoma (where the tort occurred) or California (where the plaintiff resided). 48 Cal. 4th at 96–98. Only after determining at the second step that "each state has an interest in having its law applied under the circumstances of the present case," *id.* at 96, did the court proceed to the third step and determine that Oklahoma law applied, in part because "a failure to apply California law *on the facts of the present case* will effect a far less significant impairment of California's interest," *id.* at 99 (emphasis added). In short, as the California Supreme Court recently

Case: 17-16245, 08/16/2019, ID: 11399316, DktEntry: 91-1, Page 75 of 89



explained, "the governmental interest test is far from a mechanical or rote application of various factors," *Hairu Chen*, 2019 WL 3281346, at *5, and California courts must scrupulously apply each step of the three-step test.[4]

California courts also apply the governmental interest analysis in cases where plaintiffs and defendants raise choice-of-law issues, even outside the tort context. In *Sullivan*, the California Supreme Court applied the governmental interest analysis to a wage-and-hour dispute, in a case where plaintiffs contended California's overtime law governed their work in California, and the defendant contended the laws of plaintiffs' home states governed. 51 Cal. 4th at 1202. *Sullivan* did not merely apply California's overtime law, although California was the site where the work occurred. *See id.* As explained below, *Sullivan* made a detailed analysis of each of the three steps of the governmental interest test. *See id.*

At the same time as California courts were migrating towards the multifaceted governmental interest test espoused by the Second Restatement, California courts also adopted the Second Restatement's approach to contractual choice of law provisions. *See Gamer v. duPont Glore Forgan, Inc.*, 65 Cal. App. 3d 280, 287–88 (1976). Under this test, courts would generally defer to the law of the state chosen by the parties unless either "the chosen state has no substantial relationship to the parties or the transaction and

[4] Indeed, in the California class action context, the California Supreme Court has made clear there are no presumptive choice-of-law rules. Rather, a "trial court cannot reach an informed decision on predominance and manageability without first determining whether class claims will require adjudication under the laws of other jurisdictions and then evaluating the resulting complexity where those laws must be applied." *Hairu Chen,* 2019 WL 3281346, at *5.

there is no other reasonable basis for the parties choice, or . . . application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Nedlloyd Lines B.V. v. Super. Ct. of San Mateo Cty.*, 3 Cal. 4th 459, 465 (1992).

In undertaking the predominance analysis under Rule 23(b), the court is required to consider the full scope of California's choice-of-law framework, including each state's interest in applying its own law, as well as the contractual choice-of-law provision. *See Mazza*, 666 F.3d at 590–91. If individualized choice-of-law inquiries swamp predominance, then the class cannot be certified. *See id.*

**III**

In addressing the choice-of-law framework in the context of a Rule 23(b) inquiry, the majority concedes that the differences in state law involved in this case are material. Maj. Op. at 29–30. But instead of undertaking California's choice-of-law analysis by identifying the relevant laws of each potentially affected jurisdiction and examining each jurisdiction's interest in the application of its own law, the majority sidesteps this analysis entirely by relying solely on its general rule that the jurisdiction where an employee's work occurs has the predominant interest in regulating conduct that occurs within its borders. Maj. Op. at 30–35. Not only is this approach contrary to substantive California law, but the majority's justification of this approach on practical grounds is entirely misguided.

**A**

First, as the above description of California law makes clear, the majority misreads and misapplies substantive California law. In considering whether the district court erred in declining to certify the Arizona and Florida classes, the majority interprets California's choice-of-law rules as establishing the general principle that California has the predominant interest in regulating conduct occurring within its borders. Maj. Op. at 31. In this vein, the majority asserts that *Sullivan* "strongly militates" against concluding that any other state has an interest in wage and hour laws that "would be adequate to overcome the presumption that the state in which the conduct at issue occurs has the 'predominant interest' in applying their own law." Maj. Op. at 37. These conclusions are wrong in two different ways.

Most important, the majority misreads California's choice-of-law rules to conclude that the law of the situs where the work took place controls. This is clearly contrary to California law: as shown above, California courts have expressly rejected the blanket rule that the law of the situs applies, *Travelers*, 68 Cal. 2d at 11, and "when application of the law of the place of the wrong would defeat the interests of the litigants and of the states concerned," they do not apply that law. *Reich*, 67 Cal. 2d at 554; *see also Berhard v. Harrah's Club*, 16 Cal. 3d 313, 316, 323 (1976) (applying California law where the tort occurred in Nevada but the harm was felt in California).[5] Even where, as here, a

[5] The majority also errs in applying substantive California law to determine Arizona's and Florida's interests in the application of their own laws, the second step of California's governmental interest test. Maj. Op. at 30–32. In other words, because the California Supreme Court has expressed a strong interest in regulating wage and hour claims

contractual choice-of-law provision is involved, California applies the law of the parties' choosing only after considering the relevant state interests. *See Nedlloyd*, 3 Cal. 4th at 465. For example, in *Washington Mutual Bank, FA v. Superior Court*, the California Supreme Court analyzed a state class action that involved both a contractual choice-of-law provision and the applicability of the governmental interest test. 24 Cal. 4th 906, 915 (2001). The court determined that the test from the Restatement (Second) of Conflict of Laws under *Nedlloyd* applied to the class action, *id.* at 918, and that if the choice-of-law provision did not apply under *Nedlloyd*, the court must undertake the governmental interest analysis, *id.* at 919–21.

Second, in the context of wage-and-hour disputes, the majority wildly overreads *Sullivan.* In *Sullivan*, the California Supreme Court expressly limited its ruling to the situation before it: the state's interest in applying California labor law to nonresident employees working for a California employer. *Sullivan*, 51 Cal. 4th at 1194–95. The court was careful not to address any other scenario. *See id.* Therefore, the majority's extension of *Sullivan* to establish a general rule that California has a superior interest in applying its law to wage-and-hour claims that arise within its borders, Maj. Op. at 37–38, (let alone generalizing the majority's

---

within its borders, the majority assumes that Arizona and Florida have the exact same interest. To support this assumption, the majority cites California cases which determined—after the application of the governmental interest test—that a particular foreign state had a superior interest in having its law applied. The majority fails to identify any Arizona or Florida opinion expressing such an interest, however. This is clearly wrong. Although the district court is bound to apply the *choice-of-law* provisions of California (the forum state), the district court may not impute California's interest in regulating conduct within its borders to Arizona and Florida.

extrapolation of California's rule to all other states) is not supported by *Sullivan.*

A brief description of *Sullivan* reveals the majority's error. In *Sullivan*, the California Supreme Court responded to a certified question regarding whether California labor law applied to nonresident employees who worked both in California and in other states for a California-based employer. 51 Cal. 4th at 1194. The employees at issue worked as instructors for Oracle Corporation, a large California-based company. *Id.* at 1194–95. Two of the employees were residents of Colorado; while they worked primarily in Colorado, they were required to travel and work in other states, including California. *Id.* at 1195. A third employee was an Arizona resident, but worked 20 days in California. *Id.* Oracle did not pay these employees overtime on the ground that they were exempt under California and federal overtime laws as instructors. *Id.* The employees sued Oracle, seeking unpaid overtime compensation. *Id.* The question certified to the California Supreme Court was whether California overtime law applied to the employees' work in California. *Id.* at 1196.

In its response to the certified question, the California Supreme Court addressed two distinct inquiries: first, whether, as a matter of statutory construction, the California Labor Code's overtime provisions applied to work performed in California by nonresidents, *id.* at 1196–97, and second, whether California's choice-of-law principles directed the court to apply the California Labor Code to the plaintiffs, *id.* at 1202–06. *Sullivan* focused on the question whether a California employer had to pay its employees under California's overtime law or under the overtime law of the state where the employees resided during the period when the employees worked in California. *See id.* at 1196.

Because the employer in that case was Oracle, a resident of California, the court did not have to consider whether the overtime law of the state of a nonresident employer (the issue in our case) might apply.

*Sullivan* first made a point of carefully examining California's overtime statute to ensure it applied to nonresident employees of a California employer. *Id.* at 1197. The court noted that the plain text of the applicable overtime statute stated that the statute applied to "all individuals," which would include residents and nonresidents alike. *Id.* It also noted that the legislature knew how to exclude nonresidents when it wanted to do so, because it had expressly exempted some out-of-state employers from complying with workers' compensation provisions. *Id.* Therefore, *Sullivan* held the overtime statute would apply to the plaintiffs in the case before it.

Because the statute was potentially applicable to nonresidents by its terms, the California Supreme Court then applied California's three-step governmental interest test to determine which state's law applied. *Id.* at 1202–03. *Sullivan* first asked whether the overtime law of California was the same or different than the overtime laws of Colorado and Arizona, where the employees resided. *Id.* at 1203. The court determined that the laws were different. *Id.* Federal overtime law applied in Arizona, and federal law required less overtime compensation than California. *Id.* Colorado overtime law applied in Colorado, but it too required less compensation than California. *Id.*

*Sullivan* next examined "each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* at 1203. Relying on the California statute and case law, *Sullivan* first noted that "California has, and has

unambiguously asserted, a strong interest in applying its overtime law to all nonexempt workers, and all work performed, within its borders." *Id.* Arizona had no overtime law, and Colorado's statute expressly did not apply out of state, so the court found that neither Arizona nor Colorado had "asserted an interest in regulating overtime work performed in other states." *Id.* at 1204. Therefore, there was no true conflict. *See id.* The court acknowledged, however, that states could have an interest in the extraterritorial application of their employment laws under certain limited circumstances. *See id.* at 1199.

The final step in the governmental interest analysis was to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state. *See id.* at 1205–06. The court concluded that California's interests would be more impaired if nonresidents employed in California were covered only by the law of the nonresident's state. *Id.* Among other considerations, *Sullivan* reasoned that adopting a different rule might encourage California employers to hire nonresidents of California to work in California. *Id.* at 1206. By contrast, Colorado and Arizona had no interest in applying their overtime laws to their residents working in California. *See id.*

*Sullivan* therefore concluded that California's overtime law "does apply to overtime work performed in California for a California-based employer by out-of-state plaintiffs in the circumstances of this case." *Id.* The court did not address whether the same rule would apply for a nonresident employer.

Contrary to the majority's conclusion, *Sullivan* did not establish a rule that every California wage-and-hour law applies to all persons working in California regardless of

their state of residence or their employer's state of residence. To the contrary, rather than enunciate such a rule, *Sullivan* carefully analyzed the law and policy of each relevant jurisdiction, consistent with California's governmental interest test. *See id.* at 1202–06. *Sullivan* expressly limited its analysis to the particular facts of the case before it: a case involving California overtime law, a California employer, and employees residing in Arizona and Colorado. *See id.* *Sullivan* specified that it was not applying its rule to out-of-state employers, as is the case here. *Id.* at 1201 (noting that the court did not need to address "the asserted burdens on out-of-state businesses to which Oracle refers," in part because "no out-of-state employer is a party to this litigation[, and] Oracle itself is based in California"). Further, *Sullivan* clarified that its holding did not apply to any California labor law other than the overtime law, explaining, "[w]hile we conclude the applicable conflict-of-laws analysis does require us to apply California's overtime law to full days and weeks of work performed here by nonresidents one cannot necessarily assume the same result would obtain for any other aspect of wage law." *Id.* at 1201 (citation omitted). Indeed, "California's interest in the content of an out-of-state business's pay stubs, or the treatment of its employees' vacation time, for example, may or may not be sufficient to justify choosing California law over the conflicting law of the employer's home state." *Id.*

Moreover, *Sullivan* acknowledged that different outcomes could result under different circumstances. By beginning its analysis with the statutory language, *Sullivan* indicated that the state legislature could decide not to apply its employment laws to some employees who work in-state, *id.* at 1197 (conducting statutory analysis to confirm that the California overtime legislation applied to "any individual"), or could exempt out-of-state employers who send employees

Case: 17-16245, 08/16/2019, ID: 11399316, DktEntry: 91-1, Page 83 of 89



into California from complying with California law, as it did in the case of workers' compensation law, *id.*, or could choose not to apply overtime law to employees who reside out of state, *id.* at 1198. Similarly, *Sullivan* acknowledged that a truck driver employee based at a Washington facility of a California employer could be entitled to overtime compensation under Washington law for the time he spent driving outside the state. *See id.* at 1200, 1204.

In fact, *Sullivan* expressly rejected the arguments that it was adopting a general rule that California's employment laws applied in all contexts, holding instead that disputes in each different context would be "resolved under the applicable conflict of laws analysis." *Id.* at 1200. "In any event," the court explained, "to the extent other states have legitimate interests in applying their own wage laws to their own residents for work performed in California, the applicable conflict-of-laws analysis takes those interests into account." *Id.* at 1202. In other words, *Sullivan* rejected the very approach that the majority now adopts, and instead, *Sullivan* stands for the proposition that the determination of which state's law applies requires a careful analysis of each relevant state's law and policies.

**B**

Second, the majority's argument that practical considerations compel the adoption of a general rule has the situation entirely backwards.

The only practical consideration flagged by the majority is that, absent a rule that the hours and wage laws of the situs always apply to workers within its borders, Maj. Op. at 35–36, employers would be required to properly ascertain the residency status of each of its employees, to track applicable state laws, and to determine which law applies, Maj. Op. at

27–28**.** Such a concern does not arise if the state law at issue merely requires a resident employer to pay each of its employees according to the resident state's laws, even when the employee is working temporarily in another state. In other words, if an MLB Club in Ohio paid each of its player–employees pursuant to Ohio overtime law, the MLB Club would have no extra burden at all. Unlike *Sullivan*, the majority fails to recognize that states may enact many different types of laws, and that conflicts between state laws can be resolved through the application of choice-of-law rules. *Cf. Sullivan*, 51 Cal. 4th at 1201–02.

On the other hand, the rule the majority establishes today could have dire consequences for employers and employees. For example, a rule requiring that the law of the situs always applies would require employers to research and comply with various states' laws whenever their employees traveled for short conferences or business meetings. An employer would have to research applicable state law whenever an employee traveled across state lines, including when an employee was in transit. Presumably, when an employee traveled across state lines by car or airplane, the employer would need to track the amount of time the employee spent in each state during travel in order to comply with this rule. Such a rule would make it difficult for employers to compensate interstate truck drivers or traveling salespersons. Moreover, the majority's rule would also burden employees who would no longer be protected by the laws of their resident state or employer's state while traveling for work, forcing the employees to earn less money for work travel. Rather than adopting a rule that the law of the situs applies, the better solution is faithfully adhering to long-established choice-of-law principles, which resolve the issue in a reasonable and time-tested way.

**IV**

Because it is not possible to derive a general rule from *Sullivan*, and California's choice-of-law rules weigh against any such rule, the majority should have considered the applicability of California's choice-of-law rules to the plaintiffs' claims.

Given that a minimum of 22 states potentially have an interest in applying their wage and hour laws, and that (as the majority concedes) there are material differences between the states, applying California's three-step governmental interest test would be a significant task.

First, as a threshold matter, the court must analyze the contractual choice-of-law provision (i.e., New York) in the governmental law analysis under *Nedlloyd*, 3 Cal. 4th at 466, and the Restatement (Second) of Conflict of Laws. This would require the court to analyze whether New York law has a substantial relationship to the parties or transactions here and whether application of New York law would be contrary to Arizona's or Florida's interests. *See id.* at 465.

Second, if the contractual choice-of-law provision does not govern, a court applying *Sullivan* would first have to determine whether the minimum wage laws and overtime laws of Arizona and Florida apply by their terms to nonresident employees who work for nonresident employers, *Sullivan*, 51 Cal. 4th at 1202–03. Assuming the laws did apply, the court would then have to identify the relevant laws of each of the potentially affected jurisdictions. *See id.* at 1203. It would then have to determine whether there is a conflict between the laws of Arizona and Florida, on the one hand, and the laws of the different states in which the employees and employers reside. *See id.*

If there is a true conflict, then the court would have to compare the nature and strength of each jurisdiction's interest in the application of its own law to determine whether a true conflict exists under the circumstances of the particular case. *See id.* at 1203–05. Contrary to the majority, Maj. Op. at 34–35, other states have an interest in applying their wage and hour laws outside their borders. For example, the Boston Red Sox is an MLB Club headquartered in Boston, Massachusetts, and a franchise defendant in this lawsuit. Massachusetts has previously applied its wage-and-hour laws extraterritorially. *See Dow v. Casale*, 989 N.E. 2d 909 (Mass. App. Ct. 2013). Moreover, MLB Clubs in Illinois, Pennsylvania, New York, and Washington are also defendants in this proposed class action, and courts have applied wage-and-hour laws in those states extraterritorially. *See Baxi v. Ennis Knupp & Assocs., Inc.*, No. 10-cv-6346, 2011 WL 3898034, at *14–15 (N.D. Ill. Sept. 2, 2011); *Truman v. DeWolff, Boberg & Assocs.*, No. 07-cv-1702, 2009 WL 2015126, at *2 (W.D. Pa. July 7, 2009); *Friedrich v. U.S. Comput. Sys., Inc.*, No. 90-cv-1615, 1996 WL 32888, at *8 (E.D. Pa. Jan. 22, 1996); *Pierre v. Gts Holdings, Inc.*, No. 15-cv-143, 2015 WL 7736552, at *1, *5 (S.D.N.Y. Nov. 30, 2015); *Bostain v. Food Express, Inc.*, 159 Wash.2d 700, 709–711 (Wash. 2007) (en banc).[6]

It is not surprising that the district court determined that this type of analysis would defeat the predominance that Rule 23(b)(3) requires. No two player-employees'

[6] The majority notes that, in many cases, state "courts have looked closely at where the relevant work is performed" to determine whether to apply the state's laws extraterritorially. Maj. Op. at 35 n.13. Certainly, state courts look to where the work is performed as one factor to determine which state's law applies. The majority errs by concluding that where the work is performed is effectively the *only* relevant factor in the choice-of-law analysis.

circumstances are alike; the players hail from at least 19 resident states, worked for one or more MLB Clubs based in one of 22 states for varying lengths of time, and played on one or more minor league affiliate teams in an assortment of states for as little as one day or as long as an entire season. *Sullivan* and California's choice-of-law analysis require the court to consider all of the relevant states' laws and weigh the commensurate state interests in applying those laws. The highly individualized nature of the choice-of-law inquiry with respect to each player could swamp the predominance required for certification under Rule 23(b)(3). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998); *Wash. Mut. Bank, FA*, 24 Cal. 4th at 922. In any event, the district court did not abuse its discretion by refusing to certify the Florida and Arizona classes.

For the same reason, the district court erred in certifying the California class without completing its choice-of-law analysis. *Sullivan*'s conclusion does not control where the relevant employer is not a California-based employer. 51 Cal. 4th at 1197–98. While *Sullivan* held that California's overtime laws apply to employees of a California employer who are residents of Arizona and Colorado but work occasionally in California, *Sullivan* did not address the application of both overtime and minimum wage laws to employees of out-of-state employers who work occasionally in California. *Id.* at 1197–98. Instead, *Sullivan* requires a court to apply the three-part governmental interest analysis, including weighing the interests of the employees' and employers' resident states in applying their own laws. *Id.* at 1202–03.

Here, more than half of the MLB Clubs with minor league affiliates that play in the California League are out-of-state employers. Moreover, the plaintiffs argue that the

MLB, a New York-based entity, is also an employer. The players themselves hail from at least 11 states, even if only the 26 class representatives named in this lawsuit were included in the class. In addition, 68.7% to 74.7% of the players who were assigned to a minor league affiliate in the California League also played as a member of a minor league affiliate in a different state during the 2010 to 2015 championship seasons. Approximately 11% of the proposed class members from the 2010 championship season were assigned to an affiliate in the California League for one week or less. *Sullivan* requires that the court weigh each relevant jurisdiction's interest in applying its laws, including all of the relevant variables: whether the players are employed by an out-of-state MLB Club; whether the players are nonresidents of California; whether the players spent only a short time in California; whether any other state's law might apply; and whether that state's interest in applying its own law outweighs California's interest. *See* 51 Cal. 4th at 1202–03. Because the choice-of-law inquiries cannot be neatly solved with a law-of-the-situs rule as the majority suggests, individual choice-of-law issues also appear to defeat predominance for the California class.

## V

No doubt the analysis of the intersection between Rule 23(b)(3)'s predominance inquiry and California's choice-of-law inquiry is multilayered and complex, particularly in a case like this one, involving different types of wage and hour claims, employers residing in multiple states, employees residing in multiple states, and three states where work was performed. But the majority errs in attempting to sidestep the analysis entirely in one fell swoop by the simple expedient of declaring that each jurisdiction generally has a predominant interest in regulating conduct that occurs within

its borders, a conclusion that is contrary to the requirement that California courts undertake the governmental interest analysis in every case. Although the majority gives lip service to the possibility of exceptions to this rule, its failure to consider all the variables in this case to determine whether any exception was applicable here gives the lie to such claimed flexibility. Because the majority's conclusion that courts can sidestep a choice-of-law analysis by relying on a general rule is contrary to our precedents, and because it will impose burdens on employers and disadvantage employees in many circumstances, I dissent.