Nos. 17-15983 & 17-16142

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

CHARLES RIDGEWAY, *ET AL.*

*Plaintiffs, Appellees, and Cross-Appellants,*

*v.*

WAL-MART STORES, INC.

*Defendant, Appellant, and Cross-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 08-05221-SI

# BRIEF OF AMERICAN TRUCKING ASSOCIATIONS, INC., CALIFORNIA TRUCKING ASSOCIATION, CRST EXPEDITED, INC., AND U.S. XPRESS INC. AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT'S PETITION FOR REHEARING AND REHEARING EN BANC

Richard Pianka
American Trucking Associations
950 N. Glebe Road
Arlington, Virginia 22203
Telephone: (703) 838-1889
Facsimile: (703) 838-1705
rpianka@trucking.org

*Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici American Trucking Associations, Inc., and California Trucking Association each has no parent corporation, and no publicly held corporation owns 10% or more of its stock. CRST Expedited, Inc. is wholly owned by Admiralty Holdings, Inc., and no publicly-held corporation owns 10% or more of its stock. U.S. Xpress, Inc., is wholly owned by U.S. Xpress Enterprises, Inc., and no publicly-held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

IDENTITY AND INTEREST OF AMICI CURIAE .......... 1

ARGUMENT .......... 2

A. The Panel Wrongly Held That Wal-Mart's Layover Policy Constituted Control as a Matter of Law. .......... 5

B. The Panel's Holding on the Control Issue Is Incompatible with the Federal Hours-of-Service Framework for Commercial Drivers. .......... 7

C. The Panel's Erroneous Control Holding Has Far-Ranging Implications That Make Rehearing Especially Warranted. .......... 10

CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bono Enterprises, Inc. v. Bradshaw*,
38 Cal. Rptr. 2d 549 (Cal. Ct. App. 1995) .................................... 5, 6, 8

*Chavez v. Converse, Inc.*,
2020 U.S. Dist. LEXIS 7795 (N.D. Cal. Jan. 15, 2020)...................... 11

*Morillion v. Royal Packing Co.*,
995 P.2d 139 (Cal. 2000)............................................................... 5, 6, 7

*Nance v. May Trucking Co.*,
2014 U.S. Dist. LEXIS 5520 (D. Or. Jan. 15, 2014) ....................... 9, 10

*Nance v. May Trucking Co.*,
685 F. App'x 602 (9th Cir. 2017) .......................................................... 9

*Ridgeway v. Wal-Mart Stores, Inc.*,
107 F. Supp. 3d 1044 (N.D. Cal. 2015) ................................................ 3

*Ridgeway v. Wal-Mart Stores Inc.*,
2017 U.S. Dist, LEXIS 66228 (N.D. Cal. May 1, 2017)...................... 10

*Rodriguez v. Taco Bell Corp.*,
896 F.3d 952 (9th Cir. 2018)............................................................ 6, 7

**Regulations**

49 C.F.R. § 386 App. B ¶¶ (a)(3) ............................................................... 9

49 C.F.R. § 386 App. B ¶¶ (a)(4) ............................................................... 9

49 C.F.R. § 395.2.......................................................................................... 8

49 C.F.R. § 395.3(a)(1)................................................................................. 7

## IDENTITY AND INTEREST OF AMICI CURIAE *

American Trucking Associations, Inc. (ATA), is the national association of the trucking industry, comprising motor carriers, state trucking associations, and national trucking conferences, and was created to promote and protect the interests of the national trucking industry. Its direct membership includes approximately 1,800 trucking companies and industry suppliers of equipment and services; and in conjunction with its affiliated organizations, ATA represents over 30,000 companies of every size, type, and class of motor carrier operation. ATA regularly represents the common interests of the trucking industry in courts throughout the nation.

The California Trucking Association (CTA) has over 1,500 members who operate over 350,000 trucks in California. CTA's members transport 85 percent of the shipments that travel on California's highways each day, from self-employed independent contractors (or owner-operators) to large international motor carriers employing thousands of

---

* All parties have consented to the filing of this amicus brief. *See* Circuit Rule 29-2(a). No counsel for either party authored this brief in whole or in part, and no party, party's counsel, or person other than the amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

truck drivers. CTA has been serving the businesses that operate trucks in California for over seventy-five years. Over the years that CTA has represented trucking enterprises in California, it has acquired knowledge and information about the practices and policies that regulate and affect this industry.

Amici CRST Expedited, Inc. and U.S. Xpress, Inc., are for-hire motor carriers who operate in interstate commerce in California (among other states), and employ drivers who often spend off-duty periods in the sleeper berths of their trucks.

ATA, CTA, their members, and the motor carrier amici all have a strong interest in the outcome of this case, which has major implications for the treatment of time that drivers spend off-duty in a truck's sleeper berth under California wage law.

## ARGUMENT

In its petition for rehearing and rehearing en banc, Wal-Mart identifies three crucial holdings that warrant rehearing: (1) the holding that district courts can order defendants to help plaintiffs' counsel find new clients; (2) the standard of "control" that the panel created for purposes of determining whether a driver's layover time is compensable under

California law; and (3) fundamental deficiencies in the putatively "representative" evidence on which classwide liability and damages were based. Amici agree with Wal-Mart on all three of these issues, but limit this brief to the second. This issue is of particular concern to amici, because the panel's holding represents a complete departure from the longstanding, ubiquitous understanding of the law, and has far-reaching implications for the trucking industry.

The district court concluded that, as a matter of law, the "layover" policies articulated in Wal-Mart's pay manual constituted the kind of control that rendered such off-duty time compensable under California law. *Ridgeway v. Wal-Mart Stores, Inc.*, 107 F. Supp. 3d 1044, 1054-55 (N.D. Cal. 2015). But even setting aside the dispute over the meaning of the pay manual[1] and assuming arguendo that the manual's "policy

[1] The parties differ materially on the meaning of the relevant portions of the pay manual—particularly the manual's provision that "exceptions" to the policy of paying drivers an inconvenience fee for taking their layovers in their truck's sleeper berth "must be approved prior to the Layover … including Drivers taking a layover at his/her residence," Pet. App. 20a. According to Wal-Mart, this provision meant—and was understood by the company and drivers alike to mean—that drivers had to seek approval *to receive the layover payment* if they chose to take their layover at home. Pet. App. 19a. The district court and the panel, however, concluded that the permission requirement was not about the

clearly prohibit[ed] drivers from taking a layover at home unless they receive[d] prior approval," Pet. App. 20a, the divided panel erroneously held that a policy of, in effect, requiring drivers to check in with their employer before leaving the workplace renders their off-duty periods per se compensable. That conclusion flies in the face of the relevant precedent; cannot be squared with the off-duty obligations of both motor carriers and commercial drivers under the relevant U.S. Department of Transportation (DOT) regulations and their California counterparts; and calls into serious question the ubiquitous pay practices of not just the trucking industry, but *any* industry where employees are expected to check in with their employer before heading out for the day.

Properly understood and evaluated against other binding decisions interpreting California's "control standard," as a matter of law Wal-Mart's policies, standing alone, do *not* render layover time compensable; at a minimum, as Judge O'Scannlain explained in dissent, whether the policies rose to the requisite level of control was a question for the jury.

---

layover payment but about preapproval for taking a layover at home altogether. Pet. App. 20a.

Given the magnitude of the panel's error and the confusion it will engender, rehearing is urgently warranted.

### A. The Panel Wrongly Held That Wal-Mart's Layover Policy Constituted Control as a Matter of Law.

The panel itself recognized that "[w]hat constitutes control in California is not so clear." Pet. App. 21a. All the more surprising, then, that it proceeded to hold that Wal-Mart's policy manual articulates a level of control sufficient to render driver layovers compensable *as a matter of law*, relying exclusively on a pair of cases involving fundamentally different sets of facts.

In the first of these, *Bono Enterprises, Inc. v. Bradshaw*, 38 Cal. Rptr. 2d 549 (Cal. Ct. App. 1995), *disapproved on other grounds by Tidewater Marine Western, Inc. v. Bradshaw*, 927 P.2d 296 (Cal. 1996), the employer controlled its employees by prohibiting them altogether from leaving the premises during meal breaks, rendering those breaks compensable. And in the second, *Morillion v. Royal Packing Co.*, 995 P.2d 139 (Cal. 2000), the fact that employees were flatly required to travel to their worksite on their employers' buses, and prohibited from using their own transportation, rendered that time subject to the employer's control, and thus compensable. *Id.* at 140.

But as Judge O'Scannlain put it in his partial dissent, "[t]he limited restrictions expressed in Wal-Mart's pay manual are a far cry from those in *Bono* or *Morillion*." Pet. App. 51a. Indeed, whether Wal-Mart's written policy was to require permission for an at-home layover (as plaintiffs contend, and as the panel concluded) or merely gave the company discretion over whether to pay an inconvenience fee for an at-home layover (as Wal-Mart contends), it indisputably did not *prohibit* at-home layovers altogether, and as such stops far short of the level of control that was dispositive in *Bono* and *Morillion*. Those cases, then, cannot establish that Wal-Mart's policy constituted control as a matter of law.

To the contrary, this Court's decision in *Rodriguez v. Taco Bell Corp.*, 896 F.3d 952 (9th Cir. 2018), presents a fact pattern far closer to the one here, and compels the conclusion that Wal-Mart's layover policy does not constitute control as a matter of law. *Taco Bell* concerned an employer policy providing employees with a discounted meal, conditioned on the employee eating the meal on the premises. *Id.* at 954. The plaintiff, relying on *Morillion*, contended that the on-premises restriction meant that "employees are under employer control during the

meal period," rendering them "on duty" and making the meal time compensable. *Id.* at 956. This Court rejected the argument, observing that the *Morillion* court "was careful to limit its holding to those policies that *compelled* employee participation." *Id.* at 957 (emphasis added). This Court in *Taco Bell* recognized that, in the absence of a fixed requirement or prohibition, the control question necessitates an inquiry into whether the employer "so burden[s] the use of employees' break time that employees must be considered 'on duty,'" *ibid.*—an inquiry that the panel's categorical approach in this case leaves no room for. Indeed, the panel's decision (unlike the dissent; *see* Pet. App. 50a) fails to reckon with *Taco Bell* at all.

### B. The Panel's Holding on the Control Issue Is Incompatible with the Federal Hours-of-Service Framework for Commercial Drivers.

The panel's decision that Wal-Mart exercised a level of control over its drivers sufficient to render their layover time compensable, simply by virtue of (putatively) requiring them to obtain permission before taking an at-home layover, also creates an untenable tension with the federal hours-of-service rules. Those rules—which prohibit drivers from driving beyond 14 hours of coming on duty, until they take a 10-hour off-duty period, 49 C.F.R. § 395.3(a)(1)—do not, of course, in and of

themselves purport to dictate what portions of a driver's time are compensable. But they define off duty to exclude not only all time in which drivers work, are "required to be in readiness to work," or are not "relieved from … all responsibility for performing work," but also when they are merely "*attending* a commercial vehicle" while others load or unload it or "*remaining in attendance* upon a disabled vehicle." 49 C.F.R. § 395.2 (emphases added).

Thus, as a practical matter, there is little if any daylight between time that is off-duty for federal hours-of-service purposes (where so much as *attending* the vehicle without performing work renders a driver on-duty) and time that is outside the employer's control (and therefore non-compensable under California law): drivers could not have been required to remain in attendance of their vehicles, as the panel's decision would have it, and at the same time be off-duty for hours-of-service purposes. *See Bono Enters.*, 38 Cal. Rptr. 2d at 554 ("an employee who has a duty or obligation to remain on the premises … is not free of all duty" (internal quotation marks omitted)). The decision, in other words, entails the implausible proposition that both Wal-Mart and its drivers have been engaged in an open and pervasive violation of

the hours-of-service rules—exposing both the carrier and the drivers themselves to steep liability under the DOT regulations, *see* 49 C.F.R. § 386 App. B ¶¶ (a)(3), (a)(4) (civil penalties of up to $15,419 for motor carriers and up to $3,855 for drivers for hours-of-service violations)—which has somehow gone unnoticed.

This Court has, in fact, recognized that drivers are not under the control of a motor carrier simply because they spend their off-duty periods in a truck's sleeper berth. *Nance v. May Trucking Co.*, 2014 U.S. Dist. LEXIS 5520 (D. Or. Jan. 15, 2014), involved driver-trainees assigned to work as a team with more experienced drivers, and who sometimes spent off-duty time in the truck's sleeper berth while the other driver continued to drive. *Id.* at *3-4. The plaintiffs contended that such time was compensable, specifically because, in their view, the motor carrier "'control[ed] [them] while the truck is moving,'" *id.* at *16, even while they were resting in the sleeper berth. The district court rejected that contention as a matter of law, *id.* at *23, and this Court affirmed in relevant part. *See Nance v. May Trucking Co.*, 685 F. App'x 602, 605 (9th Cir. 2017).

The district court here sought to distinguish this case from *Nance* in-

sofar as *Nance* involved claims under the federal Fair Labor Standards Act and Oregon wage law, not California law and its "control" standard. *Ridgeway v. Wal-Mart Stores Inc.*, 2017 U.S. Dist, LEXIS 66228 at *18 (N.D. Cal. May 1, 2017). This is of course true as far as it goes, but it ignores the fact that the plaintiffs in *Nance* themselves based their argument on the allegation that their presence in the sleeper berth left them under the control of their motor carrier—an argument the district court rejected. (The panel's decision does not address the holding of *Nance* at all.) And if drivers are not under the control of their employer when, as a practical matter, they *must* take their off-duty periods in the sleeper berth because the truck remains in motion, it follows *a fortiori* that drivers who at most must seek permission to take their off-duty periods at home are also not subject to control simply by virtue of that policy.

### C. The Panel's Erroneous Control Holding Has Far-Ranging Implications That Make Rehearing Especially Warranted.

The panel's decision finding control here as a matter of law, based primarily on its understanding that Wal-Mart required drivers to ob-

tain permission before taking an off-duty period at home,[2] leaves the trucking industry in a state of grave uncertainty, even for motor carriers whose policies differ from Wal-Mart's. After all, *every* motor carrier has an obligation—both to the motoring public and to its customers—to impose *some* conditions on drivers before they go off-duty, such as requiring that the driver park the truck in a safe, secure, and legal location before beginning an off-duty period elsewhere. No motor carrier would expect that such minor, routine limitations on drivers' ability to unilaterally go off-duty would represent the kind of control that renders the off-duty time compensable.

---

[2] To be sure, the panel's decision gestured at other aspects of the Wal-Mart pay manual, such as limitations on alcohol, weapons, guests, and pets in the cab of the truck. Pet. App. 30a. The overwhelming emphasis, however, is on the putative requirement that drivers obtain permission before taking a layover at home. If there were any doubt that future courts would understand the holding of the panel's decision to turn specifically on the permission issue, a recent decision of the Northern District of California—the first and so far only case to cite the panel's decision here—should dispel it. *See Chavez v. Converse, Inc.*, 2020 U.S. Dist. LEXIS 7795 (N.D. Cal. Jan. 15, 2020). In *Chavez*, the court boiled down the holding of the panel's decision here to the proposition that "Wal-Mart controlled its drivers during layovers because (1) drivers were required to get preapproval before taking a layover at home[;](2) drivers were required to record at-home layovers; and (3) drivers could be subject to disciplinary action for taking unauthorized layovers at home." *Id.* at *5.

But the panel's resolution of the control question here as a matter of law leaves no room for a factual determination of the *degree* of burden such policies impose, either in the abstract or in actual practice. The implication is that if an employer so much as claims the right deny an employee's desire to go off-duty—even if it rarely or never exercises that right—then those off-duty periods are so controlled by the employer as to be compensable. And treating the issue as question of law renders irrelevant the question whether drivers chose to remain in the truck's sleeper berth because *they* found it more convenient to do so than to go home for their layover period—in other words, it renders irrelevant the question whether they were *actually* constrained in any meaningful way by their employer.

The ramifications here go beyond the trucking industry—after all, requiring employees to obtain permission before leaving for the day is hardly uncommon. Lawyers, for example, may require support staff to check in before heading out, in case there is some pressing matter that will require them after hours. Retail and restaurant workers may be required to check in with their managers before the end of their shift, in case coverage gaps mean they will have to stay late. Surely no one

would contend that California law requires such employees to continue to be paid if, for example, they chose to remain in their employer's break room reading a novel for some period of time after their shift (perhaps because they had a nearby social engagement later in the evening), simply by virtue of the fact that their employer *might* have required them to remain on the premises even if they had wished to leave.

But that, again, is the thrust of the panel's decision: because a driver *could* in theory have been told not to go home, their time remains under their employer's control even if the decision to remain in the cab was wholly voluntary on their part as a factual matter. The decision is, thus, potentially radically at odds with the stable understanding of both employers and employees—in the trucking industry and elsewhere—of what constitutes compensable time under California law. And left intact, it will usher in a massive new wave of minimum wage litigation and require district courts to struggle with the implications of the panel's sweeping holding. Instead, rehearing should be granted, and the panel's treatment of the control issue here as a matter of law should be rejected.

## CONCLUSION

For the reasons stated above and in the petition, the Court should grant panel rehearing or rehearing en banc.

Dated: January 31, 2020

Respectfully submitted,

/s/ Richard Pianka

Richard Pianka
ATA Litigation Center
950 N. Glebe Road
Arlington, Virginia 22203
(703) 838-1889

*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(G)

1. This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(2) because this brief contains 2,778 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century font.

DATED: January 31, 2020

/s/ Richard Pianka
Richard Pianka
*Attorney for Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 17-15983 & 17-16142

I am the attorney or self-represented party.

**This brief contains 2,778 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Richard Pianka **Date** Jan. 31, 2020
*(use "*s/[typed name]*" to sign electronically-filed documents)*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 31st day of January, 2020, I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED: January 31, 2020

/s/ Richard Pianka
Richard Pianka
*Attorney for Amici Curiae*